UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MUSAB ABUHAMDAN, on Behalf of Himself and Others Similarly Situated, | ) ) ) | Case No. |
| Plaintiff, | ) ) | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| vs. | ) ) ) | CLASS ACTION |
| BLYTH, INC., ROBERT B. GOERGEN and ROBERT H. BARGHAUS, | ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) | November 12, 2012 |

## NATURE OF THE ACTION

Plaintiff, Musab AbuHamdan, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Blyth, Inc. ("Blyth" or the "Company") and its wholly-owned subsidiary ViSalus, Inc. (fka FVA Ventures, Inc.) ("ViSalus"), as well as media reports about the Company and ViSalus and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1.      This is a securities class action on behalf of all purchasers of the common stock of Blyth between March 14, 2012 and November 6, 2012, inclusive (the "Class Period"), seeking remedies pursuant to §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). "Defendants" include Blyth and its founder, controlling shareholder, Chief Executive Officer ("CEO") and Chairman of its Board of Directors (the "Board"), Robert B. Goergen ("Goergen"), and its Vice President and Chief Financial Officer ("CFO") Robert H. Barghaus ("Barghaus").

2.      Defendant Blyth is a marketing and manufacturing company that sells personal and decorative products throughout North America, including candles under the Cape Cod and Colonial brand names. Blyth sells through several websites, the Miles Kimball catalog, and a direct selling arm that operates PartyLight house parties. The Company was founded by Goergen in 1977 and is headquartered in Greenwich, Connecticut.

3.      ViSalus is a multilevel marketing company headquartered in Los Angeles, California with offices in Troy, Michigan. ViSalus markets weight management nutritional products, dietary supplements, and energy drinks in the United States and Canada, employing a person-to-person direct marketing model. ViSalus' weight-management products, which include Vi-Shape meal

replacement shakes and Vi-Trim Clear Control Drink Mix, form the bulk of its sales. ViSalus sells its products by multi-level marketing through a network of independent distributors who pay a start-up package fee to join ViSalus' sales force. Distributors who qualify for commissions are compensated based on sales of products and from sales made by any distributors they recruit (*i.e.*, the "downline"). ViSalus' revenues are comprised of product sales, distributor signup up fees (which range from $49 to $999), and the sale of training and promotional materials to its distributors.

4.    In October 2008, Blyth announced that it was acquiring ViSalus in a takeover, initially purchasing a 43.6% equity interest for $14 million. Blyth completed the second phase of the takeover in April 2011, investing an additional $2.5 million and increasing its ownership share to 57.5%. Under the terms of the ViSalus acquisition, Blyth was also required to purchase the remaining 27% of the shares it does not now own for $271 million by 2013.

5.    On March 14, 2012, Defendants announced that Blyth's FY 2012 earnings would increase 39% over FY 2011 earnings, citing purported strong "growth in ViSalus." On this news, the Company's stock price increased precipitously, closing up approximately $5 per share on unusually high trading volume of more than 6.5 times the average daily trading volume over the prior ten days.

6.    Again, on May 4, 2012 and August 3, 2012, Defendants increased Blyth's FY 2012 earnings guidance by approximately 10% each time, again citing purported strong performance in its ViSalus unit.

7.    Thereafter, on August 16, 2012, Blyth announced the Company planned to spinoff ViSalus by selling $175 million of its ViSalus stock in an initial public offering ("IPO"). Certain other shareholders of ViSalus, which included ViSalus Board members Goergen and his two sons, both of whom are also executives of Blyth and ViSalus, planned to sell in the IPO as well. Blyth would continue owning more than 50% of ViSalus post-IPO, but conducting the IPO would relieve

Blyth from the obligation to purchase the additional 27% of ViSalus' shares it does not already own. On this news, Blyth's shares increased 17% to close at $43.36 on August 16, 2012.

8.     As Defendants knew but concealed from the investing public, however, the Company would not be able to complete the ViSalus IPO as the significant majority of ViSalus' revenues are derived from selling product to customer "distributors" rather than to ultimate customers. In reality, ViSalus is a pyramid scheme with an unsustainable business model. Moreover, the recent increase in dubious ViSalus sales had been masking a significant decline in sales of Blyth's other product offerings.

9.     Suddenly, on September 21, 2012, Moody's Investors Services ("Moody's") cut its outlook for the Company to "negative," citing a weaker core business, liquidity concerns (including having $100 million in senior unsecured notes scheduled to mature), and the Company's obligation to repurchase the remaining 27% of ViSalus it did not already own. The Company's stock price declined precipitously by more than 10% that day, closing at $34.95, down $3.95 from the prior day's close. Thereafter, on September 26, 2012, Defendants cancelled the ViSalus IPO. The Company's September 26, 2012 press release explained that "ViSalus has achieved Net Sales growth in excess of 450% in the first half of 2012; however, management believes that current conditions are not conducive to recognizing this level of achievement." In order to support the Company's stock price, during a conference call with investors later that day, Goergen emphasized that it was simply the "IPO marketplace" that was unable to "recognize the strength of [the ViSalus] story . . . ."

10.    Though Blyth's shares were pummeled on this news, precipitously declining nearly $7 per share, or 21+%, on unusually high trading volume, the stock price remained artificially inflated due to Defendants' bullish mantra about ViSalus' strong operating and business metrics during the September 26, 2012 conference call Defendants held.

11.     However, the market would learn on November 2, 2012, that ViSalus' sales had indeed significantly declined and would further learn on November 6, 2012, after the close of trading, that cancelling the IPO had also had a dramatic negative impact on investors, costing them $0.12 a share.  As a result, Defendants dramatically slashed the Company's FY 2012 earnings guidance on November 6, 2012 and Blyth's stock price was again hammered, falling approximately $3 per share on extremely high trading volume to trade below $16 in intraday trading, ultimately closing at $17.54.  In the end, more than $462 million in market capitalization simply vanished from the stock's Class Period high.

## JURISDICTION AND VENUE

12.     The claims asserted herein arise under §§10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and Rule 10b-5, 17 C.F.R. §240.10b-5.  Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.

13.     Venue is proper in this district pursuant to §27 of the Exchange Act.  Acts and transactions giving rise to the violations of law complained of herein occurred in this district.

## THE PARTIES

14.     Plaintiff, Musab AbuHamdan, purchased Blyth common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages thereon.

15.     Defendant Blyth is headquartered in Greenwich, Connecticut.  During the Class Period, Blyth had 17.2+ million shares of common stock outstanding, which shares traded in an efficient market on the NYSE under the ticker symbol "BTH."  Blyth was followed by scores of stock analysts and stock rating agencies and was constantly in communication with the markets and investors in quarterly conference calls and frequent presentations to investor and analyst conferences.  Blyth also filed periodic public reports with the SEC, and regularly issued press releases to the financial press.

16.     Defendant Robert Goergen is, and was during the Class Period, Chairman of the Board and CEO of Blyth. Goergen founded Blyth and has served as its Chairman since its inception in 1977. Goergen has served as Blyth's CEO since 1978 and served as its as President from March 1994 to March 2004. Goergen is Blyth's largest shareholder, holding 35+% of its shares. Another 8.5% of Blyth's shares are owned by Gorergen's wife Pamela, who also serves on its Board. Robert B. Goergen, Jr., is Goergen's son and serves as President, Direct Selling Group and President, PartyLite Worldwide of Blyth. Goergen, his son Robert B. Goergen, Jr. and his son Todd A. Goergen also collectively own at least 4% of ViSalus and comprise three of the four members of ViSalus' Board of Directors. Todd A. Goergen also serves as ViSalus' Chief Strategy Officer.

17.     Defendant Barghaus is, and was throughout the Class Period, Blyth's Vice President and CFO.

18.     During the Class Period, Goergen and Barghaus ran Blyth as "hands-on" managers overseeing Blyth's and ViSalus' operations and finances and made the material false and misleading statements described herein. Goergen and Barghaus were intimately knowledgeable about all aspects of Blyth's and ViSalus' financial and business operations, as they received daily reports and had access to computerized information regarding sales, costs and expenses, product demand and inventory management. They were also intimately involved in deciding which disclosures would be made by Blyth and ViSalus. Indeed, both made various public statements for Blyth and ViSalus during the Class Period, and participated in all Class Period investor conferences. Goergen also signed ViSalus' IPO Registration Statement filed with the SEC on August 16, 2012, and amended on August 29, 2012 and September 17, 2012.

## BACKGROUND TO THE CLASS PERIOD

19.     Defendant Blyth is a marketing and manufacturing company that sells personal and decorative products, including candles under the Cape Cod and Colonial brand names. Blyth sells

through several websites, the Miles Kimball catalog, and a direct selling arm that operates PartyLight house parties. Blyth also owns the Sterno brand of fuel, used for tabletop heating.

20.     ViSalus is a multilevel marketing company headquartered in Los Angeles, California with offices in Troy, Michigan. ViSalus markets weight management nutritional products, dietary supplements, and energy drinks in the United States and Canada, employing a person-to-person direct marketing model.  ViSalus' weight-management products, which include Vi-Shape meal replacement shakes and Vi-Trim Clear Control Drink Mix, form the bulk of its sales.

21.     ViSalus sells its products by multi-level marketing through a network of independent distributors who pay a start-up package fee to join ViSalus' sales force.  Distributors who qualify for commissions are compensated based on sales of products and from sales made by any distributors they recruit (*i.e.*, the "downline").  ViSalus' revenues are comprised of products sales, distributor signup up fees (which range from $49 to $999), and the sale of training and promotional materials to its distributors.

22.     In October 2008, Blyth announced that it was acquiring ViSalus in a takeover, initially purchasing a 43.6% equity interest for $14.0 million.  Blyth completed the second phase of the takeover in April 2011, investing an additional $2.5 million and increasing its ownership share to 57.5%.  Under the terms of the ViSalus acquisition, Blyth is required to purchase the remaining 27% of the shares it does not now own for $271 million by 2013.

## DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

23.     The Class Period starts on March 14, 2012.  On that day, Defendants issued a press release entitled "Blyth, Inc. Announces 2012 Earnings Guidance 39% Above Prior Year." The press release stated, in relevant part, as follows:

> Blyth, Inc. (NYSE:BTH), a direct to consumer company and leading designer and marketer of candles, accessories for the home, and health and wellness products sold through the direct selling and direct marketing channels, today commented on its

outlook for the year ending December 31, 2012. As previously announced, the Company changed its fiscal year end from January 31 to December 31.

*Earnings per share is expected to be $4.50 - $4.75 for the year ending December 31, 2012* and include charges of $0.25 for the ViSalus equity incentive plan and $0.25 for restructuring related to PartyLite's North American operations. Excluding these charges, *normalized earnings per share is anticipated to be in the range of $5.00 to $5.25*, which compares to an unaudited, non-GAAP management estimate of $3.69 for the comparable prior year 12 month period ending December 31, 2011. *The forecasted 39% increase in 2012 earnings per share versus the comparable prior 12 month period is due to growth in ViSalus.*

Robert B. Goergen, Blyth's Chairman of the Board and Chief Executive Officer, commented, *"We are planning for continued strong growth at ViSalus due to the strength of the products and programs that drove the momentum experienced in 2011 and their extensions in 2012.* A sizeable portion of our planned capital expenditures is specifically designed to support the ViSalus Founders, management team and Promoters as they build ViSalus into a lifestyle brand and a household name."

Mr. Goergen continued, "We are also continuing to make important investments in PartyLite, particularly in technology and in programs designed to build and expand Leadership and Consultant earnings, which will support improvement in our North American operating results. Additional resources are being invested in Europe to support our strong existing markets, as well as the growth of our newer markets; Italy, Poland, the Czech Republic and Slovakia."

Cash flow from operations for 2012 is expected to be approximately $75 million and capital spending is anticipated to be approximately $18 million.

24.     On May 4, 2012, Defendants issued a press release increasing the Company's FY 2012 earnings guidance by approximately 10%. The press release stated, in relevant part, that the Company's "[n]ormalized earnings per share [were] expected to be $5.50 - $5.75 for the year ending December 31, 2012 compared to prior guidance of normalized earnings per share of $5.00 - $5.25[,]" emphasizing that: "[t]he forecasted increase in 2012 earnings per share versus prior guidance *is principally due to growth at ViSalus.*"

25.     On April 27, 2012, the Company's common stock reached a Class Period high of $90 per share in intraday trading.

26.     On May 16, 2012, Defendants announced that the Company's Board had approved a two-for-one split of the Company's common stock in the form of a stock dividend of one share for

each outstanding share. The stock dividend would be payable on June 15, 2012 to holders of record

at the close of business on June 1, 2012.  The split would increase Blyth's total shares outstanding

from approximately 8.6 million shares to 17.2 million shares.  The press release quoted Goergen

emphasizing the significance of the stock split by stating that Defendants were: "pleased to take this

action as a result of [Blyth's] *strong operating results and stock performance*," adding that

"[t]oday's action reflects our belief in the long-term strategy of our Company...."  In reality, the

stock split was undertaken to lower the Company's stock price to make its shares more attractive to

investors.

27.     On August 3, 2012, Defendants issued a press release again increasing the

Company's FY 2012 earnings guidance by approximately an additional 10%.  The press release

stated, in relevant part, that the Company's "[n]ormalized earnings per share [was] expected to be

$3.00 - $3.15 for the year ending December 31, 2012 compared to prior guidance of normalized

earnings per share of $2.75 - $2.88," and again attributed strong *"growth at ViSalus."*  The press

release also explained that the guidance had been revised to reflect the Company's two-for-one stock

split effective June 15, 2012.

28.     On August 16, 2012, Blyth announced the Company planned to spinoff ViSalus by

selling $175 million of its ViSalus stock in an IPO.  The release issued that day, entitled "Blyth, Inc.

Announces Filing of Registration Statement for Initial Public Offering of ViSalus,"  stated, in

relevant part, as follows:

> Blyth, Inc. (NYSE:BTH) today announced that ViSalus has filed a registration
> statement on Form S-1 with the U.S. Securities and Exchange Commission for a
> potential initial public offering ("IPO") of its Class A common stock.   The
> registration statement has been filed by FVA Ventures, Inc., which will be renamed
> ViSalus, Inc. in connection with the IPO.  ViSalus is a direct-to-consumer, personal
> health product company offering a suite of branded weight-management products,
> nutritional supplements and energy drinks to customers in the United States and
> Canada through a network marketing model, which is a form of direct selling.

Following the IPO, Blyth will continue to own over 50% of ViSalus' common stock. The number of shares to be offered and the price range for the offering have not yet been determined. A portion of the shares to be offered in the IPO will be issued and sold by ViSalus, and a portion will be sold by certain stockholders of ViSalus.

A registration statement relating to these securities has been filed with the Securities and Exchange Commission (the "SEC"), and is available on the SEC's website at www.sec.gov. . . .

*     *     *

Jefferies & Company, Inc. will act as book-running manager for the offering. . . .

29.     The Form S-1 Registration Statement filed by Blyth with the SEC on August 16, 2012, and its later amendments (collectively, the "Registration Statement"), stated that ViSalus "had approximately 1,258,000 *customers* at June 30, 2012, *an increase of approximately 500%* as compared to approximately 208,000 customers at June 30, 2011," and that ViSalus "defines a 'customer' as anyone who has purchased products from us at least once in the previous 12 months, other than any purchaser who qualifies as an individual promoter on the measurement date." The Registration Statement further stated that ViSalus "had approximately 114,000 *individual promoters* at June 30, 2012, an increase of approximately 300% as compared to approximately 29,000 individual promoters at June 30, 2011," and "define[d] an 'individual promoter' as a person eligible to receive a commission within the ViSalus promoter compensation plan on the measurement date." These statements were false and misleading in that they overstated the number of true "customers" and understated the true number of "promoters" by including as "customers" those persons and entities who purchased ViSalus product with the intent of selling that product.

30.     The Registration Statement also stated that: "Unlike in a traditional direct selling business model, *our individual promoters are not required to purchase any of our products for their personal use or for resale*." This statement was materially false and misleading as would-be promoters could not sell ViSalus products without sampling the product themselves and purchasing product for their own customers to sample as part of the sales process.

31.     The Registration Statement also stated that ViSalus "had net sales of $327.3 million for the six months ended June 30, 2012 and $230.2 million for the year ended December 31, 2011, increases of approximately 450% and 600%, respectively, as compared to net sales of $59.3 million and $33.7 million for the comparable prior year periods." While the revenue figures provided were technically accurate, the statement was materially false and misleading as it concealed that the majority of the product underlying these sales was purchased not for customer consumption, but by would-be promoters for use in future sales.

32.     On the news of the planned ViSalus IPO, Blyth's shares increased 17% from their close of $37.09 on the evening of August 15, 2012, to close at $43.36 on August 16, 2012, on extremely high trading volume of more than 1.5 million shares trading, nearly 10 times the average daily trading volume over the previous 30 trading days.

33.     As Defendants knew but did not disclose, however, the Company would never be able to complete the ViSalus IPO as the significant majority of ViSalus' revenues are derived from selling product to customer "distributors" rather than to ultimate customers, and in reality ViSalus is a pyramid scheme with an unsustainable business model. Moreover, the recent increase in dubious ViSalus sales had been masking a significant decline in sales of Blyth's other product offerings.

34.     Suddenly, on September 21, 2012, Moody's cut its outlook for the Company to "negative," citing a weaker core business, liquidity concerns (including having $100 million in senior unsecured notes scheduled to mature), and the Company's obligation to repurchase the remaining 27% of ViSalus it did not already own. The Company's stock price declined precipitously by more than 10% that day, closing at $34.95, down $3.95 from the prior day's close.

35.     Thereafter, on September 26, 2012, Defendants cancelled the ViSalus IPO. The Company's September 26, 2012 press release explained that "ViSalus has achieved Net Sales growth in excess of 450% in the first half of 2012; however, management believes that current conditions

are not conducive to recognizing this level of achievement."  However, to prevent a freefall in the

stock price, during a conference call with investors later that day, Goergen claimed that this turn in

events was simply a result of the "IPO marketplace" being unwilling to "recognize the strength of

[the ViSalus] story . . . .":

> As I am sure all of you on this call know, this morning we announced that ViSalus, Blyth's very healthy lifestyle direct selling company, withdrew its initial public offering *because current uncertain market conditions for these types of transactions* in its market segment [were] not recognizing the extraordinary growth and potential future growth of the Company.  Blyth management fully supports this decision, as the ViSalus founders, its senior managers, and Blyth management are fully committed to ViSalus' long-term growth.  We want to take the opportunity now to share our perspective, and then take your questions.
>
> *First and foremost, nothing in Blyth's or ViSalus' fundamentals has changed.* Blyth has a strong balance sheet, and continues to generate strong cash flow. *ViSalus continues to achieve impressive growth,* and ViSalus' founders and management are committed to building equity together with Blyth for the long term. *To repeat – the current IPO marketplace does not appear willing to recognize the strength of this story, however.*
>
> For those of you not familiar with ViSalus' specific achievements, let me remind you that *it is a company that is growing every day*, with net sales growth in excess of 450% during the first half of 2012 versus the prior year.  It has over 100,000 individual promoters, 15,000 of which traveled to Miami this past July to attend ViSalus' Vitality Conference.  It currently has over one million customers – hardly a surprise given their on-target strategy of challenging people to live a much-needed healthy lifestyle.  Moreover, they support people, so they can be successful in meeting this challenge.  And ViSalus hasn't even gone outside the United States and Canada yet.

36.     While Blyth's shares were pummeled on this news, precipitously declining nearly $7

per share, or 21+%, on unusually high trading volume, the shares remained artificially inflated by

Defendants' bullish comments about the vitality of the Company's core business and financial

fundamentals.

37.     However, on November 2, 2012, Blyth stock fell 15% after disclosing at the

Company's National Success Training event in St. Louis Missouri that its Q3'12 ViSalus sales were

only $169.9 million.  The Company's stock, which had closed at $23.14 on the evening of

November 1, 2012, closed down at $19.96 on November 2, 2012, with more than 1.5 million shares changing hands.

38.     Finally, on November 6, 2012, after the close of trading, Defendants issued a press release slashing the Company's FY 2012 guidance by approximately $0.20 per share, including $0.12 per share for costs attributable to the cancelled Vitalus IPO.  The press release stated, in relevant part, as follows:

> …. Reported earnings per share is expected to be $2.28 - $2.43 for the year ending December 31, 2012 compared to prior guidance of reported earnings per share of $2.47 - $2.62.
>
> Robert B. Goergen, Blyth's Chairman of the Board and Chief Executive Officer, commented, ***"Our updated guidance for 2012 reflects lower sales and profits than previously anticipated,*** due in large part to the difficult global macroeconomic environment which continues to make forecasting the demand for discretionary consumer products challenging.  Reduced consumer discretionary spending in North America and Europe is challenging for all our business units, particularly PartyLite Europe and, to a lesser extent, PartyLite North America.  ***In addition, now that ViSalus has grown to be a substantial size business, we understand better the seasonality of weight management products, which are stronger in the first half of the year due to the post-holiday and pre-summer focus on weight management.  As such, we have moderated our second half sales and earnings projections…."***
>
> \*       \*       \*       \*
>
> Reported earnings per share include the following:
>
> - ViSalus equity incentive plan charge of $0.30
>
> - Restructuring charge related to PartyLite's North American operations of $0.08
>
> - ***Fees related to the ViSalus IPO, which was withdrawn on September 26th, of $0.12***
>
> - An intangible impairment charge of $0.03 in the Catalog & Internet segment, and
>
> - Gain related to the sale and income from discontinued operations of Sterno totaling $0.41.
>
> Therefore, on a normalized basis, earnings per share is expected to be $2.40 to $2.55 for the year ended December 31, 2012 compared to prior guidance of $3.00 to $3.15.

Cash flow from operations for 2012 is expected to be approximately $65 million versus prior guidance of $85 million *reflecting the impact of lower projected sales and IPO related fees*....

39.     On this news the Company's stock price was again slammed, trading below $16 per share in intraday trading when the market opened on November 7, 2012, on extremely high volume of more than 1.6 million shares trading. The Company's stock price would close at $17.54 that day, erasing more than $462 million in market capitalization from the Company's Class Period high.

## NO SAFE HARBOR

40.     Blyth's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

41.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Blyth who knew that the FLS was false. In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading. Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

42.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in

the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Blyth, their control over, and/or receipt of modification of Blyth's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Blyth, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

43.     At all relevant times, the market for Blyth common stock was an efficient market for the following reasons, among others:

(a)     Blyth stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     According to the Company's Form 10-Q filed August 3, 2012, the Company had more than 17.2 million shares outstanding as of July 31, 2012. During the Class Period, on average, 324,498 shares of Blyth stock were traded on a daily basis, demonstrating a very active and broad market for Blyth stock and permitting a very strong presumption of an efficient market;

(c)     Blyth was qualified to file a less comprehensive Form S-3 Registration Statement with the SEC that is reserved, by definition, for well-established and largely capitalized issuers for whom less scrutiny is required;

(d)     as a regulated issuer, Blyth filed periodic public reports with the SEC;

(e)     Blyth regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(f)　　Blyth was followed by many securities analysts who wrote reports that were distributed to the sales force and certain customers of their respective firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(g)　　numerous National Association of Securities Dealers ("NASD") member firms were active market-makers in Blyth stock at all times during the Class Period; and

(h)　　unexpected material news about Blyth was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

44.　　As a result of the foregoing, the market for Blyth common stock promptly digested current information regarding Blyth from publicly available sources and reflected such information in Blyth's stock price. Under these circumstances, all purchasers of Blyth common stock during the Class Period suffered similar injury through their purchase of Blyth common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

45.　　During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Blyth's business fundamentals and ability to spinoff its investment in ViSalus and engaged in a scheme to deceive the market. Defendants knowingly misstated revenues and earnings to improve the market's perception of Blyth's worth to allow Blyth and its insiders to cash out their interests in ViSalus.

46.　　By artificially inflating and manipulating Blyth's stock price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed. When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on September 21, 2012, September 26, 2012, November 2, 2012 and November 6, 2012, Blyth's stock price fell precipitously, as the prior artificial inflation came out of the stock price. As a result of their

purchases of Blyth securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

47.     This is a class action on behalf of those who purchased or otherwise acquired Blyth common stock between March 16, 2012 and November 6, 2012, inclusive, excluding Defendants (the "Class"). Excluded from the Class are officers and directors of the Company as well as their families and the families of Defendants. Class members are so numerous that joinder of them is impracticable.

48.     Common questions of law and fact predominate and include whether Defendants: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; and (d) artificially inflated the price of Blyth common stock, and the extent of and appropriate measure of damages.

49.     Plaintiff's claims are typical of those of the Class. Prosecution of individual actions would create a risk of inconsistent adjudications. Plaintiff will adequately protect the interests of the Class. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against All Defendants

50.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

51.     Throughout the Class Period, Defendants Blyth, Goergen and Barghaus, in pursuit of their scheme and continuous course of conduct to inflate the market price of Blyth common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

52.     During the Class Period, Defendants Blyth, Goergen and Barghaus, and each of them,
carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce
and the mails, which was intended to and, throughout the Class Period, did: (a) artificially inflate and
maintain the market price of Blyth common stock; (b) deceive the investing public, including
Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the
Class to purchase Blyth common stock at inflated prices; and (d) cause them losses when the truth
was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Blyth,
Goergen and Barghaus, and each of them, took the actions set forth herein, in violation of §10(b) of
the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary
participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged
below.

53.     In addition to the duties of full disclosure imposed on Defendants Blyth, Goergen and
Barghaus as a result of their affirmative false and misleading statements to the investing public,
these Defendants had a duty to promptly disseminate truthful information with respect to Blyth's
operations and performance that would be material to investors in compliance with the integrated
disclosure provisions of the SEC, including with respect to the Company's revenue and earnings
trends, so that the market price of the Company's securities would be based on truthful, complete
and accurate information.  *See* SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R.
§229.10, *et seq.*).

54.     Defendants Blyth, Goergen and Barghaus had actual knowledge of the
misrepresentations and omissions of material facts set forth herein or acted with reckless disregard
for the truth in that they failed to ascertain and disclose such facts, even though such facts were
either known or readily available to them.

55.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Blyth common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Blyth common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants Blyth, Goergen and Barghaus, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Blyth stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

56.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants Blyth, Goergen and Barghaus, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Blyth shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

57.     By virtue of the foregoing, Defendants Blyth, Goergen and Barghaus have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See* 17 C.F.R. §240.10-5.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Goergen and Barghaus

58.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

59.     Defendants Goergen and Barghaus had control over Blyth and made the material false and misleading statements and omissions on behalf of Blyth within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of Goergen's controlling shareholder status, both men's executive positions, Goergen's Board membership and stock ownership, and their culpable participation, as alleged above, Goergen and Barghaus had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the

content and dissemination of the various statements which Plaintiff contend were false and misleading. Goergen and Barghaus were provided with or had unlimited access to the Company's and ViSalus' internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

60.     In particular, Defendants Goergen and Barghaus had direct involvement in and responsibility over the day-to-day operations of the Company and ViSalus and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

61.     By reason of such wrongful conduct, Goergen and Barghaus are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, prays for judgment as follows:

A.     Determining that this action is a proper class action;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 12, 2012

DISERIO MARTIN O'CONNOR &
   CASTIGLIONI LLP
JONATHAN P. WHITCOMB

_____
Jonathan P. Whitcomb (ct15014)

One Atlantic Street
Stamford, CT 06901
Telephone:  203/358-0800
203/348-2321 (fax)

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
MARY BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

LAW OFFICE OF ALFRED G. YATES, JR., P.C.
ALFRED G. YATES
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA 15219
Telephone: 412/391-5164
412/471-1033 (fax)

*Attorneys for Plaintiffs*