UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MUSAB ABUHAMDAN and BEAVER COUNTY EMPLOYEES RETIREMENT FUND, on Behalf of Themselves and Others Similarly Situated, | ) ) ) ) | Case No. 3:12-cv-01597-MPS <br><br> CLASS ACTION |
| Plaintiff, | ) ) ) | SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) ) | CLASS ACTION |
| BLYTH, INC., ROBERT B. GOERGEN, ROBERT H. BARGHAUS, VISALUS HOLDINGS, LLC, VISALUS, INC., and NICK SARNICOLA, | ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) ) | |

Lead Plaintiff Beaver County Employees Retirement Fund ("Beaver County" or "Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Blyth, Inc. ("Blyth" or the "Company") and its subsidiary ViSalus, Inc. (together with ViSalus Holdings, LLC and FVA Ventures, Inc., "ViSalus"), Blyth's and ViSalus's press releases and other public statements, and interviews with former employees of Blyth and/or ViSalus. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all purchasers of the common stock of Blyth between January 13, 2012 and November 6, 2012, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, promulgated thereunder.

2.     Defendant Blyth describes itself as "a direct to consumer business focused on the direct selling and direct marketing channels." The Company's products include weight management products, including meal replacement shakes, vitamins and energy mixes, and decorative and functional household products, including candles, accessories and seasonal decorations, household convenience items and personalized gifts. Defendant Robert B. Goergen ("Goergen") dominates and controls Blyth. Goergen owns more than 35% of Blyth's outstanding common stock, his wife owns an additional 8.5% of Blyth's outstanding common stock and his two sons hold executive positions at Blyth.

3.     This case concerns Blyth's purchase of ViSalus – a multi-level marketing company that was substantially owned by defendant Goergen and his sons – and the fraudulent scheme to maximize either the price that Blyth would be required to pay for it or the amount that could be

raised in ViSalus's initial public offering ("IPO").  Prior to the sale of ViSalus to Blyth, defendant Goergen and his sons held a substantial interest in ViSalus Holdings, LLC.  Defendant Goergen and his two sons currently hold three of the four seats on ViSalus Inc.'s Board of Directors (the "Board").

4.      In 2008, Blyth agreed to purchase ViSalus from the Goergens and the other owners of ViSalus.  The purchase agreement provided that Blyth would pay for ViSalus in four installments and that the payments would be based on a multiple of ViSalus's earnings before interest, taxes, depreciation, and amortization ("EBITDA").  Accordingly, the more ViSalus earned, the higher the purchase price would be.

5.      Following the execution of the purchase agreement, ViSalus's EBITDA experienced explosive growth, and accordingly, the amounts that Blyth was obligated to pay rose dramatically: from $13 million for 43.6% of ViSalus in October 2008 (implying a value of approximately $30 million) to an estimated $271 million for 27.3% of ViSalus at the fourth and final closing, initially scheduled to occur in 2012 (implying a value of approximately $992 million).

6.      As detailed herein, and unbeknownst to investors, the explosive growth in ViSalus's EBITDA was not being fueled by demand for ViSalus's underlying products; rather, it was being fueled by the aggressive recruitment of transient teams of promoters who purchased ViSalus's products with the intent of reselling rather than consuming the product.

7.      As a result of the purported skyrocketing growth in ViSalus's EBITDA, by March 14, 2012, Blyth acknowledged that it did not have sufficient cash on hand to complete the ViSalus purchase.  Nonetheless, Blyth told the market that it would find a way to finance the remainder of the acquisition.  Ultimately, Defendants settled on a plan whereby Blyth would hold onto 50% of ViSalus's stock, and Blyth and the other owners would sell the remaining 50% in an IPO.  On

August 16, 2012, ViSalus filed a Form S-1 with the SEC for the sale of ViSalus stock and began the process of selling shares of ViSalus stock to the public.

8.      Unbeknownst to investors, by the start of the Class Period, ViSalus was experiencing significant adverse undisclosed problems with its business.  The seemingly explosive "growth" in ViSalus's core business of selling nutritional products was illusory.  While ViSalus was adding substantial numbers of new promoters/customers, it was also experiencing a high churn rate – that is, a significant number of promoters/customers were leaving the company either because: (i) promoters were quitting when they realized that success was highly improbable, or (ii) teams of transient promoters, which are common in the multi-level marketing "industry," simply left to go to the next opportunity to make a "quick buck."  Indeed, during the Class Period, ViSalus was experiencing promoter/customer churn rates of approximately 200%.  Adding to and exacerbating this adverse trend, ViSalus was experiencing problems with suppliers who could not provide sufficient product, thereby further negatively impacting sales.  Additionally, ViSalus's push into the Canadian market – which had fueled a large part of ViSalus's growth – had encountered problems as ViSalus's primary diet drink product had to be re-formulated to comply with Canadian health regulations; the revised diet drink also had an inferior taste, thereby further slowing sales growth.  Defendants were motivated to conceal the problems with ViSalus's business so that Blyth could complete the ViSalus IPO, thereby allowing the owners of ViSalus, which included defendant Goergen, through his holdings in the RAM Funds (defined below), to sell their ViSalus stake to the public at the apex of ViSalus's reported sales growth.

9.      The truth about ViSalus was revealed in a series of disclosures in the fall of 2012.  On September 26, 2012, Blyth announced that it was cancelling the ViSalus IPO purportedly due to market conditions.  Analysts were skeptical of the Company's explanation and repeatedly questioned

Defendants about ViSalus's promoter churn rate and whether the underwriters for the ViSalus IPO had raised concerns about the churn rate. In response to these announcements, the price of Blyth stock declined from $32.57 per share to $25.68 per share, or 21%, on extremely heavy trading volume. On November 2, 2012, at its National Success Training event in St. Louis, ViSalus announced that its sales for the third quarter of 2012 were approximately $169.9 million, as compared to sales of $190.4 million for the second quarter of 2012. In response to the announcement that ViSalus's sales had declined dramatically, the price of Blyth stock declined from $23.14 per share to $19.97 per share, or 14%, on extremely heavy trading volume. Then, on November 6, 2012, Blyth issued a press release announcing its financial results for the third quarter of 2012 and also revealing that the number of ViSalus promoters had fallen from the previous quarter. In response to this announcement, the price of Blyth stock declined further, falling from $19.02 per share to $17.54 per share, or 8%, on extremely heavy trading volume.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

13.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to,

the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE"), a national securities market.

## THE PARTIES

14.     Lead Plaintiff Beaver County purchased Blyth common stock during the Class Period, as set forth in the certification previously filed in this case and incorporated herein by reference, and was damaged thereby.

15.     Defendant Blyth describes itself as "a direct to consumer business focused on the direct selling and direct marketing channels."

16.     Defendant Goergen served as Blyth's Chairman of the Board and Chief Executive Officer ("CEO") during the Class Period.  Defendant Goergen founded Blyth and has served as its Chairman since its inception in 1977, as its CEO since 1978 and as its President from March 1994 to March 2004.  Defendant Goergen is Blyth's largest single shareholder, with holdings representing 35% of the Company's outstanding shares.  In addition, defendant Goergen's wife, Pamela, holds an additional 8.5% of the Company's outstanding shares and has a seat on the Board. Goergen's son, Robert B. Goergen, Jr., serves as President of both the Direct Selling Group and PartyLite Worldwide of Blyth.  Goergen, Robert B. Goergen, Jr., and Goergen's other son, Todd A. Goergen, held a significant interest in ViSalus at the time of Blyth's initial investment, and they currently comprise three of the four members of ViSalus's Board.  Todd A. Goergen also serves as ViSalus's Chief Strategy Officer.  The Goergens also own, directly and indirectly, substantially all of the interest in Ropart Asset Management Fund, LLC ("RAM I") and Ropart Asset Management Fund, II, LLC ("RAM II" and collectively with RAM I, the "RAM Funds"), which owned a significant percentage of the outstanding membership interest in ViSalus Holdings.  Goergen, Robert B. Goergen, Jr., and Todd A. Goergen are sometimes referred to herein as the "Goergens."

17.     Defendant Robert H. Barghaus ("Barghaus") is, and was throughout the Class Period, Blyth's Vice President and Chief Financial Officer.

18.     Defendants Goergen and Barghaus are collectively referred to herein as the "Blyth Individual Defendants."

19.     Defendant ViSalus Holdings, LLC is a Delaware limited liability company. Until a reorganization in late 2012, ViSalus Holdings, LLC wholly owned defendant FVA Ventures, Inc.

20.     Defendant ViSalus, Inc. is a Nevada corporation incorporated in 2012. ViSalus, Inc. is the legal successor of FVA Ventures, Inc., a California corporation. FVA Ventures, Inc. filed a Form S-1 with the SEC on August 16, 2012, and an amendment thereto on August 29, 2012. ViSalus, Inc. filed a Form S-1/A with the SEC on September 17, 2012 amending the Form S-1 previously filed by FVA Ventures, Inc.

21.     ViSalus, Inc., ViSalus Holdings, LLC, and FVA Ventures, Inc. are collectively referred to herein as "ViSalus."

22.     Defendant Nick Sarnicola ("Sarnicola"), one of the three founders of ViSalus, currently holds the title of "Global Ambassador." His profile is listed on ViSalus's website under the heading "ViSalus Management Team." According to his profile, defendant Sarnicola travels around North America promoting ViSalus's products. According to ViSalus, "sales generated by . . . Sarnicola . . . together with his down-line sales organization and customers marketed to by. . . Sarnicola and members of his down-line sales organization, represented approximately 75% of net sales in 2011 and in the first six months of 2012."

23.     During the Class Period, the Blyth Individual Defendants, as senior executive officers and/or directors of Blyth, were privy to confidential and proprietary information concerning Blyth and ViSalus, their operations, finances, financial condition and present and future business

prospects.   The Blyth Individual Defendants also had access to material adverse non-public information concerning Blyth and ViSalus, as discussed in detail below.  Because of their positions with Blyth, the Blyth Individual Defendants had access to non-public information about their business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.   Because of their possession of such information, the Blyth Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Blyth Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Blyth Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Blyth Individual Defendants were able to and did, directly or indirectly, control the conduct of Blyth's business.

25.     The Blyth Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  The Blyth Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Thus, the Blyth Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.     As senior executive officers and/or directors, and as controlling persons of a publicly traded company whose shares were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded on the NYSE and governed by the federal securities laws, the Blyth Individual Defendants had a duty to promptly disseminate accurate, full and truthful information with respect to Blyth's and ViSalus's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Blyth shares would be based upon truthful and accurate information.  The Blyth Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     The Blyth Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Blyth shares by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Blyth's business, operations and management and the intrinsic value of Blyth shares; and (ii) caused Plaintiff and members of the Class to purchase Blyth shares at artificially inflated prices.

28.     Defendants ViSalus, Sarnicola and Goergen are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Blyth shares by committing deceptive and manipulative acts.  The scheme: (i) deceived the investing public regarding Blyth's and ViSalus's business, operations and management and the intrinsic value of Blyth shares; and (ii) caused Plaintiff and members of the Class to purchase Blyth shares at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

29.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the shares of Blyth between January 13, 2012 and November 6, 2012, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company and ViSalus, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

30.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Blyth shares were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Blyth or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

31.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

32.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

33.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Blyth;

(c)      whether Defendants committed deceptive or manipulative acts;

(d)      whether the price of Blyth shares was artificially inflated during the Class Period; and

(e)      to what extent the members of the Class have sustained damages and the proper measure of damages.

34.      A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### A.      Blyth, ViSalus and the Business

35.      Defendant Blyth describes itself as "a direct to consumer business focused on the direct selling and direct marketing channels."

36.      Blyth's operations can be divided into three segments: (i) the Health & Wellness Segment; (ii) the Candles & Home Décor Segment; and (iii) the Catalog & Internet Segment.  Its Candles & Home Décor Segment operates through PartyLite, which sells premium candles, reed diffusers, and other home fragrance products and decorative accessories throughout North America, Europe, and Australia.  The Company's PartyLite products are sold via "independent consultants" who sell the products at parties organized by them and the consultants recruited by them.  As of

December 31, 2012, there were approximately 15,000 active independent sales consultants in the United States.

37.     Blyth operates its Catalog & Internet Segment through the Miles Kimball Company, which is described by Blyth as "a direct to consumer business that develops and markets an extensive array of decorative and functional household products, personalized cards, gifts, unique food products and health and wellness products." The Miles Kimball Company sells its products via websites, catalogs, and direct mail campaigns.

38.     Blyth's Health & Wellness Segment operates through its subsidiary ViSalus. ViSalus, which was founded in March 2005, describes itself as "one of the fastest growing direct-to-consumer, personal health product companies in North America, offering a suite of branded weight-management products, nutritional supplements and energy drinks to customers in the United States and Canada." ViSalus sells: (i) weight-management products, including meal-replacement shakes, nutritional cookies, and appetite-suppressant drinks; (ii) nutritional supplements, including multi-vitamin and mineral supplements; and (iii) energy drinks.

39.     At the beginning of the Class Period, ViSalus was operating as FVA Ventures, a California corporation; and FVA Ventures was wholly owned by ViSalus Holdings, a Delaware limited liability company. In 2012, ViSalus effected a reorganization whereby: (i) FVA Ventures merged into ViSalus, Inc., a newly incorporated Nevada corporation, with ViSalus, Inc. continuing as the surviving corporation; and (ii) ViSalus, Inc. became the parent of ViSalus Holdings.

**B.     Multi-Level Marketing**

40.     The Company operates its businesses in what is commonly known as multi-level marketing. Multi-level marketing is a business strategy whereby a company induces independent, non-salaried persons ("promoters") to both sell – and recruit other persons to sell – the company's products by offering the promoters commissions on their own sales as well as the sales made by

persons they have recruited and by persons their recruits have also recruited. The recruited sales force stemming from a promoter is referred to as that promoter's "down-line." According to some experts, 99% of multi-level marketing participants fail.

41.     According to the Federal Trade Commission ("FTC"), a multi-level marketing company is illegitimate, "[i]f the money you make is based on the number of people you recruit and your sales to them." If a company's growth is based on recruitment, rather than sales to genuine customers, most promoters will assuredly fail because such a model is intrinsically designed to fail as there are literally not enough people to make these companies profitable to most of those involved. For example, if a promoter's success depended on recruiting three persons and for all persons under her to, in turn, promote three persons, the enterprise will be futile because after 21 levels there would not be enough people in the world to sustain further growth – *i.e.*, a twenty-second level would require an additional 10.4 ***billion*** promoters (*see* table *infra*). Alternatively, if success depended on the recruitment of five persons, 15 levels would require over seven billion promoters (*see id.*). The following table is demonstrative:

| If 3 recruits are required for success | | | If 5 recruits are required for success | | |
|---|---|---|---|---|---|
| level | No. of persons at level | Total persons in pyramid | level | No. of persons at level | Total persons in pyramid |
| 1 | 1 | 1 | 1 | 1 | 1 |
| 2 | 3 | 4 | 2 | 5 | 6 |
| 3 | 9 | 13 | 3 | 25 | 31 |
| 4 | 27 | 40 | 4 | 125 | 156 |
| 5 | 81 | 121 | 5 | 625 | 781 |
| 6 | 243 | 364 | 6 | 3,125 | 3,906 |
| 7 | 729 | 1,093 | 7 | 15,625 | 19,531 |
| 8 | 2,187 | 3,280 | 8 | 78,125 | 97,656 |
| 9 | 6,561 | 9,841 | 9 | 390,625 | 488,281 |
| 10 | 19,683 | 29,524 | 10 | 1,953,125 | 2,441,406 |
| 11 | 59,049 | 88,573 | 11 | 9,765,625 | 12,207,031 |
| 12 | 177,147 | 265,720 | 12 | 48,828,125 | 61,035,156 |
| 13 | 531,441 | 797,161 | 13 | 244,140,625 | 305,175,781 |
| 14 | 1,594,323 | 2,391,484 | 14 | 1,220,703,125 | 1,525,878,906 |
| 15 | 4,782,969 | 7,174,453 | 15 | 6,103,515,625 | 7,629,394,531 |
| 16 | 14,348,907 | 21,523,360 | 16 | 30,517,578,125 | 38,146,972,656 |
| 17 | 43,046,721 | 64,570,081 | 17 | 152,587,890,625 | 190,734,863,281 |
| 18 | 129,140,163 | 193,710,244 | 18 | 762,939,453,125 | 953,674,316,406 |
| 19 | 387,420,489 | 581,130,733 | 19 | 3,814,697,265,625 | 4,768,371,582,031 |
| 20 | 1,162,261,467 | 1,743,392,200 | 20 | 19,073,486,328,125 | 23,841,857,910,156 |
| 21 | 3,486,784,401 | 5,230,176,601 | 21 | 95,367,431,640,625 | 119,209,289,550,781 |
| 22 | 10,460,353,203 | 15,690,529,804 | 22 | 476,837,158,203,125 | 596,046,447,753,906 |

**Table showing the exponential expansion of a multi-level marketing company that depends on recruitment for growth**

42.     As a result, illegitimate multi-level marketing companies are only profitable to a select few at the top of the organizations because recruitment cannot expand at an exponential rate forever.  Because persons at the bottom of a pyramid will necessarily quit, illegitimate companies churn through many new recruits to drive their revenue growth.

**C.     Blyth Agrees to Acquire ViSalus Over Four Closings with the Price to Be Based on Trailing Earnings**

43.     Before Blyth agreed to purchase ViSalus, the Goergens held a significant interest in ViSalus Holdings.  The Goergens own, directly and indirectly, substantially all of the interest in RAM I and RAM II, which owned a significant percentage of the outstanding membership interest in ViSalus Holdings.

44.     On November 25, 2005, the Goergens, through their investment vehicle, RAM I, made their initial investment in ViSalus Holdings.  Pursuant to a Preferred Membership Unit Purchase Agreement (the "Preferred Membership Agreement"), RAM I agreed to purchase 1.5 million Series A Convertible Preferred Units for $1.5 million, or one dollar per unit.

45.     The Defendants anticipated taking ViSalus public when the Goergens made their initial investment in ViSalus Holdings.  Contemporaneous with the Preferred Membership Agreement, ViSalus Holdings agreed, pursuant to a Registration Rights Agreement, that if requested by RAM I, ViSalus Holdings would use its best efforts to register the membership units of ViSalus Holdings with the SEC for the purpose of conducing public offerings.

46.     In December 2005, ViSalus Holdings and RAM I also entered into a Put Agreement, pursuant to which RAM I had the option of selling all of its ViSalus Holdings units to ViSalus Holdings.

47.     By August 2008, the Goergens – through the RAM Funds – held a significant interest in ViSalus Holdings, owning approximately 27.6% of ViSalus Holdings  (RAM I owned 21.98% and RAM II owned 5.64%).

48.     On August 4, 2008, Blyth entered into a definitive agreement to purchase ViSalus, through a series of investments.  Specifically, Blyth, ViSalus Holdings, and the owners and members of ViSalus Holdings – including defendants Goergen and Sarnicola – entered into a Membership Interest Purchase Agreement (the "ViSalus Purchase Agreement").  Pursuant to the ViSalus Purchase Agreement, Blyth would purchase all of the outstanding membership interest in ViSalus Holdings through four closings scheduled to occur in 2008, 2010, 2011, and 2012.

49.     Pursuant to the ViSalus Purchase Agreement, Blyth would initially purchase: (i) 5,433,016 newly issued Series A-1 Convertible Preferred Units from Holdings; **and** (ii) from certain

sellers, including the RAM Funds, a portion of the outstanding membership interests, for an aggregate purchase price of $13 million.   Following the first closing, Blyth would own approximately 40% of the outstanding membership interest.   Pursuant to the ViSalus Purchase Agreement, Blyth would continue to purchase the outstanding membership interests from the sellers – purchasing 15%, 15%, and 30%, respectively, of the outstanding interests at the three remaining closings.   Blyth also agreed to make contributions to ViSalus Holdings to be used to fund ViSalus Holdings's obligations to the participants of its equity incentive plan.   At the second closing, which was scheduled to take place in 2010, Blyth would acquire 15% of the outstanding membership interests for an amount equal to 1.2 times the prior year's EBITDA.   At the third closing, which was scheduled to take place in 2011, Blyth would acquire 15% of the outstanding membership interests for an amount equal to 1.2 times the prior year's EBITDA.   At the fourth closing, which was scheduled to take place in 2012, Blyth would acquire 30% of the outstanding membership interests for an amount equal to 2.4 times the prior year's EBITDA.

50.     In October 2008, Blyth completed its initial investment in ViSalus and purchased a 43.6% equity interest in ViSalus for $13 million in cash and incurred acquisition costs of $1 million, for a total cash acquisition cost of $14 million.

51.     On October 21, 2008, the ViSalus Purchase Agreement was amended in a way designed to benefit ViSalus and to the detriment of Blyth.   Blyth was now required, subject to conditions, to increase its equity ownership in ViSalus Holdings over time to 57.5%, 72.7%, and 100.0%.

**D.     Although ViSalus Failed to Meet Predefined Targets, Blyth Waives Requirement and Proceeds with Acquisition**

52.     On April 15, 2011, Blyth completed the second phase of its acquisition of ViSalus Holdings when it purchased an additional 13.9% of the equity interest of ViSalus Holdings for

$2.5 million, increasing Blyth's ownership of ViSalus Holdings to 57.5%.  At the time of this transaction, however, Blyth was not obligated to increase its ownership in ViSalus pursuant to the ViSalus Purchase Agreement because ViSalus had failed to meet the predefined targets for 2010. Nonetheless, Blyth waived this requirement and proceeded with the second-phase investment. Importantly, Blyth's waiver of this requirement meant that the Company would be required to make the additional purchases of ViSalus in 2012 and 2013 if ViSalus hit its sales targets.

53.     Blyth again altered the terms of the ViSalus Purchase Agreement in a way designed to benefit the owners of ViSalus.  On January 12, 2012, Blyth agreed to amend the ViSalus Purchase Agreement to advance the closing date of the third closing from April 2012 to January 12, 2012. Pursuant to this amendment, on January 12, 2012, Blyth increased its ownership stake to 72.7% in exchange for approximately $22.5 million in cash and issued 340,662 unregistered shares valued at $14.6 million.  Because this closing's purchase price was based on ViSalus's estimated 2011 EBITDA, Blyth later had to pay an additional $5.6 million when the EBITDA numbers were finalized, raising the total third-phase acquisition cost to approximately $43.3 million.

E.     **ViSalus's Sales and EBITDA Begin to Increase Exponentially**

54.     Following the third closing, ViSalus's sales seemingly increased dramatically over the next two quarters – reported sales increased to $138 million and $190 million in the first and second quarters of 2012, respectively.  These sales increases meant that Blyth would be obligated to complete the fourth and final installment at a price exponentially greater than the three previous closings.

55.     On March 14, 2012, Blyth represented in its annual filing on Form 10-K that if ViSalus met its current projected EBITDA for 2012, "the total expected redemption cost of the fourth and final phase will be approximately $214 million to be paid in 2013."  As of December 31, 2011, however, Blyth only had approximately $200 million in cash and cash equivalents.  The

Company did not state how it planned to fund the final payment, representing only that "[t]he payment, if any, may be funded in part using existing cash balances from both domestic and international sources, expected future cash flows from operations and the issuance of common stock and may require the Company to obtain additional sources of external financing."

56.    On May 4, 2012, Blyth represented in its quarterly filing on Form 10-Q that if ViSalus met its current projected EBITDA for 2012, "the total expected redemption cost of the fourth and final phase will be approximately $225 million to be paid in 2013."  As of March 31, 2012, however, Blyth only had approximately $156 million in cash and cash equivalents.  The Company did not state how it planned to fund the final payment, representing only that "[t]he payment, if any, may be funded in part using existing cash balances from both domestic and international sources, expected future cash flows from operations and the issuance of common stock and may require the Company to obtain additional sources of external financing."

57.    On August 3, 2012, Blyth represented in its quarterly filing on Form 10-Q that if ViSalus met its current projected EBITDA for 2012, "the total expected redemption cost of the fourth and final phase will be approximately $271 million to be paid in 2013."  Based on this estimated closing price, the Goergens stood to earn approximately $43 million in the final closing alone from the sale of their Series A Convertible Preferred Units.

58.    To put this in perspective, this final closing price implies a valuation for ViSalus of almost $1 billion, while Blyth itself only had a market capitalization of approximately $624 million at that time.

59.    The following graph depicts the dramatic increase in the valuation of ViSalus from the first closing until the anticipated final closing in 2013:



**Implied value of ViSalus based on closing price**

60.     As of June 30, 2012, however, Blyth only had approximately $167 million in cash and cash equivalents.  Again, the Company did not specifically disclose how it intended to fund the final payment, stating only that "[t]he payment, if any, may be funded in part using existing cash balances from both domestic and international sources, expected future cash flows from operations and the issuance of common stock and may require the Company to obtain additional sources of external financing."

61.     Thus, as ViSalus purportedly experienced explosive growth, the expected costs to complete the acquisition of ViSalus increased dramatically.

**F.      ViSalus Experiences Undisclosed Problems with its Business**

62.     By the start of the Class Period, as detailed further herein, ViSalus reported strong growth, but failed to disclose that it was experiencing significant adverse problems with its business.

## The Multi-Level Marketing Pyramid

63.  ViSalus operates using a multi-level marketing structure.  ViSalus's business model is considered by many to be a pyramid scheme because its sales are driven by recruitment.  ViSalus's promoters are incentivized to recruit promoters who, in turn, are incentivized to do the same.  A substantial majority of ViSalus's promoters quit the program when they realize they are unable to profit.  The individual promoters are independent contractors that earn commissions based on sales of ViSalus products.  Such sales include those made by customers enrolled by promoters, as well as purchases of product by individual promoters in their down-line sales organizations and customers enrolled by such individual promoters.  ViSalus's revenues are comprised of product sales, distributor signup fees (which range from $49 to $999), and the sale of training and promotional materials to its distributors.

64.  Because the few successful promoters in ViSalus make their money by recruiting rather than selling product to *authentic* customers, ViSalus might be considered a pyramid scheme. ViSalus has publicly stated that "[it] [did] not believe that [it] [was] subject to laws regulating pyramid schemes" because "[its] promoters are paid by commissions based on sales of our products to bona fide purchasers."

65.  Contrary to ViSalus's assertion, however, most sales are not to bona fide purchasers. As the FTC's Bureau of Consumer Protection has warned, "[n]ot all multilevel marketing plans are legitimate.  Some are pyramid schemes.  It's best not to get involved in plans where the money you make is based primarily on the number of distributors you recruit and your sales to them, rather than on your sales to people outside the plan who intend to use the products."  Regardless of how ViSalus chooses to define the terms "customer" and "promoter, " the majority of sales of ViSalus products are not to persons whose principle intentions are to use or consume the product themselves.  Rather,

the majority of sales are to persons who intend to profit by promoting the product, recruiting promoters, and/or referring customers.

66.     The Federal Bureau of Investigation has advised, "At the heart of each pyramid scheme is typically a representation that new participants can recoup their original investments by inducing two or more prospects to make the same investment."   ViSalus has made such representations.  The ViSalus regiment is very expensive when compared to competitors' products. The ViSalus Transformation Kit, for example, which includes a 30-day supply of shake mix, energy pills, omega capsules, and other supplements, costs $249 per month.  But ViSalus pushes its "Refer 3 – Get Your Next Month Free!" program whereby a promoter/customer will get his/her Transformation Kit free, if he/she recruits 3 people to purchase Transformation Kits of equal or greater value than her own.   These recruited persons, in turn, are provided with the same opportunity.

<div align="center">

ViSalus's Sales Growth Was Not Product-Driven
Rather, Growth Was Fueled by Recruitment of Promoters

</div>

67.     ViSalus's sales growth was driven by recruitment – not by the demand for its products by customers who actually used or consumed the products themselves.  For example, one of ViSalus's founders, defendant Sarnicola whose down-line represents approximately 75% of ViSalus's sales in 2011 and the first six months of 2012, grew his down-line by recruiting organized down-lines from other multi-level marketing companies, rather than by promoting the product to authentic customers.  In the ViSalus Registration Statement (defined below), filed on September 17, 2012, ViSalus represents that defendant Sarnicola's down-line represents 75% of 2011 sales, stating, in pertinent part:

> Sales generated by a small number of individual promoters, together with their associated down-line sales organizations, represent a majority of our net sales, and there are a number of individual promoters whose generated sales, together with those of their down-line sales organizations, represent in excess of 10% of our net

sales. ***In particular, sales generated by Nick Sarnicola, one of our founders and currently an individual promoter, together with his down-line sales organization and customers marketed to by Mr. Sarnicola and members of his down-line sales organization, represented approximately 75% of net sales in 2011 and in the first six months of 2012***.[1]

68.     Investors have now learned that, rather than marketing the products, ViSalus recruited and poached already organized down-lines from other companies, bringing in high-ranking promoters, each with thousands of promoters under them.  For example, defendant Sarnicola recruited individuals with established down-lines at other multi-level marketing companies to come to ViSalus to be promoters below him in his down-line.  He recruited leading promoters from companies such as MonaVie, Excel, Prospex, and Send Out Cards.  Indeed, most of defendant Sarnicola's senior "Team Members" already had established long-term down-lines by the time they arrived at ViSalus.  Defendant Sarnicola even arranged payments to top promoters at other multi-level marketing companies in order to attract them to ViSalus.

69.     The fact that ViSalus's sales were driven by the poaching of down-lines from other multi-level marketing companies is material to investors because it indicates: (i) that the growth was not driven by the product; and (ii) that the Company's growth will be short-lived.  If these free-agent down-lines simply move to the highest-bidding multi-level marketing company, there is nothing stopping them from picking up and moving to the next "hot" company at any time.  Such a migration would immediately negatively impact sales.

70.     The fact that ViSalus's growth is driven by promoters – rather than by sales to bona fide customers – is evident by the drop in ViSalus's sales over the past two quarters.  On March 8,

---

[1]     All emphasis is added unless otherwise noted.

2013, Blyth announced disappointing first quarter results. Commenting on ViSalus's performance, Ryan Blair, CEO of ViSalus, noted how sales were tied to promoters:

> The first quarter was a period of refocusing on new customer acquisition after 2012's tremendous promoter growth. ***ViSalus experienced a sales decline, largely reflecting fewer qualified Promoters and a commensurate reduction in sales***. We also incurred higher operating expenses reflecting the additional staff and facilities costs as compared to the first quarter of last year. Going forward, we are committed to building our Promoter base, which is key to our model, expanding our product offerings and entering markets outside of North America, as we bring our Body By Vi Challenge to the U.K. in the second quarter.

<u>ViSalus's Extremely High Churn Rate and Misleading Customer Totals</u>

71.    During the Class Period, the Company did not disclose that ViSalus was "churning" through promoters at an extraordinarily high rate (*i.e.*, the "churn rate" or the rate at which promoters drop out, quit, or fail when they realize that success at the enterprise is highly improbable). Indeed, ViSalus's churn rate is extremely high relative to other multi-level marketing companies. For example, using certain figures from the Form S-1/A filed by ViSalus, at least one analysis calculated that ViSalus's churn rates for 2011 and 2012 were approximately 197% and 194%, respectively. *See* Roddy Boyd, <u>The Infernal Machine: From Powder to Dust</u>, Southern Investigative Reporting Foundation (Nov. 26, 2012), http://sirf-online.org/2012/11/26/the-infernal-machine-from-powder-to-dust. To put these figures in perspective, the churn rate for the multi-level marketing company Herbalife, which itself is considered high, is approximately 51%. *See id.* Thus, ViSalus loses its promoters at a rate ***four times higher than Herbalife***. Such a high rate makes ViSalus's business model and near-term growth unsustainable. This information is material to investors because it establishes that ViSalus's business model is unsustainable over the short term. The following table provides an analysis of the Company's churn rates for 2012 and 2011:

**Churn Rate for 2012 (annualized)**

| YE 2011 Promoters | Gross Additions | Promoters on 6/30/2012 | Promoter Churn | Avg. Promoters in Period | (Annualized) 2012 Churn % |
|---|---|---|---|---|---|
| 59,000 | 139,000 | 114,000 | 84,000 | 86,500 | **194.2%** |

**Promoter Churn for 2011**

| YE 2010 Promoters | Gross Additions | YE 2011 Promoters | Promoter Churn | Avg. Promoters in Period | 2011 Churn % |
|---|---|---|---|---|---|
| 9,000 | 117,000 | 59,000 | 67,000 | 34,000 | **197.1%** |

Source:  First three columns from ViSalus's S-1/A, filed September 17, 2012

72.     ViSalus's representations about its customer totals are misleading.  For example, in the ViSalus Registration Statement (defined below), filed on August 16, 2012, ViSalus claimed to have 1,258,000 customers as of June 30, 2012.  ViSalus, however, defines a customer "as anyone who has purchased products from us *at least once in the previous 12 months*, other than any purchaser who qualifies as an individual promoter on the measurement date."  With such a high churn rate of promoters, it follows that ViSalus correspondingly "churns" through the persons who do not even perform well enough to qualify as promoters.  ViSalus had access to more recent and accurate data concerning the purchasers of its products.  Indeed, that is how it knows if a purchaser qualifies to be a "promoter."  Thus, because its definition unnecessarily counts as "customers" many persons who stopped buying products from the Company many months before, its statements concerning "customer" amounts are materially misleading.

<u>ViSalus's Sales Begin to Slow in June 2012</u>

73.     As part of its investigation in connection with this case, Lead Counsel interviewed a confidential witness ("CW"), who was an employee of ViSalus during the Class Period.  Because of the CW's position dealing with the quality and control of ViSalus's products, he/she regularly was provided with reports concerning ViSalus's sales and units sold.  According to the CW, after significant growth in the first half of 2012, ViSalus's sales began to slow beginning in June 2012.

74. According to the CW, because of this slowdown, beginning in July 2012, there was increased pressure to increase sales. Additionally, at a conference hosted by ViSalus in Miami, on or about July 12, 2012, ViSalus attempted to re-energize its largest promoters and encouraged them to get more "blood" into the system. Because of the pyramid-nature of ViSalus's business, new recruits are vital to its growth. According to the CW, at the July 2012 Miami conference, ViSalus held a training session attended by the Company's largest promoters – the few promoters who were actually making money at the top of the "pyramid." During this session, the speakers discussed how the growth of ViSalus's sales was slowing and specifically how sales by certain subsets of lower-level promoters were flat or declining.

75. According to the CW, one of the suppliers of ViSalus's energy shots and vitamins had told him/her that the supplier had manufactured product based on the projections given to it by ViSalus earlier in the year. In July 2012, however, the supplier was told that due to lower sales, the supplier was going to have to hold two to three months of inventory until sales picked up again.

<u>ViSalus Suppliers Were Struggling with Various Issues</u>

76. Because ViSalus grew so quickly, it did not have sufficient inventory management or supply chain systems in place. Thus, ViSalus was unready for the various supply problems it faced beginning in June 2012. For example, according to the CW, ViSalus knew by late June 2012 that the suppliers of its shake mix – Georgia Spice Company and Valentine Enterprises, Inc. – were struggling to meet demand. Although these suppliers were attempting to increase the capacity of their factories, such upgrading would take several months to complete.

77. Additionally, according to the CW, during or around June through July 2012, a supplier of ViSalus's energy shots was experiencing problems with the tamper-resistant bands on its bottle caps. Because of this flaw, customers were unable to open bottles of their energy shots.

Around the same time, according to the CW, ViSalus was also having issues with the supplier of its cookies: the cookies were either crumbling too easily or breaking apart in the packaging.

78.     Because of these supply issues, in July and August 2012, ViSalus was trying to find a way to use millions of dollars' worth of shake mix that had been warehoused earlier in the year due to issues with the Canadian version of its meal-replacement shake.  In January 2012, ViSalus had attempted to expand its sales and recruitment into Canada, but in order to distribute its meal-replacement shake in Canada, ViSalus had to modify the ingredients to comply with Canadian regulators.  The new formula had to be pulled because customers complained about the taste.  As a result, instead of selling the newly formulated shake mix, ViSalus was forced to store a substantial amount of product in a warehouse in Toronto.  Since the shake mix had a finite lifespan, ViSalus had to make a determination about what to do with this product.  According to the CW, Blyth did not seek to address the shake mix problem until July.

## G.     Materially False and Misleading Statements Made During the Class Period

79.     The Class Period begins on January 13, 2012.  On that date, ViSalus issued a press release, titled "ViSalus Sales Increase Seven-Fold to $231 Million in 2011 from $34 Million in 2010," announcing that ViSalus's sales had increased substantially and that Blyth had completed the third of the four-phase acquisition of ViSalus.  Commenting on the founders and on ViSalus's market model, defendant Goergen stated, in pertinent part:

> We are gratified that Ryan [Blair], Blake [Mallen], and Nick [Sarnicola] are continuing in their ViSalus leadership roles and have an enhanced presence with Blyth.  ***ViSalus' market model and technology savvy is truly transforming the health and direct selling industries.***

80.     In response to this announcement, the price of Blyth's shares increased 12% from their close of $28.58 per share on January 12, 2012, to close at $31.90 per share on January 13, 2012, on extremely heavy volume.

81.     The statement referenced above in ¶79 regarding ViSalus's market model "truly transforming the health and direct selling industries" was materially false and misleading because Defendants knew but failed to disclose: (i) that because ViSalus's growth is driven by recruitment of transient promoters rather than by sales to authentic customers, who actually used or consumed the products themselves, most promoters that attempt to profit from the ViSalus multi-level marketing program will ultimately fail; (ii) that the churn rate for ViSalus promoters/customers was approximately 200%; and (iii) that because of the extraordinarily high churn rate of both customers and promoters, ViSalus's sales growth rate was unsustainable.

82.     On March 14, 2012, Blyth issued a press release, titled "Blyth, Inc. Announces 2012 Earnings Guidance 39% Above Prior Year," announcing its outlook for the year ending December 31, 2012.  The Company represented that earnings per share were expected to be $4.50-$4.75 for the year ending December 31, 2012 and included charges of $0.25 for the ViSalus equity incentive plan and $0.25 for restructuring related to PartyLite's North American operations and that the "forecasted 39% increase in 2012 earnings per share versus the comparable prior 12 month period is due to growth in ViSalus."  Defendant Goergen commented on the announcement stating, in pertinent part, as follows:

> *We are planning for continued strong growth at ViSalus due to the strength of the products and programs that drove the momentum experienced in 2011 and their extensions in 2012.*  A sizeable portion of our planned capital expenditures is specifically designed to support the ViSalus Founders, management team and Promoters as they build ViSalus into a lifestyle brand and a household name.

83.     On the same day, March 14, 2012, Blyth filed its Form 10-K for the year ending December 31, 2011, with the SEC, which was signed by the Blyth Individual Defendants, among others (the "2011 Form 10-K").  In the 2011 Form 10-K, Blyth represented that the cost of the fourth and final phase of its acquisition would be substantially greater than the first three payments.  The 2011 Form 10-K stated, in pertinent part, as follows:

We intend to and may be required to purchase the remaining interest in ViSalus to increase our ownership to 100%. The fourth phase and final purchase of ViSalus is conditioned upon ViSalus meeting the original purchase agreement's 2012 operating target. We have the option, but are not required, to acquire the remaining interest in ViSalus if it does not meet this operating target. However, as of December 31, 2011, the operating target for 2012 requiring the additional purchase is anticipated to be met. If ViSalus meets its current projected 2012 EBITDA forecast, *the total expected redemption cost of the fourth and final phase will be approximately $214 million* to be paid in 2013. The purchase price of the additional investment is equal to a multiple of ViSalus's EBITDA, exclusive of certain unusual items. The payment, if any, may be funded in part using existing cash balances from both domestic and international sources, expected future cash flows from operations and the issuance of common stock and may require us to obtain additional sources of external financing.

84.     The 2011 Form 10-K represented that Blyth's net sales in the direct selling segment had increased 26% for the 11-month period year over year. The Company attributed the increase in net sales to ViSalus, stating, in pertinent part, as follows:

Net sales in the Direct Selling segment increased $141.4 million, or 26%, to $690.2 million for the eleven months ended December 31, 2011 from $548.8 million in comparable prior year period. *This increase is attributed to ViSalus's net sales increase of $192.6 million, to $225.4 million from $32.8 million last year. This growth is a result of an increase in promoters to over 59,000 this year from over 8,000 last year, as well as increased demand for its products.*

85.     The 2011 Form 10-K also represented that Blyth's consolidated gross profit had increased 24% for the 11-month period year over year. The Company attributed the increase in gross profit to ViSalus, stating, in pertinent part, as follows:

Blyth's consolidated gross profit increased $104.3 million, or 24%, to $547.2 million for the eleven months ended December 31, 2011 from $442.9 million for the eleven months ended December 31, 2010. *This growth was due to an increase in ViSalus's gross profit related to higher sales volume* and an increase within Sterno's gross profit due to selling price increases to cover higher commodity costs and freight surcharges. Partially offsetting these increases was a decrease in gross profit within PartyLite due to lower sales in U.S., Canada and mature markets in Europe, as well as higher promotion and overhead costs. *The gross profit margin increased to 61.6% for the eleven months ended December 31, 2011 from 59.8% for the eleven months ended December 31, 2010 principally due to higher sales volume in ViSalus, which carries a higher gross margin than our other businesses.*

86.     The 2011 Form 10-K further represented that sales at ViSalus had dramatically increased, stating, in pertinent part, as follows:

> Net sales decreased $55.7 million, or approximately 6.5%, to $796.6 million for the year ended January 31, 2011 from $852.3 million in the comparable prior year period.  The decrease is a result of lower sales in PartyLite's North American business as well as the impact of weaker European currencies versus the U.S. dollar. This decrease was partially offset by an increase in sales in our Wholesale segment. International sales represented approximately 51% and 50% of total sales for the years ended January 31, 2011 and 2010, respectively.  ***Sales at ViSalus increased $25.4 million or 203% to $37.9 million for the year ended January 31, 2011 from $12.5 million in the comparable prior year period. This growth is a result of a 371% increase in promoters on a year-over-year basis.***

87.     Also on March 14, 2012, Blyth issued a press release announcing its fourth quarter and 2011 sales and earnings.  With respect to net sales, the press release stated, in pertinent part, as follows:

> ***Net Sales for the three months ended December 31, 2011 increased 23% to $365.0 million versus $296.9 million for the comparable prior year period primarily due to significant year-over-year sales growth at ViSalus.***  International sales represented 50% of fourth quarter sales this year compared to 53% last year.

88.     The statements referenced above in ¶¶82-87 that ViSalus was "planning for continued growth . . . due to the strength of the products and programs that drove the momentum experienced in 2011 and their extensions in 2012"; the 587% growth in ViSalus's year-over-year sales; the 371% increase in promoters year over year; and the 23% increase in Blyth's fourth quarter net sales on a year-over-year basis were materially false and misleading because Defendants knew, but failed to disclose: (i) that the growth rate of ViSalus's sales was being driven by recruitment of transient promoters, rather than by sales to authentic customers who actually used or consumed the products themselves; (ii) that the churn rate for promoters/customers was approximately 200%; (iii) that because of the extraordinarily high churn rate of both customers and promoters, ViSalus's sales growth rate was unsustainable; and (iv) that a substantial percentage of ViSalus's sales were to short-term, transient customers/promoters.

89. The 2011 Form 10-K was also materially false and misleading because it failed to disclose known trends and uncertainties regarding: (i) the Company's trend of slowing sales growth, (ii) the uncertainties surrounding the exceedingly high promoter churn rate, as set forth below at ¶¶133-135; and (iii) the uncertainties of recruiting teams of transitory promoters that migrate from one multi-level marketing company to the next.

90. On April 2, 2012, a letter from defendant Goergen to shareholders of Blyth was filed with the SEC.  Commenting on ViSalus's performance, defendant Goergen stated, in pertinent part:

> Consolidated net sales increased 20% to $888.3 million for the eleven months ended December 31, 2011 from $740.9 million for the eleven months ended December 31, 2010.  *ViSalus reported sales growth of 586% for the period, while the sales environment remained challenging for other Blyth companies.*
>
> \*       \*       \*
>
> In the Direct Selling segment, sales of $690.2 million for the eleven month period were 26% above the prior year.  *Sales at ViSalus increased to $225.4 million from $32.8 million in the prior year as strong momentum behind the Body By Vi 90 Day Challenge drove an increase in active independent Promoters and significant sales growth versus prior year.*

91. The statements referenced above in ¶90 regarding the 586% growth in ViSalus's year-over-year sales and how "strong momentum behind the Body By Vi 90 Day Challenge drove an increase in active independent Promoters and significant sales growth versus prior year" were materially false and misleading because Defendants knew, but failed to disclose: (i) that the growth rate of ViSalus's sales was being driven by recruitment of transitory teams of promoters, rather than by sales to authentic customers who actually used or consumed the products themselves; (ii) that the churn rate for promoters/customers was approximately 200%; (iii) that because of the extraordinarily high churn rate of both customers and promoters, ViSalus's sales growth rate was unsustainable; and (iv) that a substantial percentage of ViSalus's sales were to short-term, transient customers/promoters.

92.    On May 4, 2012, Blyth issued a press release announcing its financial results for the first quarter of 2012, the period ending March 31, 2012.  For the quarter, the Company reported that "[n]et Sales for the three months ended March 31, 2012 increased 56% to $283.1 million versus $181.0 million for the comparable prior year period primarily due to significant year-over-year sales growth at ViSalus.  International sales represented 29% of first quarter sales this year compared to 49% last year, driven by ViSalus's strong domestic sales growth."  The press release further stated, in pertinent part, as follows:

> Operating Profit for the first quarter was $19.6 million this year versus $3.3 million last year and includes a pre-tax ViSalus equity incentive charge of $2.9 million this year and $2.2 million last year.  The Company also incurred pre-tax restructuring charges of $1.1 million for PartyLite this year.  Excluding the impact of these charges, operating profit would have been $23.7 million this year versus $5.5 million last year.  ***The increase in operating profit is principally due to the growth in ViSalus.***
>
> *          *          *
>
> ***In the Direct Selling segment, first quarter net sales increased 82% to $236.4 million versus $130.1 million for the same period last year due to significant sales growth at ViSalus.***
>
> ***Sales at ViSalus were $136.7 million in this year's first quarter versus $20.0 million for the same period last year.  ViSalus had over 92,000 independent Promoters at the end of the first quarter versus over 16,000 for the same period last year.***

93.    Also on May 4, 2012, Blyth filed its Form 10-Q for the period ended March 31, 2012, with the SEC, which was signed by the Blyth Individual Defendants.  The Form 10-Q represented that the total expected price for the balance of ViSalus would be $225 million.  The Form 10-Q stated, in pertinent part, as follows:

> The Company intends to and may be required to purchase the remaining interest in ViSalus to increase its ownership to 100%.  The fourth phase and final purchase of ViSalus is conditioned upon ViSalus meeting its original purchase agreement's 2012 operating target.  The Company has the option, but is not required, to acquire the remaining interest in ViSalus if it does not meet this operating target. However, as of March 31, 2012, the operating target for 2012 requiring the additional purchase is

anticipated to be met. *If ViSalus meets its current projected 2012 EBITDA forecast, the total expected redemption cost of the fourth and final phase will be approximately $225 million to be paid in 2013.* The purchase price of the additional investment is equal to a multiple of ViSalus's EBITDA, exclusive of certain unusual items. The payment, if any, may be funded in part using existing cash balances from both domestic and international sources, expected future cash flows from operations and the issuance of common stock and may require the Company to obtain additional sources of external financing.

94.     The Form 10-Q also represented that ViSalus had increased the number of promoters, stating, in pertinent part, as follows:

Net sales in the Direct Selling segment for the three months ended March 31, 2012 increased $106.3 million, or 82%, to $236.4 million from $130.1 million in the comparable prior year period. *ViSalus's net sales increased $116.7 million, or 585% to $136.7 million from $20.0 million last year. This growth is a result of an increase in promoters to over 92,000 this year from over 16,000 last year, as well as increased demand for its products.*

95.     On the same day, May 4, 2012, Blyth issued another press release increasing the Company's fiscal year 2012 earnings guidance by approximately 10%. The press release stated, in pertinent part, that the Company's "[n]ormalized earnings per share [were] expected to be $5.50-$5.75 for the year ending December 31, 2012 compared to prior guidance of normalized earnings per share of $5.00-$5.25[,]" emphasizing that: "[t]he forecasted increase in 2012 earnings per share versus prior guidance is principally due to growth at ViSalus."

96.     The statements referenced above in ¶¶92-95 regarding the 56% increase in Blyth's first quarter net sales on a year-over-year basis; how the increase in Blyth's profit was principally due to growth in ViSalus; the 584% growth in ViSalus's first quarter net sales on a year-over-year basis; how ViSalus's net-sales growth was the result of an increase in promoters to over 92,000 from 16,000 the previous year; and that ViSalus forecasted increased 2012 earnings due to the growth at ViSalus were materially false and misleading because Defendants knew, but failed to disclose: (i) that the growth rate of ViSalus's sales was being driven by recruitment, rather than by sales to authentic customers who actually used or consumed the products themselves; (ii) that the churn rate

for promoters/customers was approximately 200%; (iii) that because of the extraordinarily high churn rate of both customers and promoters, ViSalus's sales growth rate was unsustainable; and (iv) that a substantial percentage of ViSalus's sales were to short-term, transient customers/promoters.

97.    The Form 10-Q for the quarterly period ended March 31, 2012 was also materially false and misleading because it failed to disclose known trends and uncertainties regarding: (i) the Company's trend of slowing sales growth; and (ii) the uncertainties surrounding the exceedingly high promoter churn rate, as set forth below at ¶¶133-135.

98.    On May 4, 2012, ViSalus issued a press release, titled "ViSalus Momentum Continues with Record-Breaking First Quarter Sales of $136.7 Million; a 585% Increase Year-Over-Year," announcing first quarter 2012 sales.  The press release stated, in pertinent part:

> ViSalus, the number one challenge marketing company with its Body by Vi 90-Day Challenge, today announced first quarter 2012 sales of $136.7 million compared to $20.0 million for the same period last year.  ***The Company had over 92,000 independent Promoters at the end of the first quarter versus over 16,000 for the same period last year.***

99.    Discussing how ViSalus's products and services support promoters, Ryan Blair, CEO of ViSalus, stated, in pertinent part:

> ***ViSalus' members continue to validate that our 90-Day Challenge business model works with their fast-paced lifestyle and helps them achieve their health goals. Our targeted new products and services support the growth and success of our Promoters, Leaders and customers as we build ViSalus into a leading lifestyle brand together.***

100.    The statements referenced above in ¶¶98-99 regarding the 475% increase in promoters; how ViSalus members have validated the business model; and how ViSalus's products and services support growth and success of ViSalus promoters were materially false and misleading because Defendants knew, but failed to disclose: (i) that the growth rate of ViSalus's sales was being driven by recruitment, rather than by sales to authentic customers who actually used or consumed the products themselves; (ii) that the churn rate for promoters/customers was approximately 200%; (iii)

that ViSalus's business model was inherently flawed in that most promoters would fail; and (iv) for this reason and because "network marketing" (*i.e.,* multi-level marketing) only benefits those few at the top, that ViSalus's products and services do not support the growth and success of promoters.

101.    On May 16, 2012, Blyth announced that the Company's Board had approved a two-for-one split of the Company's common stock in the form of a stock dividend of one share for each outstanding share.  The stock dividend would be payable on June 15, 2012 to holders of record at the close of business on June 1, 2012.  The split would increase Blyth's total shares outstanding from approximately 8.6 million shares to 17.2 million shares.

102.    On August 3, 2012, Blyth issued a press release announcing its financial results for the second quarter, the period ending June 30, 2012.  For the second quarter, the Company reported net sales increased 70% to $324.8 million from $191.5 million primarily due to significant year-over-year sales growth at ViSalus.  With respect to other business metrics the press release stated, in pertinent part, as follows:

> Operating Profit for the second quarter was $19.0 million this year versus a loss of $0.8 million last year and includes a pre-tax ViSalus equity incentive charge of $9.6 million this year and $6.0 million last year.  The Company also incurred pre-tax restructuring charges of $0.2 million for PartyLite this year.  Excluding the impact of these charges, operating profit would have been $28.9 million this year versus $5.3 million last year.  ***The increase in operating profit is principally due to the growth in ViSalus.***
>
> <div align="center">*        *        *</div>
>
> Second Quarter Segment Performance
>
> ***In the Direct Selling segment, second quarter net sales increased 98% to $278.3 million versus $140.9 million for the same period last year due to significant sales growth at ViSalus.***
>
> ***Sales at ViSalus were $190.4 million in this year's second quarter versus $40.6 million for the same period last year.  ViSalus had over 114,000 independent Promoters at the end of the second quarter versus over 28,000 for the same period last year.***

103.    On the same day, August 3, 2012, Blyth filed a Form 10-Q for the period ended June 30, 2012 with the SEC, which was signed by the Blyth Individual Defendants.  The Form 10-Q represented that the total expected price for the balance of ViSalus would now be $271 million.  The Form 10-Q stated, in pertinent part, as follows:

> The Company intends to and may be required to purchase the remaining interest in ViSalus to increase its ownership to 100%.  The fourth phase and final purchase of ViSalus is conditioned upon ViSalus meeting its original purchase agreement's 2012 operating target.  The Company has the option, but is not required, to acquire the remaining interest in ViSalus if it does not meet this operating target.  However, as of June 30, 2012, the operating target for 2012 requiring the additional purchase is anticipated to be met.  ***If ViSalus meets its current projected 2012 EBITDA forecast, the total expected redemption cost of the fourth and final phase will be approximately $271 million to be paid in 2013.***  The purchase price of the additional investment is equal to a multiple of ViSalus's EBITDA, exclusive of certain unusual items.  The payment, if any, may be funded in part using existing cash balances from both domestic and international sources, expected future cash flows from operations and the issuance of common stock and may require the Company to obtain additional sources of external financing.

104.    The Form 10-Q represented that net sales had increased due to ViSalus, stating, in pertinent part:

> Net sales in the Direct Selling segment for the six months ended June 30, 2012 increased $243.7 million, or 90%, to $514.7 million from $271.0 million in the comparable prior year period.  ***ViSalus's Net sales increased $266.4 million, or 440% to $327.0 million from $60.6 million last year.  This growth is a result of an increase in the number of promoters to over 114,000 as of June 30, 2012 from over 28,000 in the comparable prior year period.***
>
> *              *              *
>
> ***Net sales in the Direct Selling segment for the three months ended June 30, 2012 increased $137.4 million, or 98%, to $278.3 million from $140.9 million in the comparable prior year period.  ViSalus's Net sales increased $149.8 million, or 369% to $190.4 million from $40.6 million last year.  As mentioned above, this growth is a result of an increase in promoters over last year, as well as increased demand for its products due to a growing customer base.***

105.    On the same day, August 3, 2012, Blyth issued another press release again announcing an increase in the Company's fiscal year 2012 earnings guidance by approximately an

additional 10%.  The press release stated, in relevant part, that the Company's "[n]ormalized earnings per share [was] expected to be $3.00 - $3.15 for the year ending December 31, 2012 compared to prior guidance of normalized earnings per share of $2.75 - $2.88," and again attributed strong *"growth at ViSalus."*  The press release also explained that the guidance had been revised to reflect the Company's two-for-one stock split effective June 15, 2012.

106.     The statements referenced above in ¶¶101-105 regarding the 70% increase in Blyth's second quarter net sales on a year-over-year basis; how the increase in Blyth's net sales was principally due to the growth in ViSalus; the 369% increase in ViSalus's second quarter net sales on a year-over-year basis; how ViSalus's net-sales growth was the result of an increase in promoters to over 114,000 from 28,000 the previous year; the Company's increased earnings guidance; and how this increased guidance was attributed to strong growth at ViSalus were materially false and misleading because Defendants knew, but failed to disclose: (i) that by June 2012, ViSalus's sales growth was significantly slowing; (ii) that because ViSalus was experiencing problems with its inventory management and supply chain systems, including the inability of some of its suppliers to meet current demand, ViSalus could not maintain its sales growth in the near future; (iii) that the growth rate of ViSalus's sales was being driven by recruitment, rather than by sales to authentic customers who actually used or consumed the products themselves; (iv) that the churn rate for promoters/customers was approximately 200%; (v) that because of the extraordinarily high churn rate of both customers and promoters, ViSalus's sales growth rate was unsustainable; and (vi) that a substantial percentage of ViSalus's sales were to short-term, transient customers/promoters.

107.     The Form 10-Q for the quarterly period ended June 30, 2012 was also materially false and misleading because it failed to disclose known trends and uncertainties regarding: (i) the Company's trend of slowing sales growth; (ii) the Company's trend of decreasing sales; (iii) the

uncertainties concerning the Company's supply problems; (iv) the uncertainties surrounding the exceedingly high promoter churn rate; and (v) the trend of decreasing number of promoters, as set forth below at ¶¶133-135.

108.    On August 16, 2012, Blyth announced that the Company planned to spin off ViSalus by selling $175 million of its ViSalus stock in the ViSalus IPO.  The press release issued that day, titled "Blyth, Inc. Announces Filing of Registration Statement for Initial Public Offering of ViSalus," stated, in pertinent part, as follows:

> Blyth, Inc. (NYSE:BTH) today announced that ViSalus has filed a registration statement on Form S-1 with the U.S. Securities and Exchange Commission for a potential initial public offering ("IPO") of its Class A common stock.  The registration statement has been filed by FVA Ventures, Inc., which will be renamed ViSalus, Inc. in connection with the IPO.  ViSalus is a direct-to-consumer, personal health product company offering a suite of branded weight-management products, nutritional supplements and energy drinks to customers in the United States and Canada through a network marketing model, which is a form of direct selling.

> Following the IPO, Blyth will continue to own over 50% of ViSalus's common stock.  The number of shares to be offered and the price range for the offering have not yet been determined.  A portion of the shares to be offered in the IPO will be issued and sold by ViSalus, and a portion will be sold by certain stockholders of ViSalus.

> A registration statement relating to these securities has been filed with the Securities and Exchange Commission (the "SEC"), and is available on the SEC's website at www.sec.gov. . . . .

<p style="text-align:center">*      *      *</p>

> Jefferies & Company, Inc. will act as book-running manager for the offering. . . .

109.    On August 16, 2012, ViSalus filed a Form S-1 with the SEC (the Form S-1 and its amendments are collectively referred to herein as the "ViSalus Registration Statement").  In providing an overview of its customers, promoters, sales, and earnings, the ViSalus Registration Statement stated, in pertinent part, as follows:

- ***We had approximately 1,258,000 customers at June 30, 2012, an increase of approximately 500% as compared to approximately 208,000 customers at June 30,***

*2011.* We define a "customer" as anyone who has purchased products from us at least once in the previous 12 months, other than any purchaser who qualifies as an individual promoter on the measurement date.

- *We had approximately 114,000 individual promoters at June 30, 2012, an increase of approximately 300% as compared to approximately 29,000 individual promoters at June 30, 2011.* We define an "individual promoter" as a person eligible to receive a commission within the ViSalus promoter compensation plan on the measurement date.

- *We had net sales of $327.3 million for the six months ended June 30, 2012 and $230.2 million for the year ended December 31, 2011, increases of approximately 450% and 600%, respectively, as compared to net sales of $59.3 million and $33.7 million for the comparable prior year periods.*

- *We had Adjusted EBITDA of $55.2 million for the six months ended June 30, 2012 and $35.6 million for the year ended December 31, 2011, increases of approximately 600% and 2,600%, respectively, as compared to Adjusted EBITDA of $7.9 million and $1.3 million for the comparable prior year periods.*

110. In discussing how Blyth has expanded its independent promoter sales force and customers, the ViSalus Registration Statement stated, in pertinent part, as follows:

Since 2010, we have leveraged the Challenge and our economic model to expand our independent promoter sales force and customers. *As of June 30, 2012, we had 114,000 individual promoters, as compared to 29,000 individual promoters as of June 30, 2011. As of June 30, 2012, we had 1,258,000 customers, as compared to 208,000 customers as of June 30, 2011.* For the six months ended June 30, 2012, our net sales were $327.3 million, an increase of approximately 450% over $59.3 million in net sales for the six months ended June 30, 2011 primarily due to the increase in our independent promoter sales force and customer base.

| | AS OF DECEMBER 31, | | AS OF JUNE 30, | |
|---|---|---|---|---|
| | 2011 | 2010 | 2012 | 2011 |
| Individual Promoters | 59,000 | 9,000 | 114,000 | 29,000 |
| Customers | 543,000 | 78,000 | 1,258,000 | 208,000 |

111. On that day, August 16, 2012, the Company's common stock reached a Class Period high of $46.15 per share in intraday trading.

112. The statements referenced above in ¶¶109-110 regarding the 500% increase in customers from June 30, 2011 to June 30, 2012; the 300% increase in promoters from June 30, 2011 to June 30, 2012; the 600% increase in ViSalus's annual net sales; the 2,600% increase in ViSalus's

annual adjusted EBITDA; the 293% annual increase in individual promoters as of June 30, 2012;

and the 505% annual increase in customers as of June 30, 2012 were materially false and misleading

because Defendants knew, but failed to disclose: (i) that by June 2012, ViSalus's sales growth was

significantly slowing; (ii) that because ViSalus was experiencing problems with its inventory

management and supply chain systems, including the inability of some of its suppliers to meet

current demand, ViSalus could not maintain its sales growth in the near future; (iii) that the growth

rate of ViSalus's sales was being driven by recruitment, rather than by sales to authentic customers

who actually used or consumed the products themselves; (iv) that the churn rate for

promoters/customers was approximately 200%; (v) that because of the extraordinarily high churn

rate of both customers and promoters, ViSalus's sales growth rate was unsustainable; (vi) that

because of the extraordinarily high churn rate of customers, the reported number of customer totals

was misleading; (vii) that because the exceedingly high churn rate, the Company's definition of

"customers" was misleading as its vastly overstated bona fide customers; (viii) that the number of

customers was vastly overstated because ViSalus included as "customers" all persons who did not

qualify as promoters and who purchased any product in the past 12 months; and (ix) that a

substantial percentage of ViSalus's sales were to short-term, transient customers/promoters.

113.   On the news of the planned ViSalus IPO, Blyth's shares increased 17% from their

close of $37.09 per share on the evening of August 15, 2012, to a close of $43.36 per share on

August 16, 2012, on extremely high trading volume of more than 1.5 million shares traded, nearly 10

times the average daily trading volume over the previous 30 trading days.

114.   On September 21, 2012, Moody's Investors Service ("Moody's") cut its outlook for

Blyth to "negative" from "stable" citing a weaker core business, liquidity concerns (including having

$100 million in senior unsecured notes scheduled to mature), and the Company's obligation to

repurchase the remaining 27% of ViSalus it did not already own.  Because Blyth might be required to purchase the remaining interest in ViSalus for $271 million, Moody's noted, "At this time, it is unclear how Blyth will fund these upcoming obligations, as cash on hand is not sufficient."  In response to this news, on September 21, 2012, the price of Blyth stock declined precipitously, falling more than 10% to close at $34.95, down $3.95 from the prior day's close.

115.     Then, on September 26, 2012, Blyth issued a press release announcing that it was cancelling the ViSalus IPO.  The Company's September 26, 2012 press release represented that "ViSalus has achieved Net Sales growth in excess of 450% in the first half of 2012; however, management believes that current conditions are not conducive to recognizing this level of achievement."

116.     Following this announcement, on September 26, 2012, Blyth held a conference call to discuss the cancellation of the ViSalus IPO.  During the conference call, defendant Goergen claimed that the cancellation of the ViSalus IPO was simply a result of the "IPO marketplace" being unwilling to "recognize the strength of [the ViSalus] story . . . .":

> As I am sure all of you on this call know, this morning we announced that ViSalus, Blyth's very healthy lifestyle direct selling company, withdrew its initial public offering **because current uncertain market conditions for these types of transactions** in its market segment [were] not recognizing the extraordinary growth and potential future growth of the Company.  Blyth management fully supports this decision, as the ViSalus founders, its senior managers, and Blyth management are fully committed to ViSalus's long-term growth.  We want to take the opportunity now to share our perspective, and then take your questions.
>
> **First and foremost, nothing in Blyth's or ViSalus's fundamentals has changed.** Blyth has a strong balance sheet, and continues to generate strong cash flow. **ViSalus continues to achieve impressive growth,** and ViSalus's founders and management are committed to building equity together with Blyth for the long term. **To repeat – the current IPO marketplace does not appear willing to recognize the strength of this story, however.**
>
> For those of you not familiar with ViSalus's specific achievements, let me remind you that **it is a company that is growing every day**, with net sales growth in excess of 450% during the first half of 2012 versus the prior year.  It has over 100,000

individual promoters, 15,000 of which traveled to Miami this past July to attend ViSalus's Vitality Conference.  It currently has over one million customers – hardly a surprise given their on-target strategy of challenging people to live a much-needed healthy lifestyle.  Moreover, they support people, so they can be successful in meeting this challenge.  And ViSalus hasn't even gone outside the United States and Canada yet.

During the conference call, an analyst asked defendants Barghaus and Goergen about the

Company's high promoter churn.  The exchange, in pertinent part, was as follows:

<Q - Analyst>: Okay.  And then can I ask a ViSalus question, about their business, just having read through the S-1?

<A - Robert H. Barghaus>: Okay.

<Q - Analyst>: One of the things. . .

<A - Robert H. Barghaus>: We'll try to answer it if we can.

<Q - Analyst>: Okay.  *One of the things I noticed is there seems to be very high promoter churn.  I calculated it at about 200% annually.  How do they plan to address that and was that one of the underwriters' concerns?*

<A - Robert H. Barghaus>: No.  Bob came to know that was not one of the underwriters' concerns.  *I think in our experience in direct selling there's always a lot of promoter churn in direct selling companies.*

<A - Robert B. Goergen>: *That's the nature of direct selling. I don't know how you got your number because it can be calculated different ways, but in our PartyLite business we also have the same kind of issues, but it's the nature of direct selling, but I'm not so sure how you calculated and we'll address that as we need to.*

<Q - Analyst>: What do you think promoter churn is. . .

<A - Robert B. Goergen>: I said it's calculated. . . .

<Q - Analyst>: On an annualized basis.

<A - Robert B. Goergen>: . . .in various different ways and then we have to go on a great deal of difficulty how the calculation is made and it's inappropriate for the phone call.

<Q - Analyst>: Okay. *And then percentages of revenue to distributors, versus direct to consumers, was that a concern to the underwriters?*

<A - Robert H. Barghaus>: No.

<A - Robert B. Goergen>: No.

<Q - Analyst>: *It looks like 80% of sales to distributors are churning quite a lot.*

<A - Robert H. Barghaus>: *We're not going to get into ViSalus, I'm sorry, but you're inaccurate.*

<Q - Analyst>: Okay.

117.    The statements referenced above in ¶116 regarding how ViSalus's fundamentals had not changed; how ViSalus continued to achieve impressive growth; how ViSalus was growing every day; the inaccuracy of the analyst's figures; and how a 200% churn rate was "the nature of direct selling" were materially false and misleading because Defendants knew, but failed to disclose: (i) that by June 2012, ViSalus's sales growth was significantly slowing; (ii) that because ViSalus was experiencing problems with its inventory management and supply chain systems, including the inability of some of its suppliers to meet current demand, ViSalus could not maintain its sales growth in the near future; (iii) that the growth rate of ViSalus's sales was being driven by recruitment, rather than by sales to authentic customers who actually used or consumed the products themselves; (iv) that the churn rate for promoters/customers was approximately 200%; (v) that because of the extraordinarily high churn rate of both customers and promoters, ViSalus's sales growth rate was unsustainable; (vi) that because of the exceedingly high churn rate, the Company's definition of "customers" was misleading as its purpose was to vastly overstate the number of bona fide customers; (vii) that a substantial percentage of ViSalus's sales were to short-term, transient customers/promoters; and (viii) that a 200% churn rate is not typical of other direct selling (*i.e.,* multi-level marketing) companies and is not the "nature of direct selling."

118.    While Blyth's shares were pummeled on this news, precipitously declining nearly $7 per share, or 21%, on unusually high trading volume, the shares remained artificially inflated by

Defendants': (i) bullish comments about the vitality of the Company's core business and financial fundamentals; and (ii) misstatements concerning ViSalus's remarkably high churn rate.

119.   On November 2, 2012, Blyth's stock fell 14% after disclosing at the Company's National Success Training event in St. Louis Missouri that its third quarter 2012 ViSalus sales were only $169.9 million.   The Company's stock, which had closed at $23.14 on the evening of November 1, 2012, closed down at $19.96 on November 2, 2012, with more than 1.5 million shares changing hands.   As can be seen from the decline of quarterly sales in the following chart, the illusory sales growth had ended:



**Sales (in millions) per quarter**

120.   On November 6, 2012, after the close of trading, Blyth issued a press release slashing the Company's fiscal year 2012 guidance by approximately $0.20 per share, including $0.12 per share for costs attributable to the cancelled ViSalus IPO.   The press release stated, in relevant part, as follows:

> . . . . Reported earnings per share is expected to be $2.28-$2.43 for the year ending December 31, 2012 compared to prior guidance of reported earnings per share of $2.47-$2.62.

Robert B. Goergen, Blyth's Chairman of the Board and Chief Executive Officer, commented, **"Our updated guidance for 2012 reflects lower sales and profits than previously anticipated,** due in large part to the difficult global macroeconomic environment which continues to make forecasting the demand for discretionary consumer products challenging. Reduced consumer discretionary spending in North America and Europe is challenging for all our business units, particularly PartyLite Europe and, to a lesser extent, PartyLite North America. **In addition, now that ViSalus has grown to be a substantial size business, we understand better the seasonality of weight management products, which are stronger in the first half of the year due to the post-holiday and pre-summer focus on weight management. As such, we have moderated our second half sales and earnings projections . . . ."**

<div align="center">*     *     *</div>

Reported earnings per share include the following:

- ViSalus equity incentive plan charge of $0.30

- Restructuring charge related to PartyLite's North American operations of $0.08

- Fees related to the ViSalus IPO, which was withdrawn on September 26th, of $0.12

- An intangible impairment charge of $0.03 in the Catalog & Internet segment, and

- Gain related to the sale and income from discontinued operations of Sterno totaling $0.41.

Therefore, on a normalized basis, earnings per share is expected to be $2.40 to $2.55 for the year ended December 31, 2012 compared to prior guidance of $3.00 to $3.15.

Cash flow from operations for 2012 is expected to be approximately $65 million versus prior guidance of $85 million **reflecting the impact of lower projected sales and IPO related fees**….

121.    On the same day, the Company issued another press release, entitled "Blyth, Inc. Reports 3rd Quarter Sales Increase of 40%." The press release stated, in relevant part, as follows:

Commenting on the very strong third quarter sales growth, Robert B. Goergen, Chairman & CEO noted, "We are extremely gratified that ViSalus continues to grow well beyond our initial expectations for North America and fully expect growth to continue in that region going forward. Moreover, as ViSalus initiates its global expansion outside North America in the first half of 2013, we expect strong sales growth trends to prevail." Reflecting on last weekend's National Success Training, ViSalus's CEO Ryan Blair said, **"The record Promoter turnout in St. Louis**

*demonstrates the continued appeal that the Body by Vi 90 Day Challenge holds for our Promoters and customers and underscores our confidence in the continued growth potential of the North American market."*

\*      \*      \*

Sales at ViSalus were $169.9 million in this year's third quarter versus $73.2 million for the same period last year, an increase of 132%. *ViSalus had over 110,000 independent Promoters at the end of the third quarter, more than double the 52,000 promoters on board at the end of the prior year's third quarter.*

122.    On November 7, 2012, Blyth filed a Form 10-Q for the quarterly period ended September 30, 2012 with the SEC.  Commenting on the net sales of Blyth's direct selling segment, the Company stated, in pertinent part:

Net sales in the Direct Selling segment for the three months ended September 30, 2012 increased $78.2 million, or 49%, to $239.4 million from $161.2 million in the comparable prior year period.  ViSalus's Net sales increased $96.7 million, or 132% to $169.9 million from $73.2 million last year. *This growth is a result of an increase in the number of promoters to over 110,000 as of September 30, 2012 from over 52,000 in the comparable prior year period.*

\*      \*      \*

Net sales in the Direct Selling segment for the nine months ended September 30, 2012 increased $322.0 million, or 75%, to $754.1 million from $432.1 million in the comparable prior year period.  ViSalus's Net sales increased $363.1 million, or 271% to $496.9 million from $133.8 million last year. *As mentioned above, this growth is a result of an increase in promoters over last year, as well as increased demand for its products due to a growing customer base.*

123.    After incredible recruitment, the 200% churn rate took its toll.  As set forth in the following chart, the number of promoters actually fell, for the first time, and would continue to fall:

- 44 -



**Promoters per quarter**

124.     On this news, the Company's stock price was again hit hard, trading below $16 per share in intraday trading when the market opened on November 7, 2012, on extremely high volume of more than 1.6 million shares trading.  The Company's stock price would close at $17.54 that day, erasing more than $462 million in market capitalization from the Company's Class Period high.

### Additional Scienter Allegations

125.     During the Class Period, Defendants acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; that such statements or documents would be issued or disseminated to the investing public; and they substantially participated or acquiesced in the issuance or dissemination of such statements or documents.

126.     As set forth elsewhere herein in detail, each of the Blyth Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Blyth, their control over and/or receipt of Blyth's allegedly materially misleading statements, knowingly participated in the fraudulent scheme alleged herein.

127.    The Blyth Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Blyth's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each of the Blyth Individual Defendants was provided with copies of the Company's SEC filings and press releases alleged herein to be false and misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Blyth Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  The Blyth Individual Defendants signed and/or certified the Forms 10-Q and the Form 10-K issued during the Class Period, and issued false statements to analysts and investors in the investor conference call (as set forth above).

128.    As the most senior executives of Blyth, the Blyth Individual Defendants had access to detailed reports concerning ViSalus's sales and promoters.  These reports clearly showed, among other things, that sales were declining as early as June 2012, that promoter churn was excessively high (even compared to other multi-level marketing companies), that the number of active promoters was actually falling as early as June 2012, that ViSalus's sales were driven by recruitment rather than by sales, and that a significant majority of the purchasers of ViSalus's products were principally motivated in becoming profitable promoters.  Moreover, as the most senior executives of Blyth, the Blyth Individual Defendants were privy to ViSalus's business strategy, which is focused on recruiting new promoters and not selling product to the public.

129.    The allegations above also establish a strong inference that Blyth as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Blyth's true operating condition from the investing public.  By concealing these material facts from investors, Blyth maintained its artificially inflated share price throughout the Class Period.

130.    Additionally, defendant Sarnicola's knowledge, scienter and actions may be imputed to defendant ViSalus, thereby supporting a finding of ViSalus's scienter.  Defendant Sarnicola is ViSalus's co-founder and its "Global Ambassador."  Indeed, on ViSalus's website, his profile appears under the heading "ViSalus Management Team."  According to that profile, "Nick travels North America, promoting The Challenge with his wife Ashley, and supporting his team of passionate Body by Vi 90-Day Challenge Promoters."

131.    Defendants Sarnicola and Goergen were motivated to commit fraud in order to increase the number of promoters, which would increase ViSalus's EBITDA over the short term, thereby: (i) inflating the amount to be paid as part of the final acquisition price of ViSalus; or (ii) maximizing the amount ViSalus's owners  (which included defendants Sarnicola and Goergen, directly or indirectly) could receive in the anticipated ViSalus IPO.  As a substantial owner of ViSalus, this would provide defendants Sarnicola and Goergen with a financial windfall and allow them to liquidate their stakes in ViSalus.  For example, based on the estimated $271 million fourth closing price for the remaining 27.3% of ViSalus, defendant Sarnicola stood to earn $65 million for

his remaining Class A Common Units, and defendant Goergen stood to earn $43 million for the RAM Funds' remaining Series A Convertible Preferred Units.  Additionally, ViSalus's Chief Financial Officer, John Tolmie also stood to earn $8.3 million for the sale of his remaining 541,182 shares of Class B Units.

132.    Defendants were further motivated to engage in this course of conduct in order to allow certain ViSalus insiders to collectively sell their personally-held ViSalus units in the third closing – which took place in three stages in January, February, and April 2012 – for gross proceeds of approximately $43.3 million during the Class Period, as illustrated in the chart below. For example, defendant Sarnicola earned approximately $9.2 million and defendant Goergen and his sons earned approximately $12.3 million.

| Price paid by Blyth | | $43,300,000 |
|---|---|---|
| | | |
| **Class A Common Units** | Units | Proceeds (estimated) |
| Blair | 2119512 | $9,278,571 |
| Mallen | 2119512 | $9,278,571 |
| Sarnicola | 2119512 | $9,278,571 |
| | | |
| **Class B Units** | | |
| Tolmie Trust | 180865 | $791,771 |
| Beal | 137768 | $603,106 |
| Laun | 110215 | $482,487 |
| Gomez | 76302 | $334,027 |
| Abel | 67824 | $296,913 |
| Sommerfield | 60759 | $265,984 |
| Bosev | 29673 | $129,899 |
| Wescott | 19076 | $83,509 |
| Pala | 13424 | $58,766 |
| Goldsborough | 9891 | $43,300 |
| | | |
| **Series A Preferred Units** | | |
| RAM I | 2826723 | $12,374,524 |

**The Company's Form 10-K and Forms 10-Q Failed to Disclose Known Trends and Uncertainties as Required by Regulation S-K**

133.    Pursuant to Item 303 of Regulation S-K (17 CFR §229.303), Defendants were required to "[d]escribe [in the non-financial portions of their Forms 10-K and 10-Q] any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

134.    Here, the Company failed to disclose several known trends or uncertainties. Specifically, the Company failed to disclose: (i) the Company's trend of slowing sales growth; (ii) the Company's trend of decreasing sales; (iii) the uncertainties concerning the Company's supply problems; (iv) the uncertainties surrounding the exceedingly high promoter churn rate; (v) the uncertainties surrounding the Company's practice of recruiting transient teams of promoters; and (vi) the trend of decreasing numbers of new promoters.  Defendants knew of these trends and uncertainties and reasonably expected that they would have a material impact on Blyth's continued net sales and revenues from its continuing operations.

135.    Not only did the omission of these material uncertainties and trends violate Item 303 of Regulation S-K, but it also rendered statements made by Defendants in Blyth's Class Period Forms 10-K and 10-Q filings materially false and/or misleading.

**Loss Causation/Economic Loss**

136.    The market for Blyth shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated Blyth shares and operated as a fraud or deceit on Class Period purchasers of Blyth shares by misrepresenting the Company's then current state of affairs.  Defendants achieved this facade by making knowing misrepresentations and/or omissions about, among other things, the growth rate of ViSalus's sales, the increase in promoters, the number

of customers, and ViSalus's near-term prospects.  As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations became known to the public, the price of Blyth shares fell precipitously, as the prior artificial inflation came out of the price of the shares.  Plaintiff and other members of the Class purchased or otherwise acquired Blyth shares relying upon the integrity of the market price of Blyth shares and market information regarding Blyth.  As a result of their purchases of Blyth shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

137.   By improperly concealing their conduct, Defendants presented a misleading picture of Blyth's financial condition, the growth rate of ViSalus's sales, the increase in promoters, the number of customers, and ViSalus's near-term prospects during the Class Period.  Thus, instead of disclosing the truth about these matters, Defendants caused Blyth to conceal the truth.  These actions caused Blyth shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

138.   On September 26, 2012, Blyth issued a press release announcing that it was cancelling the ViSalus IPO.  In the press release announcing the cancellation, the Company explained that "ViSalus has achieved Net Sales growth in excess of 450% in the first half of 2012; however, management believes that current conditions are not conducive to recognizing this level of achievement."   During that day's conference call, however, analysts were skeptical of the Company's explanation and repeatedly questioned Defendants about ViSalus's promoter churn rate and whether the underwriters for the IPO had raised concern about the churn rate.  In response to these announcements, the price of Blyth stock declined from $32.57 per share to $25.68 per share, or 21%, on extremely heavy volume.

139.    On November 2, 2012, after ViSalus announced at the Company's National Success Training event in St. Louis Missouri that its third quarter 2012 sales were only $169.9 million, it now became apparent to investors that many of Defendants' Class Period statements had been false or misleading.  The Company's stock, which had closed at $23.14 per share on the evening of November 1, 2012, closed down at $19.96 per share on November 2, 2012, or a decline of 14%, on extremely heavy volume.

140.    On November 6, 2012, Blyth issued a press release announcing that it was reporting results for the third quarter 2012 and revealing that the number of ViSalus's promoters had fallen from the previous quarter.  The next day, ViSalus filed its Form 10-Q for the quarterly period ended September 30, 2012.  It was now apparent to investors that many other of Defendants' Class Period statements had also been false or misleading.  In response to these announcements, the price of Blyth stock declined further, falling from $19.02 per share to $17.54 per share, or a decline of 8%, on extremely heavy trading volume.

141.    Thus, the subjects of the fraudulent and misleading statements and the fraudulent or deceptive scheme were the cause of the actual loss suffered.  In other words: (a) the disclosures on September 26, November 2, and November 6, 2012 concerned the number of ViSalus's promoters and, in turn, ViSalus's sales growth; (b) these very disclosures were the subjects of the statements alleged herein to be fraudulent and the scheme alleged herein to be fraudulent or deceptive; and (c) in response to the disclosures, the price of Blyth's shares dropped precipitously on heavy volume.

142.    The price of Blyth shares at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The market now knew, among other things, that the churn rate for promoters was exceedingly high, that the Company's growth rate was driven by recruitment rather than by sales to authentic customers,

and for these reasons, the growth rates for sales and promoters was illusory.  The timing and magnitude of the decline in the price of Blyth shares negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

143.    The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Blyth's share price and the subsequent significant decline in the value of Blyth shares when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

**Fraudulent Scheme and Course of Business**

144.    During the Class Period, Defendants had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Blyth shares during the Class Period.  The fraudulent scheme: (i) deceived the investing public regarding, among other things, ViSalus's and Blyth's growth rate, ViSalus's sales and number of promoters; and (ii) caused Plaintiff and other Class members to purchase Blyth shares at artificially inflated prices, causing them damage.

145.    Motivated to maximize either (a) the price Blyth would have to pay for ViSalus or (b) the amount that could be raised in ViSalus's planned IPO, defendants Sarnicola, Goergen, and ViSalus committed deceptive or manipulative acts that affected the market price of Blyth's common shares.  Defendant Sarnicola recruited teams of promoters from other multi-level marketing companies – knowing that these teams of promoters would only be at ViSalus for a short term – for the purpose of driving up ViSalus's EBITDA over the short term, which would maximize the pecuniary gain he and the other ViSalus owners would receive in a fourth closing to Blyth or,

alternatively, an IPO to the investing public.  These deceptive acts took place throughout the Class Period and, because they drove up ViSalus's sales over the short term, had the effect of artificially inflating the price of Blyth shares.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

146.    At all relevant times, the market for Blyth shares was an efficient market for the following reasons, among others:

(a)    Blyth shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Blyth filed periodic public reports with the SEC and the NYSE;

(c)    Blyth regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Blyth was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

147.    As a result of the foregoing, the market for Blyth shares promptly digested current information regarding Blyth from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Blyth shares during the Class Period suffered similar injury through their purchase of Blyth shares at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

148.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Blyth who knew that those statements were false when made.

**COUNT I**

**For Violation of §10(b) of the Exchange Act and Rule 10b-5(b)
Against Defendants Blyth, Goergen, and Barghaus**

149.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

150.     Throughout the Class Period, defendants Blyth, Goergen and Barghaus, in pursuit of their scheme and continuous course of conduct to inflate the market price of Blyth common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

151.     During the Class Period, defendants Blyth, Goergen and Barghaus, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period, did: (a) artificially inflate and

maintain the market price of Blyth common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Blyth common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, defendants Blyth, Goergen and Barghaus, and each of them, took the actions set forth herein, in violation of Section 10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

152.    In addition to the duties of full disclosure imposed on defendants Blyth, Goergen and Barghaus as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Blyth's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  *See* SEC Regulations S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*).

153.    Defendants Blyth, Goergen and Barghaus had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

154.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Blyth common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Blyth

common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by defendants Blyth, Goergen and Barghaus, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Blyth stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

155.    Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by defendants Blyth, Goergen and Barghaus, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Blyth shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

156.    By virtue of the foregoing, defendants Blyth, Goergen and Barghaus have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  *See* 17 C.F.R. §240.10-5.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against Defendants Goergen and Barghaus as Persons Controlling Blyth

157.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

158.    Defendants Goergen and Barghaus had control over Blyth and made the material false and misleading statements and omissions on behalf of Blyth within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of Goergen's controlling shareholder status, both men's executive positions, Goergen's Board membership and stock ownership, and their culpable participation, as alleged above, Goergen and Barghaus had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  Defendants Goergen and Barghaus were provided with or had unlimited access to the

Company's and ViSalus's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

159.    In particular, defendants Goergen and Barghaus had direct involvement in and responsibility over the day-to-day operations of the Company and ViSalus and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

160.    By reason of such wrongful conduct, Goergen and Barghaus are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT III

### For Violation of §10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### Against Defendants ViSalus, Inc., ViSalus Holdings, LLC, Goergen, and Sarnicola

161.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

162.    This Count is brought solely and exclusively under the provisions of Rule 10b-5(a) and (c).  Accordingly, Plaintiff need not allege in this Count nor prove in this case that any of Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law.

163.    During the Class Period, Defendants engaged in a fraudulent or deceptive scheme by: (i) committing a deceptive or manipulative act; (ii) with the requisite scienter; (iii) that the act affected the market for securities or was otherwise in connection with their purchase or sale; and (iv) that Defendants' actions caused Plaintiff's injuries.

164.    In furtherance of this unlawful plan, scheme and course of conduct, Defendants employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of Blyth common stock, in violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78 j(b), and Rule 10b-5(a) and (c), 17 C.F.R. §240-10b-5, promulgated thereunder.

165.    Defendants' manipulative and/or deceptive acts were intended to drive up ViSalus's sales over the short term so as to maximize the amount the ViSalus owners could profit from the sale of ViSalus to either Blyth or the public pursuant to an initial public offering.

166.    Plaintiff and the Class reasonably relied upon the integrity of the market in which Blyth common stock traded.

167.    During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct.  Had Plaintiff and the Class known of Defendants' unlawful scheme and unlawful course of conduct, they would not have purchased Blyth common stock, or if they had, would not have done so at the artificially inflated prices paid for such securities.

168.    As a direct and proximate result of Defendants' scheme to defraud and such unlawful course of conduct, Plaintiff and the Class suffered damages in connection with their purchases of Blyth common stock during the Class Period.

169.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) promulgated thereunder, and are liable to Plaintiff and the Class for damages suffered in connection with their purchases of Blyth common stock during the Class Period.

**COUNT IV**

**For Violation of §20(a) of the Exchange Act**
**Against Defendants Goergen and Sarnicola as Persons Controlling ViSalus**

170.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

171.     Defendants Goergen and Sarnicola had control over ViSalus within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of Goergen's and Sarnicola's substantial holdings in ViSalus, Goergen's Board membership, and their culpable participation, as alleged above, defendants Goergen and Sarnicola had the power to influence and control and did, directly or indirectly, influence and control the decision making of ViSalus, including the decision to fraudulently manipulate ViSalus's sales over the short term to the detriment of Blyth's public shareholders.

172.     By reason of such wrongful conduct, defendants Goergen and Sarnicola are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     Determining that this action is a proper class action;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

     Plaintiff demands a trial by jury.

DATED:  June 24, 2013          ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                    SAMUEL H. RUDMAN
                                    DAVID A. ROSENFELD
                                    CHRISTOPHER M. BARRETT


                                          */s/ David A. Rosenfeld*
                                   DAVID A. ROSENFELD (DR7564)

                                    58 South Service Road, Suite 200
                                    Melville, NY  11747
                                    Telephone:  631/367-7100
                                    631/367-1173 (fax)
                                    drosenfeld@rgrdlaw.com

                                    *Lead Counsel for Plaintiff*

                                    DISERIO MARTIN O'CONNOR &
                                        CASTIGLIONI LLP
                                    JONATHAN P. WHITCOMB (CT 15014)
                                    One Atlantic Street
                                    Stamford, CT  06901
                                    Telephone:  203/358-0800
                                    203/348-2321 (fax)

                                    *Liaison Counsel*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 24, 2013, a copy of foregoing Second Amended Complaint for Violations of the Federal Securities Laws was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

<p align="center"><em>/s/ David A. Rosenfeld</em><br>DAVID A. ROSENFELD (DR7564)</p>

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
drosenfeld@rgrdlaw.com