**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MUSAB ABUHAMDAN and BEAVER COUNTY EMPLOYEES RETIREMENT FUND, on Behalf of Themselves and Others Similarly Situated,

Plaintiffs,

v.

BLYTH, INC., ROBERT B. GOERGEN, ROBERT H. BARGHAUS, VISALUS HOLDINGS, LLC, VISALUS, INC., and NICK SARNICOLA,

Defendants.

No. 3:12-cv-01597-MPS

Oral Argument Requested

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........ 1

ARGUMENT ........ 2

I. COUNTS I AND II OF THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED FOR THE REASONS SET FORTH IN DEFENDANTS' PREVIOUS MEMORANDUM ........ 2

II. COUNTS III AND IV OF THE SECOND AMENDED COMPLAINT FAIL TO STATE A CLAIM FOR "SCHEME" LIABILITY AGAINST VISALUS, MR. GOERGEN, OR MR. SARNICOLA ........ 4

A. Plaintiff Fails To Plead Any Deceptive Or Manipulative Conduct That It Relied Upon In Connection With The Purchase or Sale of Blyth Stock ........ 7

B. Plaintiff Fails To Plead Fraud With Particularity ........ 10

C. Plaintiff Fails To Plead A Strong Inference Of Scienter ........ 12

D. Plaintiff's Section 20(a) Claim Fails For Lack Of Any Underlying Violation ........ 14

CONCLUSION ........ 14

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....9

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
511 U.S. 164 (1993)....8

*Cohen v. Stevanovich*,
722 F. Supp. 2d 416 (S.D.N.Y. 2010)....9

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)....13

*Fezzani v. Bear, Stearns & Co. Inc.*,
716 F.3d 18 (2d Cir. 2013)....10

*In re Alstom SA Secs. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)....11

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)....13

*In re Citigroup Auction Rate Sec. Litig.*,
700 F. Supp. 2d 294 (S.D.N.Y. 2009)....10

*In re Prestige Brands Holding, Inc.*,
No. 05-cv-6924, 2006 WL 2147719 (S.D.N.Y. July 10, 2006)....13

*In re Tower Automotive Secs. Litig.*,
483 F. Supp. 2d 327 (S.D.N.Y. 2007)....11

*Janus Capital Grp., Inc. v. First Derivative Traders*,
131 S. Ct. 2296 (2011)....2, 3, 7, 8

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)....12

*Leventhal v. Tow*,
48 F. Supp. 2d 104 (D. Conn. 1999)....13

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
No. 09-cv-1740, 2013 WL 1188050 (D. Conn. Mar. 23, 2013)....14

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
603 F.3d 144 (2d Cir. 2010)....6, 7, 10, 14

*SEC v. Daifotis*,
No. 11-137, 2011 WL 2183314 (N.D. Cal. June 6, 2011)....................9

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)....................9

*SEC v. Kelly*,
817 F. Supp. 2d 340 (S.D.N.Y. 2011)....................7, 8

*Stichting Pensioenfonds ABP v. Merck & Co., Inc.*,
No. 05-5060, 2012 WL 3235783 (D. N.J. Aug. 1, 2012)....................8

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008)....................7, 9, 10

*Taylor v. Westor Capital Grp.*,
No. 12-8032, 2013 WL 1803936 (S.D.N.Y. Apr. 22, 2013)....................6, 11

*Wilson v. Merrill Lynch & Co.*,
617 F.3d 120 (2d Cir. 2011))....................14

**FEDERAL STATUTES**

15 U.S.C. § 78j.................... *passim*

15 U.S.C. § 78t(a)....................1, 3, 4, 14

**REGULATIONS**

17 C.F.R. § 240.10b-5.................... *passim*

**RULES**

Fed. R. Civ. P. 9(b)....................6, 10, 11

## INTRODUCTION

Defendants' prior motion to dismiss demonstrated that the First Amended Complaint ("FAC") failed to state a claim under Sections 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5(b) thereunder because, among other things, it did not sufficiently allege any material misstatement or omission, scienter, or loss causation. Defendants also demonstrated that the claims against ViSalus, Inc. and ViSalus Holdings, LLC (collectively, "ViSalus") failed for additional independent reasons, including failure to allege that ViSalus (whose stock does not trade publicly) made any statement in connection with the purchase or sale of *Blyth* stock, much less with scienter. Finally, the prior motion showed that the FAC's "controlling persons" claim under Section 20(a) against the individual defendants failed for lack of any primary violation.

Plaintiff's Second Amended Complaint ("SAC") fails to cure any of the deficiencies of its predecessor. It challenges essentially the identical set of statements as the FAC, and aside from trivial differences in wording, offers the same laundry list of reasons those statements were allegedly false or misleading. The same disclosures towards the end of the Class Period are alleged to have caused Plaintiff's losses. The SAC cites no new confidential witnesses or documents, and offers no new allegations from its single existing confidential witness. Accordingly, pursuant to this Court's invitation in its Order of June 4, 2013 (Dkt. 62), Defendants incorporate by reference the prior brief (Dkt. 59) as to those allegations, and devote this memorandum to the limited respects in which the SAC is different.[1]

[1] Although largely identical allegations appear in both the FAC and the SAC, the numbered paragraphs containing those allegations have changed. For the convenience of the Court, Defendants attach as Exhibit A a new version of the previous memorandum in support of the motion to dismiss the FAC, revised *only* so that previous citations to the FAC now cite to the corresponding paragraphs in the SAC, and so that where the wording of quotations excerpted from the FAC has changed slightly, previous quotations from the FAC now reflect quotations from the SAC. Also for the Court's convenience, Defendants attach as Exhibit B a redline comparison between the FAC and SAC.

The SAC differs from the prior complaint in only two material respects, neither of which cures Plaintiff's failure to state a claim:

*First*, Plaintiff attempts to buttress its scienter allegations against Mr. Goergen by alleging certain additional detail on the Goergen family's ownership interest in ViSalus. But those allegations also fail to show that Mr. Goergen had any motive to commit securities fraud with respect to Blyth; on the contrary, Mr. Goergen's ownership interests in Blyth and ViSalus support the opposite conclusion.

*Second*, the SAC drops its 10b-5(b) claim against ViSalus, and no longer asserts that ViSalus violated Rule 10b-5(b) by making any statements.[2] Instead, the SAC tries a new claim for "scheme" liability under Rule 10b-5(a) and (c) for supposed "deceptive and manipulative acts" by ViSalus, Mr. Goergen, and a new defendant, ViSalus's co-founder Nick Sarnicola. As set forth below, this "scheme" claim is baseless because it fails to plead any (1) deceptive or manipulative act (2) upon which Plaintiff relied (3) committed with scienter (4) that caused Plaintiff any injury (5) in connection with the purchase or sale of Blyth stock.

For these reasons, and as set forth below and in Defendants' previous memorandum, the SAC should be dismissed with prejudice.

## ARGUMENT

### I. COUNTS I AND II OF THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED FOR THE REASONS SET FORTH IN DEFENDANTS' PREVIOUS MEMORANDUM

Count I of the SAC alleges that Blyth, Mr. Goergen, and Mr. Barghaus violated Section 10(b) and Rule 10b-5(b) thereunder by supposedly making materially false statements or omissions that artificially inflated the market price of Blyth common stock. SAC ¶ 150.

---

[2] *Compare* FAC Count I (asserting 10b-5(b) liability against all defendants), *with* SAC ¶¶ 98-100, 109-110, 112 (alleging misstatements made by ViSalus), *and id.* ¶¶ 149-169 (asserting only 10b-5(a) and (c) claims against ViSalus). The SAC has also dropped FVA Ventures, Inc. as a defendant.

In moving to dismiss the FAC, Defendants demonstrated that the 10b-5(b) and related Section 20(a) claims should be dismissed because the FAC: (1) failed to plead any affirmative misrepresentations, (2) did not identify any actionable material omissions, (3) failed to allege particularized facts establishing the required strong inference of scienter, (4) did not identify any corrective disclosure and therefore failed to plead loss causation, and (5) failed to state a claim for control person liability. *See* Mem. in Support of Mot. to Dismiss ("Mem.") (Dkt. 59) at 11-39.

Count I is subject to dismissal on the same bases as set forth in Defendants' prior motion to dismiss. Other than dropping ViSalus as a defendant from Count I, the only material difference between the FAC and the SAC relating to Count I is Plaintiff's failed attempt to buttress the scienter allegations against Mr. Goergen based on a supposed financial motive to inflate the price of Blyth stock. Defendants previously demonstrated that (1) the desire to achieve a lucrative acquisition proposal for a company is too generic to furnish a compelling inference of scienter, (Mem. at 34); and, (2) in any case, Mr. Goergen's interest in ViSalus furnished no motive to commit fraud in connection with Blyth securities because he rationally would not undermine his greater interest in Blyth to profit from his lesser interest in ViSalus, Mem. at 32-33. The SAC now offers two additional speculative allegations as to Mr. Goergen, neither of which remedies those deficiencies.

*First*, the SAC purports to quantify the Goergen family's holdings in ViSalus through the Ropart Asset Management Funds. SAC ¶¶ 16, 131. Although the SAC now pleads that Mr. Goergen "stood to earn $43 million" if Blyth acquired his family's outstanding interest in ViSalus, Plaintiff still fails to address that the Goergens' interest in Blyth—the much larger company—was greater still, and that Mr. Goergen would have directly undermined that interest

by causing Blyth to overpay for ViSalus. *See* SAC ¶ 16 (alleging that Mr. Goergen owns 35% of Blyth's outstanding shares and that his wife owns additional shares); *id.* ¶¶ 83, 93, 103 (alleging that Blyth lacked sufficient cash on hand to complete its purchase of ViSalus, and would have needed to use up its available cash and potentially issue additional shares that would dilute the interests of current owners, including Mr. Goergen). In essence, Plaintiff continues to suggest that Mr. Goergen was motivated to create a liquidity crisis at Blyth in the hope of earning a "windfall" from his smaller interest in ViSalus. This is not cogent or compelling evidence of scienter. *See* Mem. at 33.

*Second*, the SAC now alleges that Mr. Goergen and members of his family sold some *ViSalus* stock to Blyth during 2012. SAC ¶ 132. But those sales were part of the "third closing," at a price set based on ViSalus's earnings for *2011*, *id.* ¶ 53, which is not alleged to have been artificially inflated and pre-dates the putative class period. Rather than furnishing any plausible (much less compelling) inference of motive, the allegation appears to be a misplaced effort to respond to the fact that no defendant is alleged to have sold any *Blyth* stock during the Class Period. *See* Mem. at 32 (absence of insider sales undermines any inference of scienter).

Count II alleges control person liability under Section 20(a) against Messrs. Goergen and Barghaus based on the same underlying conduct alleged in Count I, and is therefore defective. *See* Mem. at 39.

For these reasons, and those set forth in the prior motion to dismiss, Counts I and II fail to state a claim.

## II. COUNTS III AND IV OF THE SECOND AMENDED COMPLAINT FAIL TO STATE A CLAIM FOR "SCHEME" LIABILITY AGAINST VISALUS, MR. GOERGEN, OR MR. SARNICOLA

Count III of the SAC alleges that ViSalus, Mr. Goergen, and Mr. Sarnicola (but not Blyth or Mr. Barghaus) violated Section 10(b) and Rules 10b-5(a) and (c) thereunder by engaging in a

supposed "fraudulent or deceptive scheme." SAC ¶ 163. Count III is "brought solely and exclusively under the provisions of Rule 10b-5(a) and (c)," *id.* ¶ 162, and rests nearly entirely on a rote allegation that ViSalus, Mr. Goergen, and Mr. Sarnicola "employed devices, schemes and artifices to defraud, and knowingly and/or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon Plaintiff and the Class in connection with their purchases of Blyth common stock," *id.* ¶ 164. The SAC states that "Plaintiff need not allege in this Count nor prove in this case that any of Defendants made any misrepresentations or omissions of material fact for which they may also be liable under Rule 10b-5(b) and/or any other provisions of law." *Id.* ¶ 162.

The SAC provides only scant and conclusory allegations about the supposed "scheme." Beyond the boilerplate assertion cited above, all the SAC offers is the unsourced allegation that Mr. Sarnicola "recruited teams of promoters from other multi-level marketing companies—knowing that these teams of promoters would only be at ViSalus for a short term . . . ." *Id.* ¶ 145. Mr. Goergen's supposed role in this "scheme" is not pleaded at all, and as to ViSalus, the SAC merely asserts that "Sarnicola's knowledge, scienter and actions may be imputed to defendant ViSalus," noting that he was a ViSalus co-founder and "Global Ambassador," and that his website profile "appears under the heading 'ViSalus Management Team.'" *Id.* ¶ 130.

As to scienter, the SAC asserts only that "Defendants Sarnicola and Goergen were motivated to commit fraud in order to increase the number of promoters, which would increase ViSalus's EBITDA over the short term," *id.* ¶ 131, in order to "maximize either (a) the price Blyth would have to pay for ViSalus or (b) the amount that could be raised in ViSalus's planned IPO," *id.* ¶ 145.

The SAC does not plausibly articulate how any of the Count III defendants' conduct had the supposed effect of artificially inflating the price of Blyth stock. Instead, the SAC merely concludes that the "scheme" "(i) deceived the investing public regarding Blyth's and ViSalus's business, operations and management and the intrinsic value of Blyth shares; and (ii) caused Plaintiff and members of the Class to purchase Blyth shares at artificially inflated prices," *id.* ¶ 28; and that "[t]hese deceptive acts took place throughout the Class Period and, because they drove up ViSalus's sales over the short term, had the effect of artificially inflating the price of Blyth shares," *id.* ¶ 145.

This new Count III fails for multiple independent reasons. Rules 10b-5(a) and (c) of the Securities Exchange Act make it unlawful "[t]o employ any device, scheme, or artifice to defraud," or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Private claims under Rule 10b-5(a) and (c) must allege (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance. *Taylor v. Westor Capital Grp.*, No. 12-8032, 2013 WL 1803936, at *4 (S.D.N.Y. Apr. 22, 2013). As with any claim under Section 10(b), plaintiffs must further allege a connection between the "scheme" and the purchase or sale of a security, economic loss, and loss causation. *See Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) ("*PIMCO*"). In addition, claims that liability is premised on a fraudulent or deceptive scheme sound in fraud, and plaintiffs must meet the strict pleading requirements of Rule 9(b). *See Taylor*, 2013 WL 1803936, at *4.

The SAC fails to satisfy these elements and pleading requirements.

### A. Plaintiff Fails To Plead Any Deceptive Or Manipulative Conduct That It Relied Upon In Connection With The Purchase or Sale of Blyth Stock

The SAC's "scheme" claim is based solely on the sparse allegation that Mr. Sarnicola supposedly "recruited teams of promoters from other multi-level marketing companies—knowing that these teams of promoters would only be at ViSalus for a short term . . . ." SAC ¶ 145. This fails to state a claim because the SAC does not plead any inherently deceptive or manipulative act, plausibly articulate how the supposed scheme inflated the price of Blyth stock, or plead that Plaintiff relied on the supposed scheme.

*First*, Plaintiff cannot state a claim by alleging that the so-called "scheme" was reflected in alleged misrepresentations about ViSalus's business.[3] Such allegations are insufficient as a matter of law to plead "scheme" liability. *Janus Capital Grp., Inc. v. First Derivative Traders,* 131 S. Ct. 2296, 2303-04 (2011) ("in *Stoneridge*, we rejected a private Rule 10b–5 suit against companies involved in deceptive transactions, even when information about those transactions was later incorporated into false public statements"); *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159-64 (2008) (dismissing "scheme" liability claims against issuer's suppliers who allegedly entered into sham transactions that rendered issuer's financial statements misleading); *PIMCO*, 603 F.3d at 158-60 (affirming dismissal of claims for "scheme" liability where plaintiff alleged "that the ultimate result of a secondary actor's deceptive course of conduct is communicated to the public through a company's financial statements"); *SEC v. Kelly*, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) ( "Courts have not allowed subsections (a) and (c) of Rule 10b-5 to be used as a 'back door into liability for those who help others make a false

[3] For example, the central allegations underlying Plaintiff's 10b-5(b) claim are that Blyth failed to disclose that ViSalus's growth was unsustainable and its promoter turnover was unusually high. *See, e.g.*, SAC ¶ 112. Plaintiff identifies these exact same omissions as the heart of the "scheme" claim. *Id.* ¶ 144 (the "fraudulent scheme . . . deceived the investing public regarding, among other things, ViSalus's and Blyth's growth rate, ViSalus's sales and number of promoters").

statement or omission in violation of subsection (b) of Rule 10b-5.'") (citation omitted)). This is consistent with the Supreme Court's repeated admonition that secondary actors are not liable for an issuer's misstatements. *See, e.g.*, *Janus Capital Group, Inc.*, 131 S.Ct. at 2301-05 (holding that primary liability under 10b-5 extends only to "makers" of statements); *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1993) (holding that there is no private right of action for aiding and abetting).[4]

*Second*, Plaintiff has failed to plead—as it must—that the supposed "scheme" participants engaged in conduct that constitutes an inherently deceptive act distinct from any misrepresentation or omission. *See, e.g.*, *Kelly*, 817 F. Supp. 2d at 344 ("[s]cheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an ***inherently deceptive act*** that is distinct from an alleged misstatement.") (emphasis added); *Stichting Pensioenfonds ABP v. Merck & Co., Inc.*, No. 05-5060, 2012 WL 3235783, at *10 (D. N.J. Aug. 1, 2012) (dismissing Rule 10b-5(a) and (c) claim because conduct at issue did not involve sham or inherently deceptive transactions, but rather was "part and parcel" of issuer's misrepresentations) (citation omitted).[5] Even if Plaintiff's allegations were true, there is nothing inherently deceptive about operating a business that relies on steady recruitment of new promoters to offset frequent promoter turnover, or that grows its sales force by recruiting from other companies successful

---

[4] Of course, as set forth in Defendants' prior memorandum, no actionable misrepresentations or omissions are pleaded here in any event. *See* Mem. at 14-29.

[5] In *Kelly*, the defendants were AOL executives who were not involved in the company's financial statements but who had been involved in certain "round-trip" transactions that were not accounted for properly. The court concluded that the defendants could not be liable for a "scheme" because the transactions were not "inherently deceptive." As it explained, "the alleged round-trip transactions by AOL between 2000 and 2003 are deceptive *only because of AOL's subsequent public misrepresentations*. There is nothing *inherently deceptive* about structuring a transaction with a counterparty so that the counterparty purchases advertising, and AOL touted this practice in the media. . . . *It is the manner in which those transactions were* accounted for by AOL and *reported to the public*—AOL's alleged improper recognition of advertising revenue from such transactions—*that is deceptive, and not the act of engaging in such transactions itself*." 817 F. Supp. 2d at 344 (emphasis added).

salespersons with "established down-lines [sales networks]." SAC ¶ 68.[6] It is well established that allegations that a company's business model is flawed do not suffice to state a claim for "scheme" liability. *See Stoneridge*, 552 U.S. at 149 (federal securities laws do not extend "into the realm of ordinary business operations"); *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479 (1977) ("We thus adhere to the position that 'Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.'") (citation omitted); *SEC v. Daifotis,* No. 11-137, 2011 WL 2183314, at *9 (N.D. Cal. June 6, 2011) ("Conduct that is consistent with the defendants' normal course of business would not typically . . . allow for a primary violation . . . ."). Absent an inherently deceptive act, Plaintiff's claim for "scheme" liability fails for lack of a predicate.[7]

*Third,* Plaintiff fails to plead the necessary element of *reliance* on the alleged conduct here. The Supreme Court and the Second Circuit have flatly rejected allegations of "scheme" liability where a plaintiff disclaims knowledge of the purported "scheme." *Stoneridge*, 552 U.S.

---

[6] In any event, the market could not have been deceived regarding the subject of the alleged "scheme" in light of the robust disclosures that Blyth and ViSalus made before and throughout the Class Period concerning promoter turnover, recruitment, and the risks associated with ViSalus's business. *See generally* Mem. at 8-10, 19-23; *see also* Decl. of David Lesser (Dkt. 61), Ex. A at 11 (Blyth Form 10-K filed Apr. 8, 2011) ("We are dependent upon sales by independent consultants and distributors. [ . . . ] This distribution system depends upon the successful recruitment, retention and motivation of a large number of independent consultants and distributors to offset frequent turnover. [ . . . ] Our sales are directly tied to the levels of activity of our consultants . . . ."); Ex. C at 12 (ViSalus Form S-1 filed Aug. 16, 2012) ("This marketing system depends upon the successful recruitment, retention and motivation of a large number of individual promoters to offset frequent turnover"); *id.* ("our failure to continue to recruit, retain and motivate individual promoters could harm our business, financial condition and results of operations"); *id.* ("no guarantee" that sales force would not "experience . . . erosion" or "decline . . . precipitously"); *id.* at 13 ("We are also subject to significant competition for the recruitment of individual promoters from other network marketing organizations, including those that market weight-management products, nutritional supplements and energy drinks, as well as other types of products. [. . . .] Furthermore, the fact that our individual promoters may easily enter and exit our network-marketing program contributes to the level of competition that we face."). In any event, Plaintiff itself characterizes "transient promoters" as "common in the multi-level marketing 'industry.'" SAC ¶ 8.

[7] "Market manipulation," which can be inherently deceptive, is not alleged here. *See, e.g., ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99-100 (2d Cir. 2007) ("Manipulation . . . refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity."); *Cohen v. Stevanovich*, 722 F. Supp. 2d 416, 424 (S.D.N.Y. 2010) ("[T]o state a manipulation claim under Section 10(b) and Rule 10b–5, plaintiffs must identify wash sales, matched orders, rigged prices, or some other manipulative act intended to mislead investors by artificially affecting market activity.").

at 159-64 (rejecting scheme claim where secondary actors' allegedly deceptive acts "were not communicated to the public" and "[n]o member of the investing public had knowledge" of the alleged scheme); *PIMCO*, 603 F.3d at 158-60 (affirming dismissal of claims for "scheme" liability where complaint disavowed knowledge of alleged scheme); *Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 24-25 (2d Cir. 2013) (affirming dismissal of claims for market manipulation for failure to establish reliance). Here, Plaintiff categorically disclaims any public knowledge of any deceptive activities. SAC ¶ 6 ("unbeknownst to investors, the explosive growth in ViSalus's EBITDA . . . was being fueled by the aggressive recruitment of transient teams of promoters . . . ."); *id.* ¶ 167 ("During the Class Period, Plaintiff and the Class were unaware of Defendants' fraudulent scheme and unlawful course of conduct."). Having done so, Plaintiff cannot as a matter of law establish reliance, and its claim for "scheme" liability fails. *Stoneridge*, 552 U.S. at 160-61, 166-67; *PIMCO*, 603 F.3d at 159-60.[8]

### B. Plaintiff Fails To Plead Fraud With Particularity

The "scheme" claim fails for the independent reason that it is not pleaded with the particularity required by Rule 9(b).

*Mr. Goergen.* As noted above, despite charging Mr. Goergen with "scheme" liability, the SAC offers no facts at all concerning Mr. Goergen's role in the "scheme." The claim is thus plainly defective as to him. *See, e.g., In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 304 (S.D.N.Y. 2009) (dismissing 10b-5(a) and (c) claim where complaint "does not include specific allegations as to which Defendants performed what manipulative acts at what times and with what effect").

---

8 Moreover, *Stoneridge* concluded that reliance was not established where the secondary actor's conduct did not make it "necessary or inevitable" that the issuer would make false or misleading statements. *See Stoneridge*, 552 U.S. at 161; *see also PIMCO*, 603 F.3d at 159-60. Here, Mr. Sarnicola—the only individual alleged to have taken any action in connection with the "scheme"—is not alleged to have had any role with respect to the preparation of Blyth's financial or other public statements.

*Mr. Sarnicola.* The allegations as to Mr. Sarnicola also fall short. Plaintiff offers just one purportedly factual allegation under the heading "Fraudulent Scheme and Course of Business": "Defendant Sarnicola recruited teams of promoters from other multi-level marketing companies—knowing that these teams of promoters would only be at ViSalus for a short term—for the purpose of driving up ViSalus's EBITDA over the short term, which would maximize the pecuniary gain he and other ViSalus owners would receive in a fourth closing to Blyth or, alternatively, an IPO to the investing public." SAC ¶ 145. But Plaintiff offers no confidential witness, document, or other source to support this allegation.

Not surprisingly, then, it fails to provide any necessary particulars of the alleged "scheme," for example: (1) how many promoters Mr. Sarnicola recruited from other multi-level marketing companies, (2) when, (3) how he knew in advance that those promoters would only be at ViSalus for a short term or that additional promoters could not be recruited if they did leave, (4) how long the promoters actually stayed at ViSalus, (5) the extent of the effect on ViSalus's EBITDA or the price Blyth would pay for ViSalus, or (6) how the "scheme" affected the price of *Blyth*'s stock. This fails to comport with Rule 9(b). *See Taylor*, 2013 WL 1803936, at *6-7 (dismissing 10b-5(c) claim where complaint "contains virtually no details about this alleged scheme: it is impossible to tell what . . . acts were performed, who performed them, when they were performed, what securities were involved, and what effect this scheme had on the market for those securities"); *In re Tower Automotive Secs. Litig.*, 483 F. Supp. 2d 327, 349-50 (S.D.N.Y. 2007) (dismissing 10b-5(a) and (c) claim for failure to comply with Rule 9(b)).

*ViSalus.* As noted above, the claims against ViSalus are entirely derivative of the allegations against Mr. Sarnicola, and therefore fail for the same reasons.

### C. Plaintiff Fails To Plead A Strong Inference Of Scienter

To state a claim for "scheme" liability, Plaintiff also must plead particularized facts establishing a strong inference of scienter against each defendant. *See, e.g., In re Alstom SA Secs. Litig.*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005). The SAC comes nowhere close.

*Mr. Goergen*. As noted above, other than naming Mr. Goergen as a defendant in Counts III and IV, the SAC says nothing at all about his involvement in any "scheme" to recruit promoters. It therefore fails to allege facts establishing his conscious misbehavior or recklessness in connection with any such scheme. Moreover, the SAC's motive allegations against Mr. Goergen do nothing to support an inference of scienter. *See supra* at 3-4. And Plaintiff offers no allegation that Mr. Goergen had the *opportunity* to participate in any scheme to recruit ViSalus promoters in order to inflate its EBIDTA. *See Kalnit v. Eichler*, 264 F.3d 131, 138-39 (2d Cir. 2001) (plaintiff must establish scienter either by direct evidence, or by showing *both* motive and opportunity). He is not alleged to have played any operational role at ViSalus, and is only alleged to be a director. SAC ¶ 16.

*Mr. Sarnicola.* The scienter allegations against Mr. Sarnicola are defectively conclusory. For example, the SAC does not set forth a single factual allegation showing that Mr. Sarnicola (1) knew that the promoters he recruited would be at ViSalus only for a short time, (2) knew that ViSalus's business model was unsustainable because he could not recruit additional promoters to replace those who left, (3) recruited promoters for the purpose of inflating ViSalus's EBITDA in the "short term," as opposed to legitimately seeking to grow the business, or (4) did any of this for the purpose of inflating *Blyth* stock (which he is not alleged to have sold or even owned). Plaintiff therefore fails to plead any direct evidence of conscious misbehavior or recklessness.

As to motive, according to the SAC, Mr. Sarnicola (like Mr. Goergen) allegedly was motivated to commit fraud in order to increase the number of promoters, which would increase

ViSalus's EBITDA over the short term, thereby: (1) inflating the amount to be paid by Blyth as part of the final acquisition price of ViSalus in the fourth closing, or (2) maximizing the amount Mr. Sarnicola could receive in the anticipated Visalus IPO. SAC ¶ 131. This assertion—unsupported by anything beyond Plaintiff's mere conjecture—is the type of generic motive that courts in this Circuit routinely reject. *See, e.g., ECA-Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 201 (2d Cir. 2009) ("At most, Plaintiffs allege a generalized desire to achieve a lucrative acquisition proposal. Such generalized desires fail to establish the requisite scienter because 'the desire to achieve the most lucrative acquisition proposal can be attributed to virtually every company seeking to be acquired' . . . .") (citation omitted); *In re Prestige Brands Holding, Inc.*, No. 05-cv-6924, 2006 WL 2147719, at *7 (S.D.N.Y. July 10, 2006) (rejecting allegation that shareholder "had a motive to commit fraud because it sold some of its stock in connection with the IPO" because early investors "routinely sell stock in IPOs, and such sales raise no inference of fraud").[9]

In any event, the allegation at best might explain why Mr. Sarnicola might have had reason to want to maximize the value of his nonpublic *ViSalus* stock in the planned "fourth closing" or the IPO. But the securities fraud claims here concern the price of *Blyth* stock. Mr. Sarnicola is not alleged to have owned any Blyth stock, and therefore—even assuming arguendo that he had reason to inflate ViSalus's EBITDA and share value—he had no motive to inflate the price of Blyth stock.[10] And, even if Mr. Sarnicola had *motive* to inflate Blyth's stock (and he

---

[9] *See also, e.g., In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 381 F. Supp. 2d 192, 218 (S.D.N.Y. 2004) ("If such generalized allegations of greed were sufficient to satisfy Section 10(b)'s scienter requirement, then claims against any for-profit endeavor would survive the pleading stage simply by alleging that the defendant was in the business of making money—Section 10(b)'s scienter requirement surely commands more."); *Leventhal v. Tow*, 48 F. Supp. 2d 104, 115 (D. Conn. 1999) (holding allegation that defendants were motivated to artificially inflate company's stock price to get more favorable terms in stock-for-stock transaction "insufficient to establish scienter and . . . routinely rejected by the courts").

[10] According to the SAC, any price inflation resulted not from ViSalus's financial results themselves (none of which are challenged), but rather from what Blyth omitted to say about them. SAC ¶¶ 136-37.

clearly did not), he certainly had no *opportunity* to inflate Blyth stock—he is not alleged to been involved in the preparation of Blyth's public statements or to have had any role at all at Blyth.[11]

*ViSalus*. The SAC's scienter allegations against ViSalus are entirely derivative of the allegations against Mr. Sarnicola, *see* SAC ¶ 130, and hence fail for the same reasons. *See, e.g.*, *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 09-cv-1740, 2013 WL 1188050, at *32 (D. Conn. Mar. 23, 2013) (rejecting allegation that corporation had motive to commit securities fraud for same reason motive allegations against individual defendants failed).

### D. Plaintiff's Section 20(a) Claim Fails For Lack Of Any Underlying Violation

Count IV of the SAC asserts control person liability against Messrs. Goergen and Sarnicola supposedly as "persons controlling ViSalus," for the same underlying conduct as alleged in Count III. As explained in Defendants' previous memorandum, claims for "control person" liability under Section 20(a) must be predicated on a primary violation of securities law. Having failed to state a claim for "scheme" liability, Plaintiff's related 20(a) claim should be dismissed. *See, e.g., Wilson v. Merrill Lynch & Co.*, 671 F.3d, 120, 139 (2d Cir. 2011); *PIMCO*, 603 F.3d at 160.

## CONCLUSION

For the foregoing reasons, Plaintiff's Second Amended Complaint should be dismissed with prejudice.

---

[11] Plaintiff also cites to Mr. Sarnicola's actual sales of ViSalus stock in the "third closing" as evidence of motive with respect to the putative scheme to deceive the class. SAC ¶ 132. But that makes as little sense as to him as it does with respect to Mr. Goergen. See *supra* at 4. As the SAC itself admits, the price Blyth paid in the third closing was "based on ViSalus's estimated *2011* EBITDA." *Id.* ¶ 53 (emphasis added). Those results pre-date commencement of the alleged Class Period and are not alleged to have been inflated.

Dated: August 2, 2013

Respectfully submitted,

DEFENDANTS BLYTH, INC., ROBERT B. GOERGEN, ROBERT H. BARGHAUS, VISALUS HOLDINGS, LLC, VISALUS INC., AND NICK SARNICOLA

By their attorneys,

*/s/ Alfred Pavlis*
Alfred U. Pavlis (ct08603)
Harold B. Finn III (ct08480)
Tony Miodonka (ct28262)
FINN DIXON & HERLING LLP
177 Broad Street
Stamford, Connecticut 06901
Telephone: 203.325.5000
Facsimile: 203.325.5001
Email: apavlis@fdh.com

*/s/ Andrew S. Dulberg*
Andrea J. Robinson (ct07491)
Peter A. Spaeth (phv02541)
Andrew S. Dulberg (phv05890)
WILMER CUTLER PICKERING HALE & DORR LLP
60 State Street
Boston, MA 02109
617 526-6000 (T)
617 526-5000 (F)
andrea.robinson@wilmerhale.com
peter.spaeth@wilmerhale.com
andrew.dulberg@wilmerhale.com

David Lesser (phv05066)
WILMER CUTLER PICKERING HALE & DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212 230-8800 (T)
212 230 8888 (F)
david.lesser@wilmerhale.com

**CERTIFICATION**

I hereby certify that on August 2, 2013, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system:

*/s/ Alfred U. Pavlis*
Alfred U. Pavlis (ct08603)
FINN DIXON & HERLING LLP
177 Broad Street, 15th Floor
Stamford, CT 06901-2689
Tel: (203) 325-5000
Fax: (203) 325-5001
E-mail: apavlis@fdh.com