# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MUSAB ABUHAMDAN and BEAVER )
COUNTY EMPLOYEES RETIREMENT )
FUND, on Behalf of Themselves and Others )
Similarly Situated, )
     )
                 Plaintiffs, )           No. 3:12-cv-01597-MPS
     )
       v. )           Oral Argument Requested
     )
BLYTH, INC., ROBERT B. GOERGEN, )
ROBERT H. BARGHAUS, VISALUS )
HOLDINGS, LLC, VISALUS, INC., and )
NICK SARNICOLA, )
     )
                Defendants. )

## REPLY MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 1

   I.    THE SAC FAILS TO PLEAD A FALSE OR MISLEADING STATEMENT ................... 1

      A.    The SAC Fails To Allege An Affirmative Misstatement ............................................. 1

      B.    The SAC Fails To Allege An Omission ...................................................................... 3

   II.   THE SAC FAILS TO PLEAD A "SCHEME" ................................................................ 7

      A.    No Deceptive Act ........................................................................................................ 7

      B.    No Reliance ................................................................................................................. 9

      C.    No "Connection With" The Purchase Or Sale Of Securities ..................................... 10

      D.    No Particularity ......................................................................................................... 11

   III.  THE SAC FAILS TO PLEAD SCIENTER ................................................................... 11

      A.    No Scienter For The 10b-5(b) Claim Against Mr. Barghaus ..................................... 12

      B.    No Scienter For The Claims Against Messrs. Goergen And Sarnicola ...................... 12

   IV.  THE SAC FAILS TO PLEAD LOSS CAUSATION ...................................................... 14

   V.   PLAINTIFF SHOULD NOT BE GIVEN LEAVE TO AMEND ...................................... 15

CONCLUSION ................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) .................................................................................4

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*,
   866 F. Supp. 2d 223 (S.D.N.Y. 2012) ....................................................................15

*City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011) ....................................................................14

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005) ...............................................................................................14

*Endovasc, Ltd. v. J.P. Turner & Co., LLC*,
   169 F. App'x 655 (2d Cir. 2006) ............................................................................15

*G-I Holdings, Inc. v. Baron & Budd*,
   No. 01 Civ. 0216, 2004 WL 1277870 (S.D.N.Y. June 10, 2004) .............................5

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ......................................................................4

*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) ......................................................................3

*In re MRU Holdings Sec. Litig.*,
   769 F. Supp. 2d 500 (S.D.N.Y. 2011) ................................................................9, 12

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .....................................................................................14

*Indiana State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v.
Omnicare, Inc.*,
   583 F.3d 935 (6th Cir. 2009) ...................................................................................3

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ...................................................................................13

*Kleinman v. Elan Corp., plc*,
   706 F.3d 145 (2d Cir. 2013) .......................................................................2, 6, 8, 12

*Muller-Paisner v. TIAA*,
   289 F. App'x 461 (2d Cir. 2008) ..............................................................................2

*NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*,
  No. 3:09-CV-1740, 2013 WL 1188050 (D. Conn. Mar. 23, 2013) .........................................2

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...........................................................................................6, 12, 13

*Panther Partners Inc. v. Ikanos Communications, Inc.*,
  681 F.3d 114 (2d Cir. 2012).....................................................................................................7

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*,
  603 F.3d 144 (2d Cir. 2010)..........................................................................................9, 10, 11

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004).....................................................................................................5

*San Leandro Emergency Medical Grp. Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996).......................................................................................................3

*SEC v. Kelly*,
  817 F. Supp. 2d 340 (S.D.N.Y. 2011).......................................................................................8

*SEC v. Zandford*,
  535 U.S. 813 (2002)................................................................................................................13

*Shemian v. Research in Motion Ltd.*,
  No. 11 Civ. 4068, 2013 WL 1285779 (S.D.N.Y. Mar. 29, 2013) ............................................2

*Stonebridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008)......................................................................................................9, 11, 13

*Taylor v. Westor Capital Group*,
  No. 12 Civ. 8032, 2013 WL 1803936 (S.D.N.Y. Apr. 22, 2013)...........................................11

**FEDERAL STATUTES**

15 U.S.C. § 78j.............................................................................................................................10, 13

**REGULATIONS**

17 C.F.R. § 240.10b-5.......................................................................................................................10

## INTRODUCTION

Plaintiff's Opposition brief ("Opp." or "Opposition") is rife with disparaging characterizations of ViSalus's business model, but that does not plead a securities fraud claim. The Opposition essentially walks away from any claim of an affirmative misstatement, offers no basis to conclude that any duty to disclose supposed omissions existed, and either concedes that the supposedly omitted information was actually disclosed or suggests that information was not disclosed based on the Opposition's distortions both of the Second Amended Complaint ("SAC") and of the Defendants' actual disclosures. Meanwhile, Plaintiff ignores many of the specific arguments for dismissal and citations to authority in Defendants' prior memoranda. All that remains of the 10b-5(b) claim is the assertion that Defendants were obligated to characterize ViSalus's business pejoratively, but courts have soundly rejected such claims.

Plaintiff also cannot salvage its "scheme" claim, which fails even to plead deceptive conduct, must less to satisfy controlling law requiring allegations that the investing public knew of the complained-of acts in order to plead reliance. Plaintiff is left with an implausible scheme pitting Mr. Goergen against himself and having no connection to Blyth stock. For these and other reasons set out below and in Defendants' prior memoranda, including the Plaintiff's failure to plead scienter and loss causation, the SAC should be dismissed with prejudice.

## ARGUMENT

## I.     THE SAC FAILS TO PLEAD A FALSE OR MISLEADING STATEMENT

### A.     The SAC Fails To Allege An Affirmative Misstatement

Defendants previously showed that the SAC fails to plead an affirmative misstatement, *see* 1st Mem. (Dkt. 59) at 14-17, a failure Plaintiff's Opposition renders even starker. Despite insisting that Defendants misled the market due to ViSalus's definition of "customer" and their statements about ViSalus's growth and "fundamentals," Plaintiff now concedes that "certain" of

the challenged statements are "literally true." Opp. at 15.[1]

Plaintiff also admits that ViSalus explicitly provided a "definition" for the term "customers" when it disclosed that it had over 1.2 million customers as of June 30, 2012. Opp. at 16. While Plaintiff argues that this definition was "designed to mislead" because it included "aspiring promoters who . . . failed to qualify as a promoter," Opp. at 16-17, in fact, ViSalus clearly disclosed that: "We define a 'customer' as ___**anyone**___ who has purchased products from us at least once in the previous 12 months, other than any purchaser who qualifies as an individual promoter on the measurement date." SAC ¶109 (quoting S-1 filed Aug. 16, 2012) (emphasis added). *See Muller-Paisner v. TIAA*, 289 F. App'x 461, 464 (2d Cir. 2008) (no liability where "[n]o reasonable investor of ordinary intelligence would have believed" that statement stood for proposition plaintiff claimed).

None of Plaintiff's other arguments has any merit. Plaintiff ignores black letter law establishing that statements concerning Blyth's future earnings guidance and future growth are protected by the PSLRA's safe harbor. *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 3:09-CV-01740, 2013 WL 1188050, at *17 (D. Conn. Mar. 23, 2013) (holding that projections of future revenues and financial performance were "plainly forward-looking" and dismissing related claims) (cited in 1st Mem. at 17). Plaintiff also falls short arguing that fleeting references to "growth at ViSalus" transformed press releases announcing increased earnings guidance into statements about the "then-present state" of ViSalus. Opp. at 22; *see, e.g.*, *Shemian v. Research in Motion Ltd.*, No. 11 Civ. 4068, 2013 WL 1285779, at *24 (S.D.N.Y.

---

[1] The Opposition now identifies as "false" ViSalus's warning that future results were subject to the risk that ViSalus would be unable to maintain its historic growth rate. Opp. at 18. But the SAC neither challenges nor even mentions this statement. *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013) (failure to plead statement as false in complaint, despite asserting falsity in brief, "alone falls short of the heightened pleading standard of the PSLRA"). In any case, the claim that Defendants then knew, as a "mathematical certainty," that growth would decline for reasons withheld from the market fails for the reasons stated herein and in Defendants' prior memoranda.

Mar. 29, 2013) (rejecting argument that statements were "not solely forward-looking because they [also] referenced RIM's past and current success").[2]  And Plaintiff's argument that none of the challenged statements is puffery because they concern the "strength, growth, and fundamentals" of ViSalus (Opp. at 22-23 & nn. 13-14) fails because the relevant issue is not the *subject matter* of a statement, but its *wording*.[3]

## B.  The SAC Fails To Allege An Omission

In attempting to salvage the SAC's omission claims, the Opposition fails to acknowledge or distinguish extensive case law establishing that: (1) an issuer has no duty to disparage itself; (2) statements of historical fact are not misleading for failure to warn that the future may be less rosy; and (3) Item 303 of Regulation S-K requires only the disclosure of *known trends* or uncertainties reasonably expected to have a *material* effect as of the date of the relevant disclosures.  1st Mem. at 18-19 (citing cases).  These doctrines, along with the disclosures Defendants actually made, doom Plaintiff's claims.

The Opposition offers only variations on the SAC's repeated conclusory assertions that Defendants' statements were misleading because "it was, in fact, guaranteed that ViSalus would decline," and "Defendants knew that ViSalus would contract."  Opp. at 18 n.10.  The Second Circuit, however, has "easily rejected" the argument that a defendant's "statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-

---

[2]  Even if these statements *did* refer to then-existing facts—and they do not—Plaintiff offers no particularized facts establishing that Defendants did not honestly believe them when made.

[3]  *See, e.g.*, *Indiana State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 943-44 (6th Cir. 2009) (statement that outlook "remains positive given our strong underlying fundamentals and our proven growth strategy" held "squarely within this realm of corporate puffery") (emphasis added); *San Leandro Emergency Medical Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) (statement that company "should deliver income growth consistent with its historically superior performance" held puffery) (emphasis added); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 248 (S.D.N.Y. 2010) (statement "[w]e continue to demonstrate strength in our core franchise" held inactionable puffery) (emphasis added).

term unsustainability of its business model." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38 (2d Cir. 2012). *See also, e.g.*, *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 587 (S.D.N.Y. 2006) (no duty to disclose that revenues were "unsustainable"); 1st Mem. at 18 & n.14 (citing cases). In any event, as discussed below, Plaintiff has failed to plead with particularity that ViSalus's business was "unsustainable," SAC ¶71, or that any Defendant "knew" during the putative class period that ViSalus was "guaranteed" to "decline."

  *1. Network Marketing Business Model.* Although the SAC and Opposition critique ViSalus's business model, they cannot identify any material information that was withheld from the market. The Opposition continues to ignore the steady stream of disclosures describing ViSalus's business that defeat any material omission claim. *See, e.g.*, 1st Mem. at 8-10, 2nd Mem. (Dkt. 80) at 9 n.6. Plaintiff argues that ViSalus "might be considered a pyramid scheme" because "its sales are driven by recruitment," Opp. at 5, but ignores Defendants' disclosure that "we depend on sales by our independent promoter sales force to drive our business . . . ." *See, e.g.*, Ex. C at 12; 1st Mem. at 9-10, 19-20 (citing disclosures regarding reliance on recruitment, frequent turnover, and risk that growth, sales force, and customer base could decline).[4]

  Similarly, Plaintiff insists without any supporting facts that ViSalus's growth was *not* based on "sales to genuine end user customers." Opp. at 17-18. But the SAC identifies no basis for this allegation, and contradicts it by relying upon a disclosure that expressly refers to such customer sales. *See* SAC ¶67 (citing disclosure regarding sales attributable to Mr. Sarnicola "together with his down-line sales organization *and customers marketed to by Mr. Sarnicola and*

---

[4] To the extent that something could render the business model vulnerable to mischaracterization as a pyramid scheme, Defendants also warned that "[w]e are also subject to the risk of challenges to the legality of our network marketing program, alleging, for instance, that it is an illegal 'pyramid scheme' in violation of federal and state laws." *See, e.g.*, Ex. B at 9.

*members of his down-line sales organization*") (emphasis added).  Indeed, the SAC repeatedly

acknowledges ViSalus's direct sales to consumers.  SAC ¶22 (referring to "customers marketed

to by" Mr. Sarnicola and his down-line sales organization), ¶63 (sales include those to

"customers enrolled by promoters" and by their downline sales organization), ¶77 ("customers"

were unable to open bottles of energy shots), and ¶78 ("customers complained" about taste of

meal replacement shake); *see also* 1st Mem. at 20-21.  Moreover, Plaintiff offers no facts to

challenge ViSalus's disclosure that most of its sales are "direct sales to consumers."  1st Mem. at

9 (quoting S-1/A filed Aug. 29, 2012).[5]

Plaintiff also asserts that "[i]nvestors have now learned" that ViSalus recruited promoters

from other companies "rather than marketing the products."  SAC ¶68.  Such unsourced and

vague allegations cannot sustain a claim,[6] however, and in any case are just hindsight-driven say-

so based on post-class period performance.  *See* Opp. at 18 (citing post-class period results as

basis for unsustainability claim).  The absence of "real customers" plainly is not demonstrated by

a reduction in sales coinciding with a reduction in sales force.  Opp. at 19-20.  It is predictable

that a company's sales to customers would decline with fewer people promoting its products.

Finally, Plaintiff's suggestion that multilevel marketing businesses are uniformly doomed to

collapse, Opp. at 3-5, is not plausible; many multi-level marketing companies, such as Amway

and Tupperware, have had enduring success.  *Cf.* Ex. C at 13 (listing ViSalus's competitors).

2.     *Turnover Rate.*  The Opposition also confirms the SAC's failure to plead any

material omissions concerning ViSalus's turnover rate.  Plaintiff acknowledges disclosures of

---

[5]  The lack of a well-pleaded predicate similarly defeats Plaintiff's related charge that ViSalus's business model is "mathematically impossible," Opp. at 3, and "intrinsically designed to fail," *id.* at 18.

[6]  *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004) (fraud not established with particularity where complaint provides "no source" for allegations); *G-I Holdings, Inc. v. Baron & Budd*, No. 01 Civ. 0216, 2004 WL 1277870, at *2 (S.D.N.Y. June 10, 2004) ("Numerous district courts in this Circuit have required that the sources of information for fraud pleadings . . . be disclosed.").

"frequent" promoter turnover, but argues that Defendants should have also disclosed that (1) turnover was "exceedingly high," (2) turnover was "dramatically higher than other multilevel marketing companies," and (3) "a substantial number of promoters would only be staying at ViSalus for a limited time . . . and would then be leaving and moving on to the next 'hot' company." Opp. at 21. Plaintiff's theory falters given (1) case law showing an issuer has no duty to disparage itself (1st Mem. at 18), and that there is no material difference between describing turnover as "frequent" or "exceedingly high" (1st Mem. at 21-22), and (2) the fact that ViSalus disclosed *the exact data from which it was possible to calculate its promoter turnover rate* by whatever methodology chosen (1st Mem. at 22).[7] Plaintiff also fails to plead particularized facts to support the assertion that ViSalus's turnover was, in fact, "extraordinarily high."[8] *Compare id.* at 21-23, *with* SAC ¶71.

      *3.    Sales Trend.* Item 303 does not establish a duty to disclose here. As Defendants showed, Plaintiff has failed to plead or otherwise show (1) a trend, (2) that was material, and (3) that was known to any Defendant. 1st Mem. at 23-27. The Opposition simply ignores that even accepting as true the allegations of its confidential witness ("CW") and overlooking the failure to provide any meaningful quantification—at best, Plaintiff has pleaded a trend of no more than two months, which is insufficient as a matter of law to trigger any duty under Item 303. *Id.* (further noting substantial increase in sales over prior year). Post-class period performance, cited in Opp. at 19-20, cannot support Plaintiff's claim, because a trend must be known as of the date the duty attached. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("[W]e have refused

---

[7] Plaintiff's suggestion that Mr. Barghaus hid the truth by calling "inaccurate" the claim that "80% of sales to distributors are churning quite a lot" (Opp. at 16) reduces to a disagreement concerning how to calculate promoter turnover, but even the SAC itself acknowledges that its own calculation is just "one analysis." SAC ¶71.

[8] Unlike in *Ganino*, *see* Opp. at 21, here, there is no disputed "issue of fact" preventing this Court from dismissing Plaintiff's claims at this stage. *See, e.g.*, *Kleinman*, 706 F.3d at 152-57 (affirming dismissal of 10b-5 claims).

to allow plaintiffs to proceed with allegations of fraud by hindsight.").  Plaintiff rebuts none of these arguments, and the lone case Plaintiff cites (Opp. at 24) is readily distinguishable.[9]

    *4.    Products and Supply Chain.*  The Opposition does not even try to salvage the CW's allegations concerning ViSalus's products and supply chain, except for protesting that they should not be tested against the Federal Rules of Evidence.  Opp. at 23-24.  Defendants never asserted as much; Plaintiff must satisfy the *Second Circuit's* pleading-stage requirements.  *See, e.g.*, 1st Mem. at 25 & n.23.  But Plaintiff offers no response to the point that the CW cannot be credited because his statements are never tied to Blyth's bottom line or Defendants.  *Id.* at 25-29.  The allegations prove nothing in any event:  if the CW is to be believed, ViSalus's sales were "flat or declining," SAC ¶74, while its suppliers "were struggling to meet demand."  SAC ¶76.

## II.    THE SAC FAILS TO PLEAD A "SCHEME"

    Recognizing its failure to plead an actionable misstatement or omission, Plaintiff beats a retreat to its newly-minted "scheme" claim.  According to Plaintiff, Messrs. Sarnicola and Goergen (in his capacity as a holder of ViSalus stock) attempted to cause Blyth (or the investing public) to pay them more for their ViSalus interest than it was worth by inflating ViSalus's earnings and concealing its allegedly inevitable collapse.  This claim fails on every possible front.

### A.    No Deceptive Act

    Plaintiff agrees that scheme liability requires the commission of a deceptive act, Opp. at

---

[9]  In *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012), the Second Circuit found that a plaintiff stated a claim where it alleged that prior to a stock offering, the defendant chip-maker received numerous reports from clients, representing 72% of its business, that its chips were defective, the Board of Directors was discussing the issue, employees flew to Japan to address the issue, and defendants failed to disclose any of this. The allegations based on Plaintiff's lone CW pale in comparison—Plaintiff never explains the contradiction between the alleged trend and the alleged difficulty in meeting demand, alleges only that unidentified "subsets" of lower level promoters were experiencing sales that were flat or declining by unspecific amounts and for unspecified reasons, and does not allege facts to show that any Defendant actually knew about any decrease in sales or promoters (material or otherwise) before making any challenged statement.  Moreover, the CW's own allegations suggest that any "supply issues" would be resolved as sales increased.  SAC ¶75 (supplier was told to hold inventory "until sales picked up again").

27, but maintains that Mr. Sarnicola's "poaching of transient teams of promoters" qualifies. Opp. at 32. Yet there is nothing deceptive ("inherently" or otherwise) about recruiting and enrolling effective salespersons to sell ViSalus's products. *See SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011) (lawful transactions did not give rise to scheme liability when the only "inherently deceptive" conduct was how they were accounted for in financial statements).[10]

Plaintiff also cannot withstand dismissal by trying to rewrite the SAC in arguing the adequacy of the scheme allegations it purports to describe.[11] By way of alleged "facts" the SAC in fact offers only an unsourced allegation that Mr. Sarnicola "recruited leading promoters from companies such as MonaVie, Excel, Prospex, and Send Out Cards," sometimes offering them monetary incentives to join ViSalus. Opp. at 28-29. These allegations, even if credited, do not remotely resemble deceptive conduct. *See, e.g.*, *Kelly*, 817 F. Supp. 2d at 344 (example of "inherently deceptive" act was "u-turning" of "commodity prices between brokerage houses," whereby "one broker would send his price to a second broker, which would then report that price back to the first as a purportedly 'independent' quote").[12] Nor is it sufficient to argue that "Defendants can be held liable for this conduct because they 'had the principal purpose and

---

[10] The Opposition's stray references to "manipulation" should be ignored. *See, e.g.*, Opp. at 26-28. The Complaint simply does not allege the type of conduct required to state a claim for "market manipulation." 2nd Mem. at 9 n.7.

[11] For example, citing paragraph 67 of the SAC, the Opposition states: "Sarnicola, Goergen and ViSalus . . . engaged in a scheme to drive up sales by aggressively 'recruiting' transient teams of promoters . . . ." Opp. at 28. But that paragraph, like the rest of the SAC, contains no allegation that Mr. Goergen played any role in promoter recruitment or enrollment. It also says nothing about who was enrolled or how long they stayed at ViSalus during the class period, offering no support for the rote statement that promoters, like migratory birds, flock in "transient teams." Plaintiff relies on another distortion when, citing paragraph 69 of the SAC, it says: "Sarnicola, Goergen and Visalus knew that these promoters would cause a temporary spike in sales, and that once these multilevel marketing professionals picked up and left for the next opportunity, sales would come crashing back down." Opp. at 29. That paragraph says nothing about Mr. Goergen or the state of mind of Mr. Sarnicola or Visalus. SAC ¶69. *Kleinman*, 706 F.3d at 153 (party may not amend pleadings through a brief). Plaintiff's new claim that Mr. Goergen "supported the scheme" by making challenged statements—also absent from the SAC (SAC ¶¶144-45)—fails for that reason as well as those discussed above. *See supra* § I.

[12] As discussed above, the repeated assertion that ViSalus did not have "genuine end user customers," Opp. at 1, is inconsistent with the SAC's own allegations and is little more than a baseless characterization of multi-level marketing businesses untethered to particularized factual allegations concerning ViSalus. *See supra* at 4-5.

effect of creating a false appearance of fact in furtherance of the scheme.'" Opp. at 29. "It is rather circular to say that the Individual Defendants committed fraud by concealing their intent to commit fraud." *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d 500, 515 (S.D.N.Y. 2011) (punctuation and citation omitted) (dismissing scheme claim). Plaintiff still has not pleaded a deceptive act.[13]

## B. No Reliance

As shown previously, there can be no doubt that Plaintiff is required to allege reliance in order to state a claim under Section 10(b) and Rule 10b-5. 2nd Mem. at 9-10; *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 158-60 (2d Cir. 2010) ("*PIMCO*") (affirming dismissal of complaint for failure to plead reliance). Indeed, in what can only be read as a concession that it *cannot* establish reliance, Plaintiff claims that despite this authority it "is not even required to . . . allege it at this stage." Opp. at 35.

Plaintiff is wrong. *Stoneridge* and *PIMCO* clearly hold that a plaintiff alleging a scheme must plead that the investing public knew about the defendants' deceptive acts or fraudulent scheme in order adequately to plead reliance. *Stoneridge*, 552 U.S. at 161. To overcome this

---

[13] In its Opposition, Plaintiff tries a new theory that Mr. Goergen was the "mastermind" of a scheme, and seeks to support it with the following assertions: (1) he "anticipated" an IPO in 2005 as evidenced by a Rights Agreement he purportedly "negotiated" providing that, if requested by RAM I, ViSalus would use its "best efforts" to register ViSalus shares for the purpose of conducting an IPO, Opp. at 30 (citing SAC ¶¶43-45), and (2) he furthered the scheme in 2008 when he "arranged" or "negotiated" for Blyth to acquire ViSalus not by making one immediate payment, but instead by making four installment payments based on ViSalus's 2008-11 EBITDA, *id.* (citing SAC ¶¶ 48-49. *But see* SAC ¶¶144-45 (making no such assertions under heading "Fraudulent Scheme and Course of Business"). Neither the provisions of the Complaint on which the Opposition relies nor the public record support these assertions. *See* SAC ¶¶43-45, 48-49 (merely describing the Goergen family's investment in RAM and Blyth's agreement with ViSalus); Supp. Lesser Decl. Ex. J (Blyth Form 8-K filed Aug. 5, 2008) (Blyth's acquisition of ViSalus was "considered, analyzed, negotiated, and approved objectively and independently" by committee of independent directors advised by independent counsel and excluding Mr. Goergen). In any event, there is a wide berth between the allegation that in 2005 ViSalus undertook to use "best efforts" to facilitate an IPO if RAM I had requested and the conclusion that (1) Mr. Goergen "anticipated" an IPO at that time, or (2) RAM's right had anything to do with ViSalus's planned IPO in the fall of 2012. The Complaint alleges neither that RAM I's exercise of any right played a role in the 2012 IPO, nor even that the 2005 Rights Agreement was still in force. Regardless, there was nothing "deceptive" about the 2005 and 2008 transactions.

controlling law, Plaintiff attempts to dance between the raindrops by ignoring its 10b-5(b) claims,

suggesting that "many" deceptive acts "were public and known to investors," and then

confusingly asserting that rather than disclaiming knowledge of the "deceptive acts," all Plaintiff

has disclaimed is knowledge of the "scheme." Opp. at 34.[14]

These contortions are unavailing. In *PIMCO*, plaintiffs "attempt[ed] to distinguish

*Stoneridge* by arguing that [in *PIMCO*] . . . defendants' deceptive conduct was communicated to

the public . . . ." 603 F.3d at 159. But the plaintiffs there, like here, elsewhere *admitted* that they

were unaware of the "*scheme*" at the time they purchased the securities at issue, which doomed

their complaint. *Compare* SAC ¶167, *and* Opp. at 34 (unambiguously claiming that "the public

was not aware of the scheme"), *with PIMCO*, 603 F.3d at 158-60. That concession ends the

inquiry. *Id.* Even if Plaintiff were permitted to disclaim its concession, the scheme claim would

fail because if the challenged conduct *was* disclosed, then by definition there was no deception.

*PIMCO*, 603 F.3d at 160 ("after *Stoneridge*, it is somewhat unclear how the deceptive conduct of

a secondary actor could be communicated to the public and yet remain 'deceptive.'").[15]

## C. No "Connection With" The Purchase Or Sale Of Securities

Plaintiff agrees that to state a claim for securities fraud, it must allege misconduct "in

connection with" the purchase or sale of securities. Opp. at 27; 15 U.S.C. § 78j; 17 C.F.R. §

240.10b-5. But Plaintiff describes the scheme as an effort to inflate the price of private *ViSalus*

---

[14] In fact, the SAC clearly disclaims knowledge of *both* the alleged scheme *and* acts purportedly taken in support thereof. *See, e.g.*, SAC ¶167 ("During the Class Period, Plaintiff and the Class were *unaware of Defendants' fraudulent scheme and unlawful course of conduct.*") (emphasis added).

[15] Plaintiff cannot meaningfully distinguish *Stoneridge* and *PIMCO* on the ground that they involved so-called "secondary actors." Opp. at 33-35. As Plaintiff admits, the term "secondary actors" refers to people or parties *other than* "the issuing firm whose securities are the subject of the allegations of fraud." Opp. at 35 n.22 (quoting *PIMCO*). Mr. Sarnicola and ViSalus are neither the issuing firm (Blyth) nor employed by it. As for Mr. Goergen, the alleged "scheme" is based on his conduct as a ViSalus shareholder, acting to the detriment of Blyth, and thus he is a secondary actor with respect to the "scheme" claim. To the extent the SAC alleges that Mr. Goergen made statements in support of the "scheme" claim (and it does not), those statements are inactionable. *See supra* §I.

stock, which is held neither by the Plaintiff nor any member of the putative class. Any such scheme necessarily had no "connection with" the purchase or sale of any *Blyth* stock. *Stoneridge*, 552 U.S. at 160 ("the deceptive act must be 'in connection with the purchase or sale of any security'"). And to the extent Plaintiff claims that the "connection" is an incidental effect of also inflating Blyth's own financial statements, that is too remote to satisfy the narrow requirements of *Stoneridge*. *Id.* at 161 (undisclosed deceptive acts "too remote to satisfy the requirement of reliance" where scheme was not disclosed but merely reflected in issuer's financial statements); *PIMCO* (same).

### D. No Particularity

The SAC—which offers just two paragraphs under the heading "Fraudulent Scheme and Course of Conduct" (SAC ¶¶144-45) —fails to answer the who, what, when, where, and how questions as required to state a claim. *Taylor v. Westor Capital Grp.*, No. 12 Civ. 8032, 2013 WL 1803936, at *7 (S.D.N.Y. Apr. 22, 2013) (dismissing scheme claim for failure to plead with particularity). With its shape-shifting scheme allegations, the Opposition raises only more unanswered questions. What relationship, if any, exists between Messrs. Goergen and Sarnicola? Did they scheme together or independently? How many promoters "poached" by Mr. Sarnicola left ViSalus and when? And so on. The lack of particularity is fatal to Plaintiff's claim.[16]

### III. THE SAC FAILS TO PLEAD SCIENTER

The Opposition confirms that the scienter allegations fall far short of the strong inference of fraudulent intent required. *See* 1st Mem. at 29-34; 2nd Mem. at 12-14.

---

[16] The failure to plead with particularity is evidenced by the Opposition's failed and repeated efforts to impute to the SAC allegations that simply are not pleaded. *See supra* n.11; *compare* Opp. at 30 (Mr. Goergen "dominated" Blyth and ViSalus, "was the largest shareholder of ViSalus," "arranged for Blyth to purchase ViSalus," "caused Blyth to agree to this agreement"), *with* SAC.

## A.  No Scienter For The 10b-5(b) Claim Against Mr. Barghaus

Plaintiff does not contend that Mr. Barghaus had any *motive* whatsoever to commit fraud.[17]  Instead, Plaintiff offers only the throwaway that Mr. Barghaus merely "had access to" unspecified statements in unspecified "reports" at unspecified times and (not that he even knew about such issues but) failed to "address the supplier issues" the CW identified.  Opp. at 39-40. This is patently deficient.  1st Mem. at 30 & n.32 (citing cases); *Novak*, 216 F.3d at 309 (plaintiff must "specifically identify the reports or statements" containing information at odds with a defendant's public statements).[18]

## B.  No Scienter For The Claims Against Messrs. Goergen And Sarnicola

The Opposition fails to plead that Messrs. Goergen and Sarnicola acted deliberately or recklessly, or had the requisite motive to commit fraud.  The allegation that Mr. Goergen had access to unspecified "reports" (Opp. at 39, 41) fails for the reasons discussed immediately above.[19]  Plaintiff's further suggestion that it has pleaded scienter because it alleges vaguely that these men "orchestrated a scheme" (Opp. at 40) is hopelessly circular, and ignores that scienter is a separate requirement.  Plaintiff certainly offers no facts, well-sourced or otherwise, in support of the claim that either Defendant "knew" that new promoters would only stay for a short period, or that ViSalus was "guaranteed" to contract.[20]

---

[17]  Plaintiff also does not provide any reason why Blyth would want to inflate the price it would pay for ViSalus.

[18]  The CW allegations are not relevant to scienter.  *See* 1st Mem. at 25-26, 31.  Plaintiff does not even try to distinguish the cases Defendants cited which demonstrate that confidential witnesses cannot be credited when they fail to allege personal knowledge of the individual defendants' state of mind or of whether the defendants actually reviewed specific reports.  1st Mem. at 31 n.34 (citing cases).

[19]  The Opposition claims that "[t]he Complaint also sufficiently pleads that Sarnicola had access to and was able to receive and review reports," Opp. at 41, but the SAC does *not* allege that Mr. Sarnicola had access to any reports, much less which reports or what they said.  Plaintiff cannot amend the SAC through its brief.  *Kleinman*, 706 F.3d at 153.

[20]  The broad allegation that defendants "knew that the business model they touted to investors was unsustainable" but failed to disclose it has been held insufficient to establish scienter.  *In re MRU Holdings Sec. Litig.*, 769 F. Supp. 2d at 504, 514-17.

As far as motive, the Opposition presses the same either/or theory, claiming that, knowing ViSalus's business model was unsustainable, Messrs. Goergen and Sarnicola were motivated to artificially inflate *ViSalus's* EBITDA so that they could sell their own interests in ViSalus either to Blyth or to the public and thereby "earn a financial windfall." Opp. at 37. This allegation is implausible, and the motive is misplaced: Plaintiff must plead a motive to inflate *Blyth's stock*—otherwise the required "connection" to the purchase or sale of Blyth securities is lacking. *See supra* at 10-11. Faced with this argument, Plaintiff boldly claims that the relevant inquiry is merely whether defendants have a generic motive "to commit fraud." Opp. at 39. Not so. *See Stoneridge*, 552 U.S. at 162 (Section 10(b) "does not reach all commercial transactions that are fraudulent and affect the price of a security in some attenuated way"); *SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("[Section 10(b)] must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation"); *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("generalized motives" do not establish scienter).[21]

In any event, Plaintiff's motive theory simply makes no sense, pitting Mr. Goergen (as ViSalus shareholder) against himself (as Blyth shareholder). If *Blyth* acquired the outstanding interest in ViSalus at an inflated price, the transaction would harm, not help, Mr. Goergen, whose 35% interest in Blyth vastly outweighs his family's interest in ViSalus. 1ˢᵗ Mem. at 32-33. Even had there been an IPO, Blyth still would have retained "over 50% of ViSalus's common stock" following the IPO, and thus again Mr. Goergen stood only to lose by any deception unless he

---

[21] *Novak*, cited in Opp. at 39, simply does not stand for the proposition that the securities laws are broadly designed to root out any alleged fraud without connection to any specific stock. The sentence Plaintiff quotes (which describes the pleading standard for scienter prior to the enactment of the PSLRA) is followed by the explanation that motive is generally established when "insiders were alleged to have misrepresented to the public material facts about the corporation's performance . . . in order to *keep the stock price artificially high while they sold their own shares at a profit.*" *Novak*, 216 F.3d at 308 (emphasis added). As discussed below, Mr. Goergen is not alleged to have sold a single share of Blyth stock during the class period. Moreover, the construction of Section 10(b) Plaintiff asks this Court to adopt would be directly contrary to the statutory language. 15 U.S.C. § 78j(b).

sold his Blyth holdings, which he did not. 1st Mem. at 34; SAC ¶¶16, 98. Indeed, if, as alleged, Mr. Goergen knew that increases in sales at ViSalus would be short-lived (a central allegation to the scheme claim), then rationally he would have *sold* as much of his Blyth stock as possible before ViSalus's business (and Blyth's stock price with it) deteriorated—as he supposedly knew it would. But he is not alleged to have sold even one share, and as the beneficial owner of over 3 million shares of Blyth stock, Mr. Goergen suffered a paper loss of *more than $77 million* during the class period.[22] The alleged motive is utterly implausible. *See supra* n.11.

The cases Plaintiff cites only stand for the generic proposition that insider sales support an inference of scienter. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (motive and opportunity satisfied by allegation that defendant realized $1.25 million from sale of stock, among other facts); *City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 421 (S.D.N.Y. 2011) (motive and opportunity satisfied by allegation that defendants sold more than 80% of their holdings, among other facts). Here, by contrast, not a single Defendant is alleged to have made a single dollar from the sale of any interest in artificially inflated Blyth stock during the Class Period.[23]

## IV.    THE SAC FAILS TO PLEAD LOSS CAUSATION

Plaintiff barely responds to Defendants' argument that the SAC provides no connection between any supposed corrective disclosure and any prior alleged misstatement or omission, as it must. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343 (2005) ("To 'touch upon' a loss is not to *cause* a loss, and it is the latter that the law requires."). Plaintiff still fails to explain how Defendants' September 26, 2012 statements about ViSalus's business corrected any challenged

---

[22] *See, e.g.*, SAC ¶2 (alleging that Mr. Goergen owns "more than 35% of Blyth's outstanding common stock); *id.* ¶¶113, 124 (Blyth stock fell from $43.36 per share to $17.54 per share during class period); Ex. B at 2 (10-K states 8,568,494 outstanding shares of Blyth common stock).

[23] The allegations about potential sales of private *ViSalus* stock are a red herring. 2nd Mem. at 4.

statements.  *Compare* 1ˢᵗ Mem. at 37-38, *with* Opp. at 43-44.  Instead, Plaintiff simply declares

that it has pleaded loss causation, and offers the remarkable assertion that Blyth's November 2,

2012 announcement that ViSalus's quarterly sales were "only" $169.9 million (up 232% on a

year-over-year basis) somehow "made it apparent to investors that many of Defendants' Class

Period statements that provided a basis to believe that the Company would experience strong

growth had been false or misleading."  Opp. at 43.  Plaintiff's final "fact-based inquiry"

argument (*id.*) ignores that numerous courts dismiss cases where, as here, plaintiffs fail to *allege*

either a corrective disclosure of a previously misrepresented fact or the materialization of a

concealed risk.  *See* 1ˢᵗ Mem. at 34-39; *Bricklayers & Masons Local Union No. 5 Ohio Pension*

*Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 245 (S.D.N.Y. 2012).

## V.     PLAINTIFF SHOULD NOT BE GIVEN LEAVE TO AMEND

In a last-ditch effort, Plaintiff requests leave to amend for a *fourth* time.  That request

should be denied.  Plaintiff offers no information about what it would allege on another go-round,

and further amendment is both futile and directly contrary to this Court's June 4, 2013 order,

allowing Plaintiff to amend its complaint to plead "as many facts as possible, consistent with

Rule 11, to address the alleged defects discussed in Defendants' memorandum of law," and

warning that the Court "will not allow further amendments after June 24, 2013."  Dkt. 62.  *See,*

*e.g.*, *Endovasc, Ltd. v. J.P. Turner & Co., LLC*, 169 F. App'x 655, 657-58 (2d Cir. 2006)

(affirming denial of leave to amend under identical circumstances).

### CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice.

Dated:  October 3, 2013

Respectfully submitted,

DEFENDANTS BLYTH, INC., ROBERT B. GOERGEN, ROBERT H. BARGHAUS, VISALUS HOLDINGS, LLC, VISALUS INC., AND NICK SARNICOLA

By their attorneys,

*/s Tony Miodonka*
Alfred U. Pavlis (ct08603)
Harold B. Finn III (ct08480)
Tony Miodonka (ct28262)
FINN DIXON & HERLING LLP
177 Broad Street
Stamford, Connecticut 06901
Telephone:  203.325.5034
Facsimile:  203.325.5001
Email:  tmiodonka@fdh.com

*/s/ Andrea J. Robinson*
Andrea J. Robinson (ct07491)
Peter A. Spaeth (phv02541)
Andrew S. Dulberg (phv05890)
WILMER CUTLER PICKERING HALE & DORR LLP
60 State Street
Boston, MA 02109
617 526-6000 (T)
617 526-5000 (F)
andrea.robinson@wilmerhale.com
peter.spaeth@wilmerhale.com
andrew.dulberg@wilmerhale.com

David Lesser (phv05066)
WILMER CUTLER PICKERING HALE & DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
212 230-8800 (T)
212 230 8888 (F)
david.lesser@wilmerhale.com

## <u>CERTIFICATION</u>

I hereby certify that on October 3, 2013, a copy of foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system:

/s/ Tony Miodonka

Tony Miodonka (ct28262)
FINN DIXON & HERLING LLP
177 Broad Street, 15th Floor
Stamford, CT 06901-2689
Tel: (203) 325-5000
Fax: (203) 325-5001
E-mail: tmiodonka@fdh.com
