# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MUSAB ABUHAMDAN and BEAVER COUNTY
EMPLOYEES RETIREMENT FUND, on behalf of
themselves and others similarly situated,
     Plaintiffs,

      v.

BLYTH, INC., ROBERT B. GOERGEN, ROBERT
H. BARGHAUS, VISALUS HOLDINGS, LLC,
VISALUS, INC., and NICK SARNICOLA,
     Defendants.

No. 3:12cv1597 (MPS)

## RULING ON MOTION TO DISMISS

The Plaintiffs bring this class action on behalf of all persons who purchased common stock of Blyth, Inc. ("Blyth"), between January 13, 2012 and November 6, 2012, alleging violations of the Securities Exchange Act of 1934 (the "Exchange Act"). The Plaintiffs bring their claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively, and Rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated by the Securities and Exchange Commission ("SEC") pursuant to Section 10(b). The Defendants—Blyth, Robert Goergen ("Goergen"), Robert Barghaus ("Barghaus"), ViSalus Holdings, LLC and ViSalus, Inc. (collectively "ViSalus"), and Nick Sarnicola ("Sarnicola")—have moved to dismiss all of the claims in the Plaintiffs' Second Amended Complaint (the "Complaint").[1]

On August 4, 2008, Blyth entered into an agreement to purchase ViSalus through a series of four investments to be made over a period of approximately four years. Plaintiffs' core claim

---

[1] Defendants filed their original Motion to Dismiss Plaintiffs' first Amended Complaint on June 3, 2013. [Doc. # 58]. The Court entered an Order on June 4 allowing Plaintiffs to "file a second amended complaint in which it pleads as many facts as possible, consistent with Rule 11, to address the alleged defects discussed in Defendants' memorandum of law. The Court will not allow further amendments after June 24, 2013." [Doc. # 62]. Plaintiffs filed a Second Amended Complaint on June 24. [Doc. # 66]. Because that amended complaint omitted Beaver County Employees Retirement Fund—the lead plaintiff—from the case caption, the Court ordered Plaintiffs to file a corrected Second Amended Complaint, [Doc. # 70], which they did on July 2, 2014, [Doc. # 71]. The Motion to Dismiss that is the subject of this ruling seeks dismissal of the corrected Second Amended Complaint. [Doc. # 79].

is that Goergen and Sarnicola engaged in a deceptive scheme, or made misleading statements that omitted material information about ViSalus, for the purpose of artificially inflating ViSalus's price at the fourth and final step of the purchase, and that this conduct harmed purchasers of Blyth stock.  The Complaint alleges that, because they owned substantial interests in ViSalus, Goergen and Sarnicola stood to benefit handsomely from selling their ViSalus shares at an artificially inflated price.

Plaintiffs' omissions claim is that Defendants made a series of positive statements to the marketplace about ViSalus's business, which was a key driver of Blyth's business, and that those statements misled Blyth investors because they omitted material information about ViSalus that would have disclosed that its dramatic growth during 2011 and the first half of 2012 was "illusory" and would be "short-lived."   In particular, the Complaint alleges that Defendants knew, but failed to disclose, that ViSalus's growth was driven by the recruitment of "transient" salespersons (referred to as "promoters") rather than sales to genuine consumers, and that the "extraordinarily high" turnover rate among promoters rendered ViSalus's growth and business model unsustainable.  Plaintiffs argue that Blyth's stock traded at an artificially high price as a result, and that when the true nature of ViSalus's growth was revealed to the market, the price of Blyth stock declined precipitously.

Plaintiffs' omissions theory cannot withstand dismissal, however, both because it fails to plead facts showing that Defendants made a misleading statement and because it fails to plead the element of loss causation.  The failure to plead a misleading statement can be broken into three independent problems: (1) most of the statements upon which Plaintiffs' omissions theory is based are not actionable, (2) Defendants had no duty to disclose the omitted information in light of what had been disclosed to the market, and (3) the Complaint fails to plead the omitted

2

information with sufficient particularity.  The Complaint fails to plead loss causation because it is devoid of factual allegations showing that the drop in Blyth's stock price was caused by either a corrective disclosure or the materialization of a concealed (as opposed to a disclosed) risk.

Plaintiffs' separate claim for a deceptive scheme under Rule 10b–5(a) and (c) must also be dismissed because it fails to plead inherently deceptive conduct and, like the omissions claim, fails to plead a plausible theory of loss causation.  The deceptive scheme claim is premised upon the allegation that Sarnicola, a co-founder of ViSalus, recruited teams of promoters from other companies knowing that they would be at ViSalus only for a short term.  The problem is that the act of recruiting salespersons from other companies is not inherently deceptive, and thus cannot form the basis of a deceptive scheme claim.  Further, the Complaint fails to plead the key allegation—that Sarnicola *knew* the recruited teams of promoters would be at ViSalus for a short term—with the requisite particularity, and the deceptive scheme claim also suffers from the same problem with respect to loss causation as the omissions claim.

Plaintiffs' other claims are derivative of the omissions and deceptive scheme claims and thus must be dismissed as well.  Defendants' motion to dismiss is therefore GRANTED.

I.      **BACKGROUND**

The following allegations are taken from the Complaint.

A.      **Blyth, ViSalus, and the Multi-Level Marketing Model**

Blyth, which describes itself as "a direct to consumer business focused on the direct selling and direct marketing channels," markets and sells a number of products, including weight management products and decorative and functional household items.  (Pls.' Second Amended Complaint ("Compl.") [Doc. # 71] at ¶ 2.)  Goergen served as Blyth's Chief Executive Officer and Chairman of the Board during the class period.  (*Id.* ¶ 16.)  Goergen owns 35% of Blyth's

3

shares and is Blyth's largest single shareholder.  (*Id.*)  Barghaus is, and was throughout the class period, Blyth's Vice President and Chief Financial Officer.  (*Id.* ¶ 17.)

ViSalus, which was founded in 2005 and most of which was acquired by Blyth in a series of transactions alleged in the Complaint, describes itself as "one of the fastest growing direct-to-consumer, personal health product companies in North America."  (*Id.* ¶ 38.)  ViSalus sells weight-management products, nutritional supplements, and energy drinks.  (*Id.*)  Sarnicola is a co-founder of ViSalus and its "Global Ambassador."  (*Id.* ¶ 22.)  ViSalus operates its business through what is commonly known as "multi-level marketing," a "business strategy whereby a company induces independent, non-salaried persons ('promoters') to both sell – and recruit other persons to sell – the company's products by offering the promoters commissions on their own sales as well as the sales made by persons they have recruited and by persons their recruits have also recruited."  (*Id.* ¶ 40.)  The sales force recruited by a particular promoter, or by that promoter's recruits, is referred to as that promoter's "down line."  (*Id.*)

The Complaint alleges that, because of the nature of its multi-level marketing model, ViSalus "might be considered a pyramid scheme."  (*Id.* ¶ 64.)  The Bureau of Consumer Protection of the Federal Trade Commission ("FTC") has stated that "[n]ot all multilevel marketing plans are legitimate," and that "[s]ome are pyramid schemes."  (*Id.* ¶ 65.)  A multi-level marketing company is illegitimate, according to the FTC, "[i]f the money you make is based on the number of people you recruit and your sales to them."  (*Id.* ¶ 41.)  As the Complaint explains, "[i]f a company's growth is based on recruitment, rather than sales to genuine consumers, most promoters will assuredly fail because such a model is intrinsically designed to fail as there are literally not enough people to make these companies profitable to most of those involved."  (*Id.*)  For example, "if a promoter's success depended on recruiting three persons and

for all persons under her to, in turn, promote three persons, the enterprise will be futile because after 21 levels there would not be enough people in the world to sustain further growth – *i.e.*, a twenty-second level would require an additional 10.4 billion promoters." (*Id.*)  The Complaint also alleges that, because illegitimate multi-level marketing companies are only profitable to the few people at the top, and because persons "at the bottom of the pyramid will necessarily quit, illegitimate companies churn through many new recruits to drive their revenue growth." (*Id.* ¶ 42.)  The Complaint further alleges that, "[b]ecause the few successful promoters in ViSalus make their money by recruiting rather than selling product to authentic customers, ViSalus might be considered a pyramid scheme." (*Id.* ¶ 64.)

### B.   Goergen's Ownership Interest in ViSalus and Blyth's Agreement to Purchase ViSalus

Several years before the class period, on November 25, 2005, Goergen, through his investment vehicle "RAM I"—in which Goergen and his two sons "own, directly and indirectly, substantially all of the interest" (*id.* ¶ 16)—made an initial investment in ViSalus of $1.5 million in exchange for 1.5 million shares.[2] (*Id.* ¶ 44.)  Over the next three years, Goergen and his two sons—through RAM I and a similar investment vehicle, RAM II—continued to purchase interests in ViSalus.  By August 2008, they owned approximately 27.6% of ViSalus.  (*Id.* ¶ 47.)

On August 4, 2008, Blyth entered into an agreement to purchase ViSalus through a series of four investments.  (*Id.* ¶ 48.)  Under the purchase agreement, Blyth agreed that the four closings for these investments would occur in 2008, 2010, 2011, and 2012.[3] (*Id.*)  The agreement provided that Blyth would initially purchase, from certain sellers, including the RAM

---

[2] Contemporaneous with that agreement, ViSalus agreed that if requested by RAM I, ViSalus would use its best efforts to register the membership units of ViSalus with the SEC for the purpose of conducting public offerings.  (*Id.* ¶ 45.)  In December 2005, ViSalus and RAM I entered into an agreement "pursuant to which RAM I had the option of selling all of its ViSalus Holdings units to ViSalus Holdings." (*Id.* ¶ 46.)
[3] At some point in 2011, the date of the final closing apparently was moved to 2013.  (*See id.* ¶ 52.)

Funds, a 40% ownership stake in ViSalus in exchange for approximately $13 million.  (*Id.* ¶ 49.) Under the agreement, Blyth would continue to purchase the outstanding membership interests from the sellers – purchasing 15%, 15%, and 30%, respectively, at the three remaining closings. (*Id.*)

The price at each phase would be determined by ViSalus's earnings before interest, taxes, depreciation, and amortization ("EBITDA") from the prior year.  (*Id.* ¶ 4.)  Specifically, at the second closing, which was scheduled to take place in 2010, Blyth would acquire 15% of the outstanding membership interests for an amount equal to 1.2 times the prior year's EBITDA. (*Id.* ¶ 49.)  At the third closing, which was scheduled to take place in 2011, Blyth would acquire 15% of the outstanding membership interests for an amount equal to 1.2 times the prior year's EBITDA.  (*Id.*)  At the fourth closing, which was scheduled to take place in 2012, Blyth would acquire 30% of the outstanding membership interests for an amount equal to 2.4 times the prior year's EBITDA.  (*Id.*)[4]

Blyth completed the first phase of the ViSalus purchase in October 2008, acquiring a 43.6% equity interest in ViSalus for $13 million, (*id.* ¶ 50), and subsequently completed the second phase of the acquisition on April 15, 2011, increasing its ownership to 57.5% in exchange for $2.5 million.[5]  (*Id.* ¶ 52.)  Blyth completed the third phase of the purchase on January 12,

---

[4] On October 21, 2008, the purchase agreement was amended such that Blyth was then required, subject to conditions, to increase its equity ownership in ViSalus Holdings to 57.5% during the second phase (instead of 55%) and 72.7% during the third phase (instead of 70%).  (*Id.* ¶ 51).  The Complaint characterizes this amendment as "designed to benefit ViSalus and to the detriment of Blyth."  (*Id.*)  It is not immediately apparent to the Court—and the Complaint does not explain—why the amendment is so characterized, and there do not appear to be any factual allegations to support such a characterization.

[5] The Complaint alleges that, at the time of this transaction, "Blyth was not obligated to increase its ownership in ViSalus" because ViSalus "had failed to meet the predefined targets for 2010."  (*Id.*)  Blyth nonetheless waived the requirement and made the purchase, meaning that it would be required to make the third and fourth phase purchases of ViSalus in 2012 and 2013—rather than 2011 and 2012—if ViSalus hit its sales targets.  (*Id.*)

2012, increasing its ownership in ViSalus to 72.7% in exchange for approximately $43.3 million.[6]  (*Id.* ¶ 53.)

### C.    ViSalus's Rapid Growth

The class period begins the day after the third closing, January 13, 2012, when ViSalus issued a press release announcing sales of $231 million in 2011, a seven-fold increase over its 2010 sales of $34 million.  (*Id.* ¶ 79.)  Commenting on ViSalus's market model, Goergen stated that "ViSalus' market model and technology savvy is truly transforming the health and direct selling industries."[7]  (*Id.*)  The price of Blyth's shares increased to $31.90 that day, a 12% increase, on "extremely heavy volume."  (*Id.*)  On March 14, 2012, Blyth issued a press release announcing earnings guidance 39% above the prior year "due to growth at ViSalus," and Goergen commented on the announcement by stating that "[w]e are planning for continued strong growth at ViSalus due to the strength of the products and programs that drove the momentum experienced in 2011 and their extensions in 2012."  (*Id.*)  That same day, Blyth filed its Form 10-K for 2011.  The 10-K described increases in sales and stated that "[t]his increase is attributed to ViSalus's net sales increase of $192.6 million, to $225.4 million from $32.8 million last year.  This growth is a result of an increase in promoters to over 59,000 this year from over 8,000 last year, as well as increased demand for its products."  (*Id.* ¶ 84 (later stating that sales growth at ViSalus "is a result of a 371% increase in promoters on a year-over-year basis.").)

ViSalus's sales, and its number of promoters, continued to rise during the first half of 2012.  On May 4, 2012, Blyth issued a press release announcing its financial results for the first

---

[6] The third phase was originally supposed to take place in April 2012, but on January 12, 2012 the purchase agreement was amended to advance the closing date to that day.  The Complaint also characterizes this amendment as "designed to benefit the owners of ViSalus."  (*Id.* ¶ 53.)  Like the October 21, 2008 amendment referred to above, *see* note 4, *supra*, it is not immediately apparent to the Court—and the Complaint does not explain—why the amendment is so characterized, and there do not appear to be any factual allegations to support such a characterization.

[7] It is not clear from the Complaint whether this comment was in the press release or in some other statement.

quarter of 2012.  (*Id.* ¶ 92.)  The press release stated that Blyth had experienced a 56% increase in sales over the 2011's first quarter "primarily due to significant year-over-year sales growth at ViSalus."  (*Id.*)  Blyth also filed its Form 10-Q for the first quarter on that day, stating that "ViSalus's net sales increased $116.7 million, or 585% to $136.7 million from $20.0 million last year.  This growth is a result of an increase in promoters to over 92,000 this year from over 16,000 last year, as well as increased demand for its products."  (*Id.* ¶ 94.)  The same day, Blyth announced a 10% increase to its 2012 earnings guidance "principally due to growth at ViSalus."  (*Id.* ¶ 95.)  On August 3, 2012, Blyth issued substantially similar disclosures about the second quarter of 2012, announcing increased sales, profit, and 2012 earnings guidance "due to the growth in ViSalus."  (*Id.* ¶ 102.)

### D.    The Alleged Source of ViSalus's Growth and Flaws in its Business

The foundation of Plaintiffs' claim is the allegation that ViSalus's explosive growth during 2011 and the first half of 2012 was "illusory," and, as a result, unsustainable and inevitably temporary.  (*See, e.g.*, *id.* ¶¶ 8, 69, 71, 142; *see also* Pls.' Opp'n [Doc. # 58] at 2.)  In support of this allegation, the Complaint alleges ViSalus's dramatic growth was "driven by recruitment – not by the demand for its products by customers who actually used or consumed the products themselves."  (Compl. ¶ 67.)  According to the Complaint, "most [ViSalus] sales are not to bona fide purchasers," and instead "the majority of sales are to persons who intend to profit by promoting the product, recruiting promoters, and/or referring customers."  (*Id.* ¶ 65.)  In addition, the Complaint alleges that, "rather than marketing the products, ViSalus recruited and poached already organized down-lines from other companies, bringing in high-ranking promoters, each with thousands of promoters under them."  (*Id.* ¶ 68.)  Sarnicola, for example, "recruited individuals with established down-lines at other multi-level marketing companies"—

including MonaVie, Excell, Prospex, and Send Out Cards—"to come to ViSalus to be promoters below him in his down-line." (*Id.*)  In fact, Sarnicola's "down-line" was responsible for 75% of ViSalus's sales in 2011 and the first six months of 2012.  (*Id.* ¶ 67.)  Most of Sarnicola's senior "Team Members" already had established long-term down-lines by the time they arrived at ViSalus, and Sarnicola "even arranged payments to top promoters at other multi-level marketing companies in order to attract them to ViSalus." (*Id.*)  Based on these allegations, the Complaint characterizes the promoters recruited by Sarnicola as "transient." (*See id.* ¶¶ 6, 8, 81, 88, 91, 96, 106, 112, 117, 134.)  According to the Complaint, "[i]f these free-agent down-lines simply move to the highest-bidding multi-level marketing company, there is nothing stopping them from picking up and moving to the next 'hot' company at any time." (*Id.* ¶ 69.)

In addition, the Complaint alleges that, on top of the heavy reliance on promoters to drive growth, ViSalus was "churning" through promoters at an "extraordinarily high" rate.  (*Id.* ¶ 71.)  The Complaint defines "churn rate" as the rate at which promoters "drop out, quit, or fail when they realize that success at the enterprise is highly improbable." (*Id.*)  According to the Complaint, "a substantial majority of ViSalus's promoters quit the program when they realize they are unable to profit," (*id.* ¶ 63), and "ViSalus's churn rate is extremely high relative to other multi-level marketing companies." (*Id.* ¶ 71.)  Using certain figures from the Form S-1/A filed by ViSalus in August of 2012, at least one analysis calculated that ViSalus's churn rates for 2011 and 2012 were approximately 197% and 194%, respectively. (*Id.*)  By comparison, the churn rate at the multi-level marketing company Herbalife is approximately 51% and "itself is considered high." (*Id.*)  The Complaint further alleges that ViSalus's high churn rate "makes ViSalus's business model and near-term growth unsustainable." (*Id.*)

### E.     The Announcement and Cancellation of the ViSalus IPO

As ViSalus experienced "explosive growth" during the first half of 2012, the expected cost to complete the fourth phase of the ViSalus acquisition increased dramatically. (*Id.* ¶ 61.) In its Form 10-K disclosed on March 14, 2012, Blyth represented that, if ViSalus met its projected EBITDA for 2012, "the total expected redemption cost of the fourth and final phase [would] be approximately $214 million to be paid in 2013," yet Blyth only had approximately $200 million in cash and cash equivalents as of December 31, 2011. (*Id.* ¶ 55.) The Form 10-K did not state how Blyth planned to fund the final payment, representing only that "[t]he payment, if any, may be funded in part using existing cash balances from both domestic and international sources, expected future cash flows from operations and the issuance of common stock and may require the Company to obtain additional sources of external financing." (*Id.*)

Blyth made similar representations in its filings later in 2012, estimating the redemption cost of the fourth and final phase to be $225 million in its May 4, 2012 Form 10-Q and $271 million in its August 3, 2012 10-Q. (*Id.* ¶ 56, 57.) The Complaint alleges that the final closing price of $271 million "implies a valuation of ViSalus of almost $1 billion, while Blyth itself only had a market capitalization of approximately $624 million at the time." (*Id.* ¶ 58.) The Complaint also alleges that, based on the estimated closing price from August 3, 2012, Goergen and his sons "stood to earn approximately $43 million in the final closing alone" from the sale of their ViSalus stock to Blyth. (*Id.* ¶ 57.)

Rather than proceeding with its own purchase of the remainder of ViSalus for $271 million, Blyth announced on August 16, 2012 that ViSalus planned to hold an initial public offering ("IPO") of its Class A Common stock. (*Id.* ¶ 108.) A portion of the shares to be offered in the IPO would be issued and sold by ViSalus, and a portion would be sold by certain stockholders of ViSalus. (*Id.*) The press release stated that, following the IPO, Blyth would

continue to own over 50% of ViSalus's common stock.  (*Id.*)  On the news of the planned ViSalus IPO, Blyth's shares increased 17% from their close of $37.09 per share on the evening of August 15, 2012, to a close of $43.36 per share on August 16, 2012.  (*Id.* ¶ 113.)

On September 21, 2012, however, Moody's Investors Service ("Moody's") downgraded Blyth's outlook from "stable" to "negative," citing a weaker core business, liquidity concerns, and Blyth's obligation to purchase the remaining 27% of ViSalus it did not yet own.  (*Id.* ¶ 114.) In particular, Moody's stated, "[a]t this time, it is unclear how Blyth will fund these upcoming obligations, as cash on hand is not sufficient."  (*Id.*)  That same day, the price of Blyth stock "declined precipitously," falling more than 10% to close at $34.95.  (*Id.*)

Five days later, on September 26, 2012, Blyth announced in a press release that it was cancelling the ViSalus IPO.  (*Id.* ¶ 115.)  The press release represented that "ViSalus has achieved Net Sales growth in excess of 450% in the first half of 2012; however, management believes that current conditions are not conducive to recognizing this level of achievement." (*Id.*)  Goergen echoed that representation on a conference call the same day, stating that the cancellation of the ViSalus IPO was the result of the "IPO marketplace" being unwilling to "recognize the strength of [the ViSalus] story."  (*Id.* ¶ 116.)  "Blyth's shares were pummeled on this news, precipitously declining nearly $7 per share, or 21%, on unusually high trading volume."  (*Id.* ¶ 118.)

### F.    Subsequent Disclosures and Falls in Blyth Share Price

On November 2, 2012, Blyth disclosed at its National Success Training event that ViSalus's third-quarter sales had dipped to $169.90 million from $190 million the previous quarter.  (*Id.* ¶ 119.)  Blyth's stock, which had closed at $23.14 on the evening of November 1, 2012, closed at $19.96 on November 2, 2012, a 14% drop.  (*Id.*)  On November 6, 2012, Blyth

issued a press release reducing its fiscal year 2012 guidance by approximately $0.20 per share. (*Id.* ¶ 120.)  The following day, Blyth filed its Form 10-Q for the third quarter of 2012.  (*Id.* ¶ 122.)   The 10-Q reported ViSalus third-quarter sales of $169.90 and a corps of 110,000 promoters as of September 30, 2012, as compared to 114,000 promoters the previous quarter. (*Id.*)  For the first time, the number of promoters had fallen from the previous quarter.  (*Id.* ¶ 123.)  Blyth's stock price "was again hit hard" on this news, closing at $17.54 that day and "erasing more than $462 million in market capitalization from [Blyth's] Class Period high."  (*Id.* ¶ 124.)

## G.    Plaintiffs' Claims

Count I of the Complaint alleges that Blyth, Goergen, and Barghaus made materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading in violation of § 10(b) of the Exchange Act and Rule 10b–5(b), 17 C.F.R. § 240.10b–5.  (*Id.* ¶¶ 149-56.)  In particular, Plaintiffs argue that Defendants knew, but failed to disclose, that: (1) the growth rate of ViSalus's sales was being driven by recruitment of "transient" promoters, rather than by sales to authentic customers who actually used or consumed the products themselves, (2) the "churn rate" for promoters/customers[8] was approximately 200%, (3) ViSalus's sales growth rate was unsustainable because of the "extraordinarily high" churn rate of both customers and promoters, and (4) a substantial percentage of ViSalus's sales were to short-term, "transient" customers/promoters.[9]   (*See, e.g.*, *id.* ¶ 88.)   According to the Complaint, these facts were

---

[8] It is unclear why the allegations in paragraph 88 of the Complaint and similar paragraphs refer to the "churn rate" of *customers* in addition to promoters.  The factual allegations about turnover from which the allegations in paragraph 88 appear to be derived, (*see id.* ¶ 71), discuss promoters only, not customers, which is consistent with Plaintiffs' arguments in their opposition brief.  Accordingly, the Court will focus on the alleged churn rate of promoters only.
[9] Although the Complaint contains other allegedly undisclosed information about ViSalus's business during the class period—such as allegations about declining sales in June and July of 2012 as well as "product" and "supply

material and should have been disclosed because they suggested that ViSalus's growth was "not driven by the product" and would be "short-lived." (*See id.* ¶ 69.) Count II is nearly identical to Count I, except that it asserts liability against Goergen and Barghaus under § 20(a) of the Exchange Act as "persons controlling Blyth." (*Id.* ¶¶ 158-60.)

Count III of the Complaint alleges that ViSalus, Goergen, and Sarnicola engaged in a fraudulent or deceptive scheme to defraud purchasers of Blyth stock in violation of § 10(b) of the Exchange Act and subsections (a) and (c) of Rule 10b-5. (*Id.* ¶¶ 161-69.) Specifically, Plaintiffs argue that, in order to either (a) maximize the price Blyth would have to pay for ViSalus, or (b) maximize the amount that could be raised in ViSalus's planned IPO, Sarnicola, Goergen, and ViSalus engaged in a deceptive scheme that "affected the market price of Blyth's common shares." (*Id.* ¶ 145.) According to the Complaint, the scheme consisted of Sarnicola's recruiting "teams of promoters from other multi-level marketing companies – knowing that these teams of promoters would only be at ViSalus for a short term – for the purpose of driving up ViSalus's EBITDA over the short term, which would maximize the pecuniary gain he and the other owners [of ViSalus] would receive in a fourth closing to Blyth or, alternatively, an IPO to the investing public." (*Id.*) Count IV is nearly identical to Count III, except that it asserts liability against Goergen and Sarnicola under § 20(a) of the Exchange Act as "persons controlling ViSalus." (*Id.* ¶¶ 170-73.)

## II.    STANDARD OF REVIEW

The function of a motion to dismiss under Rule 12(b)(6) is to determine whether the plaintiff has stated a legally cognizable claim that, if proven, would entitle her to relief. To

---

chain" problems—counsel for Plaintiffs conceded at oral argument that the allegations regarding "illusory growth" and "churn rate" form the core of Plaintiffs' claims of fraud, and that the other allegations merely "add color" to the Complaint. In any event, there are no facts alleged to show that any of the information discussed in these peripheral allegations was material. The Court will therefore focus on the "core" allegations and discuss the peripheral allegations only as necessary.

survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In other words, "[t]o survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (internal quotation marks and citations omitted).

In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Selevan v. N.Y. Thruway Auth.*, 584 F.3d 82, 95 (2d Cir. 2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," however, are not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 678.

A securities fraud complaint must also meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104–67, 109 Stat. 737 (1995) (codified as amended in scattered sections of Title 15 U.S.C.). Rule 9(b) provides that the "circumstances constituting fraud" must be "state[d] with particularity." Fed. R. Civ. P. 9(b). The PSLRA contains a similar particularity requirement. *See* 15 U.S.C. § 78u-4(b). Under the PSLRA, in an action in which the plaintiff alleges that the defendant made a materially untrue statement or omission:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1). In addition, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A).

## III.   DISCUSSION

### A.   Count I – Material Misrepresentations or Omissions Under § 10(b) and Rule 10b–5(b)

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Rule 10b–5(b), promulgated by the SEC to implement this provision, makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b–5(b).

To plead a violation of § 10(b) and Rule 10b–5(b), a plaintiff must allege facts supporting the following elements: (1) a material misrepresentation or omission; (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the material misrepresentation or omission and the loss. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341

(2005).  For the reasons discussed below, I find that the Complaint fails to plead: (a) a material misrepresentation or omission, or (b) loss causation.[10]

### 1.      Omissions

Plaintiffs' Rule 10b–5(b) theory is based on alleged omissions, not false statements. Plaintiffs do not allege that the various statements made through the class period regarding Blyth's earnings and the like were literally untrue; rather, they allege that the statements were made under circumstances in which the omission of certain material information—especially information about the degree to which the promoters who drove ViSalus's business were leaving—made the statements misleading.  (*See, e.g.*, Compl. ¶ 88; Pls.' Opp'n [Doc. # 83] at 14 (stating that statements "were misleading because, among other reasons, the purported sales growth at ViSalus was driven by the recruitment of promoters rather than genuine demand for ViSalus's products"); *id.* at 15 ("Based on what Georgen knew at the time that he made this statement, these comments – even if certain of them were literally true – were materially misleading."); *id.* at 16 (referring to "misleading and evasive comments").)

Rule 10b–5(b) imposes a duty on issuers of securities to disclose material facts necessary to make a statement made, in light of the circumstances under which it is made, not misleading. 17 C.F.R. § 240.10b–5(b).  Information is "material" when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having

---

[10] I note that, although I resolve Plaintiffs' claim on the omissions and loss causation elements, Plaintiffs' scienter theory is not without its weaknesses.  For example, with respect to motive, although the Complaint alleges that Goergen owned ViSalus stock and thus stood to benefit from the final sale of ViSalus, Goergen also owned over a third of Blyth's stock, and thus stood to lose money if ViSalus eventually failed, as the Complaint alleges that it would.  In other words, Plaintiffs' theory of motive is difficult to square with the fact that Goergen owned interests on both sides of the Blyth-ViSalus transaction.  With respect to Plaintiffs' recklessness theory of scienter, the Complaint contains rather thin allegations that "each defendant was aware of or had access to the information contradicting his public statements."  *In re Tronox, Inc. Secs. Litig.*, No. 09 Civ. 6220, 2010 U.S. Dist. LEXIS 67664, at *39 (S.D.N.Y. June 28, 2010); (*see, e.g.*, Compl. ¶ 128 ("the Blyth Defendants had access to detailed reports concerning ViSalus's sales and promoters.").)  Despite these weaknesses, I resolve only the omissions and loss causation elements, and find it unnecessary to reach Defendants' other arguments in favor of dismissal.

significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485

U.S. 224, 231-32 (1988).  But "§ 10(b) and Rule 10b–5(b) do not create an affirmative duty to

disclose any and *all* material information."  *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct.

1309, 1321 (2011) (emphasis added).   Indeed, "[d]isclosure of an item of information is not

required simply because it may be relevant or of interest to a reasonable investor."  *Klienman*,

706 F.3d at 152 (internal quotation marks omitted).  Rather, in accordance with the language of

Rule 10b–5(b), "disclosure is required only when necessary to make statements made, in light of

the circumstances under which they were made, not misleading."  *Id.* (internal quotation marks

omitted).   In addition, "[t]here can be no omission where the allegedly omitted facts are

disclosed."  *In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005).

As discussed more fully below, Plaintiffs' omissions theory suffers from three fatal flaws.

First, many of the statements identified by Plaintiffs as being misleading as the result of

omissions are not actionable at all and thus cannot support an omissions theory.   Second,

Defendants had no duty to disclose the allegedly omitted information, in any event, because they

had already disclosed substantially similar information, thus making all of the identified

statements not misleading.   Third, Plaintiffs have failed to allege the omitted information with

the requisite particularity.

### a.        Most of Defendants' Statements Are Not Actionable

The language of Rule 10b–5(b) makes clear that an omission claim, though

fundamentally about what is *not said*, can only arise in the context of an affirmative statement:

"It shall be unlawful . . . to omit to state a material fact necessary in order to make the *statements*

*made*, in light of the circumstances under which they were made, not misleading . . . ."  17

C.F.R. § 240.10b–5 (emphasis added).   Thus, "Rule 10b–5 imposes no duty to disclose all

material, nonpublic information . . . ."  *In re Bank of America AIG Disclosure Securities Litigation*, No. 11-cv-6678, 2013 WL 5878814, at *6 (S.D.N.Y. Nov. 1, 2013).  Instead, "once a party chooses to speak, it has a 'duty to be both accurate and complete.'"  *Id.* (quoting *Caiola v. Citibank, N.A., N.Y.*, 295 F.3d 312, 331 (2d Cir. 2002)).  But certain types of statements, such as corporate "puffery," are considered to be inactionable under the securities laws regardless of whether they omit related information.  *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 811 (2d Cir. 1996) ("Such puffery . . . cannot constitute actionable statements under the securities laws.").

Consistent with the language of Rule 10b–5(b), Plaintiffs' omissions claim is based on a series of affirmative statements made by Defendants during the class period.  (*See, e.g.*, Compl. ¶ 88 ("The *statements* referenced above in ¶¶82-87 . . . *were materially false and misleading* because Defendants knew, but failed to disclose . . . .") (emphasis added).)  Most of the affirmative statements that Plaintiffs contend were made misleading by Defendants' omissions fall into three general categories: (1) statements about ViSalus's business model, (2) statements about ViSalus's expected future performance, and (3) statements about ViSalus's past performance.[11]  As explained below, these statements are not themselves actionable and could not support an omissions claim even if the omitted information identified in the Complaint was material and otherwise adequately pled.

### (i)    Statements about ViSalus's Business Model

Plaintiffs claim that the following statements about ViSalus's business model were misleading: (1) "Our targeted new products and services support the growth and success of our Promoters, Leaders and customers as we build ViSalus into a leading lifestyle brand together"

---

[11] The only statements that do not fall into these three categories are the statements made by Goergen and Barghaus during a September 26, 2012 conference call discussing the cancellation of the ViSalus IPO. (Compl. ¶ 116.) Those statements are addressed later in this decision.

(Compl. ¶ 89 (quoting ViSalus's May 4, 2012 press release)); (2) "ViSalus's market model and technology savvy is truly transforming the health and direct selling industries" (*id.* ¶ 69 (quoting statement of Mr. Goergen in ViSalus's Jan. 13, 2012 press release)); and (3) "First and foremost, nothing in Blyth's or ViSalus's fundamentals has changed" (*id.* ¶ 106 (quoting Sept. 26, 2012 conference call).)

All of these statements are inactionable "expressions of puffery and corporate optimism." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  Statements that are "too general to cause a reasonable investor to rely upon them" constitute "puffery" and cannot form the basis of a securities fraud claim.  *See ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009) (holding that generalizations regarding defendant's "business practices," such as statement that it "set the standard for best practices in risk management techniques," were inactionable puffery because they were "so general that a reasonable investor would not depend on [them] as a guarantee that [the defendant] would never take a step that might adversely affect its reputation").  Like the statements in *ECA, Local 134*, all three of the statements about ViSalus's business model are too general to induce reliance by a reasonable investor.  They are "precisely the type of 'puffery' that this and other circuits have consistently held to be inactionable." *ECA, Local 134 IBEW*, 553 F.3d at 206.[12]

   **(ii)**  **Statements about ViSalus's Expected Future Performance**

---

[12] Two statements made by Goergen during the September 26, 2012 conference call also constitute puffery.  During the call, Goergen stated that "ViSalus continues to achieve impressive growth" and that ViSalus "is a company that is growing every day."  (Compl. ¶ 116.)  Plaintiffs do not appear to contest the literal truth of these statements.  Instead, Plaintiff argues that those statements were misleading because Defendants knew but failed to disclose the various issues with ViSalus's business.  (Pls.' Opp'n [Doc. # 83] at 15 ("Based on what Georgen knew at the time that he made this statement, these comments – even if certain of them were literally true – were materially misleading.").)  Like the statements about ViSalus's business model, however, Goergen's statements during the conference call about ViSalus's growth are too general to induce reasonable reliance by an investor.  The other statements made during the conference call are addressed below.

Plaintiffs claim that several statements about ViSalus's expected future performance were misleading, including: (1) "We are planning for continued strong growth at ViSalus due to the strength of the products and programs that drove the momentum experienced in 2011 and their extensions in 2012" (Compl. ¶ 82); (2) the statements in Blyth's March 14, 2012 press release increasing the fiscal year 2012 earnings guidance (*id.* ¶ 82); (3) the statements in Blyth's May 4, 2012 press release increasing the fiscal year 2012 earnings guidance (*id.* ¶ 95); and (4) the statements in Blyth's August 3, 2012 press release increasing the fiscal year 2012 earnings guidance (*id.* ¶ 105). None of these statements is actionable.

The first statement—"[w]e are planning for continued strong growth at ViSalus"—is, like the statements in the previous section, nothing more than commercial puffery. It is simply too general to induce reliance by a reasonable investor. *See ECA, Local 134 IBEW*, 553 F.3d at 206.

The other three statements are protected under the PSLRA's "safe harbor" provision for "forward-looking statements," *i.e.*, "statement[s] containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, . . . or other financial items" or "statement[s] of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management." 15 U.S.C. § 78u–5(i)(1)(A) & (C).[13] The PSLRA provides that a person shall not be liable with respect to any forward-looking statement, if and to the extent that:

> (A) the forward-looking statement is--
>
> > (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
> >
> > (ii) immaterial; or

---

[13] These are two among several definitions of "forward-looking statements" set forth in the PSLRA. *See* 15 U.S.C. § 78u–5(i)(1).

(B) the plaintiff fails to prove that the forward-looking statement--

    (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

    (ii) if made by a business entity; was--

        (I) made by or with the approval of an executive officer of that entity; and

        (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u–5(c).  As the Second Circuit has stated, "[t]he safe harbor is written in the disjunctive; that is, a defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (emphasis in original).

    Plaintiffs argue that the statements in Blyth's earnings guidance press releases are not protected by the safe harbor because they "contain representations about the ***then-present state*** of ViSalus's growth."  (Pls.' Opp'n [Doc. # 83] at 22 (pointing out Blyth's statement "[i]ncreasing fiscal year 2012 earnings guidance 'principally ***due to growth at ViSalus***.'" (quoting Blyth's May 4, 2012 press release) (emphasis in original).)  Plaintiffs correctly point out that "[i]t is well recognized that even when an allegedly false statement has both a forward looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply." (*Id.* at 21 (quoting *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003)).  Plaintiffs' reliance on this principle, however, is misplaced.[14]  "[M]ixing projections with statements of present fact does not deprive

---

[14] The principle cited in *In re Nortel* and relied upon by Plaintiffs appears to emanate from the First Circuit's decision in *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1213 (1st Cir. 1996), *superseded by statute on other grounds as stated in Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762 (1st Cir. 2011).  There, the plaintiff alleged that the defendant's statement about the "adequacy" of its loss reserves

the former of protection under the bespeaks caution doctrine." *Shemian v. Research In Motion Ltd.*, No. 11-cv-4068, 2013 WL 1285779, at *24 (S.D.N.Y. Mar. 29, 2013) (finding that the defendant's forward-looking statements were protected by the "bespeaks caution" doctrine despite referencing the company's past and current success).   Rather, to the extent a statement contains both forward- and backward-looking aspects, the two must be severed and analyzed separately.   *See NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, No. 09-cv-1740, 2013 WL 1188050, at *18 (D. Conn. Mar. 23, 2013) (where plaintiff failed to sufficiently plead the falsity of statement of present fact, "the forward-looking portion of the statement is severable and eligible for safe-harbor protection if accompanied by meaningful cautionary language").   The only backward-looking aspect of the press releases highlighted by Plaintiffs is the reference to "growth at ViSalus."  Plaintiffs do not argue that the reference to growth at ViSalus was false, *i.e.*, that there had been no growth at ViSalus, and to the extent Plaintiffs argue that the reference was misleading because of the information it omitted, the phrase "growth at ViSalus" is too vague to induce reasonable reliance by an investor.

---

was false and misleading.  In analyzing whether the "bespeaks caution" doctrine applied to those statements, the First Circuit stated:

> The "adequacy" statement [about the defendant's loss reserves] has both a forward-looking aspect and an aspect that encompasses a representation of present fact.  In its forward-looking aspect, the statement suggests that DEC would take no further restructuring charges in the near-term future.  In its present-oriented aspect, it represents that as of March 21, 1994, DEC had no current intent to undertake activities that would require any such further restructuring charges to be taken.  To the extent that plaintiffs allege that the reserve "adequacy" statement encompasses the latter representation of present fact, and that such a representation was false or misleading when made, the surrounding cautionary language could not have rendered the statement immaterial as a matter of law.

*Id.* at 1213.  *Shaw* and its progeny thus hold that a statement of present or historical fact is not protected by the "bespeaks caution" doctrine because it contains a forward-looking aspect or is accompanied by a forward-looking statement.  The bespeaks caution doctrine is the judicially-created analogue to the PSLRA's safe harbor provision.  *See In re Gilat Satellite Networks, Ltd.*, No. 02-cv-1510, 2005 WL 2277476, at *11 (E.D.N.Y. Sept. 19, 2005) ("The PSLRA safe harbor is sufficiently similar to prior law that some courts and commentators have described it as 'codifying' the bespeaks caution doctrine"; also noting that "the Second Circuit has at times applied the bespeaks caution doctrine in conjunction with the PSLRA safe harbor without distinguishing between the two").  Although the two do not overlap completely, any distinctions between them do not affect the analysis here.

As for the forward-looking components of the earnings guidance press releases, I find that they qualify for the safe harbor.  Each of the statements about Blyth's earnings guidance is "identified" as a forward-looking statement, *i.e.*, they "project[ed] results into the future." *Slayton*, 604 F.3d at 769 ("[T]he facts and circumstances of the language used in a particular report will determine whether a statement is adequately identified as forward-looking."); (*see* Exs. E, F, G to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. ## 61-5, 61-6, 61-7] (using the words "expect," "forecast," and "planning," clearly indicating that the statements were about future outcomes, and stating that the press releases contained "forward-looking statements").) Further, the forward-looking statements were accompanied by meaningful cautionary statements in the press release, along with cautionary statements in Blyth's 10-K incorporated by reference. (*See* Exs. E, F, G to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. ## 61-5, 61-6, 61-7] (stating that "[a]ctual results could differ materially due to various factors, including . . . risks associated with our ability to recruit new independent sales consultants, . . . and other factors described . . . in the Company's most recently filed Annual Report on Form 10-K"); *see also* Ex. B (Blyth's Form 10-K filed March 14, 2012) [Doc. # 61-2] at 12 (stating under "Risk Factors" that "[t]his distribution system depends upon the successful recruitment, retention and motivation of a large number of independent consultants and distributors to offset frequent turnover"), 15 (stating that Blyth and its subsidiaries compete with other companies for promoters, and that the loss of a leading promoter or a substantial number of promoters could result in a decline in sales), 16 (stating "[w]e are subject to the risk that, in one or more markets, our network marketing program could be found not to be in compliance with applicable law or regulations," including regulations "directed at preventing fraudulent or deceptive schemes, often referred to as *'pyramid' or 'chain sales' schemes* . . . .") (emphasis added).)  These cautionary statements were

substantive and company-specific rather than mere boilerplate disclaimers, and they sufficiently warned of the risks that Plaintiffs allege were associated with ViSalus's business model. *See Slayton*, 604 F.3d at 772 (cautionary language must include substantive, company-specific warnings that relate to the materialized risk, not vague, blanket, or boilerplate disclaimers). The forward-looking statements in the press releases therefore qualify for the PSLRA's safe harbor and are not actionable.

### (iii)    Statements about ViSalus's Past Performance

Several of the statements that Plaintiffs allege were misleading are factual summaries of ViSalus's past performance accompanied by a brief explanation of the reasons for such performance. For example, the Complaint alleges that the following statement from Blyth's May 4, 2012 10-Q was misleading: "ViSalus's net sales increased $116.7 million, or 585% to $136.7 million from $20.0 million last year. This growth is a result of an increase in promoters to over 92,000 this year from over 16,000 last year, as well as increased demand for its products." (Compl. ¶ 94.) Plaintiffs do not allege that this and similar statements were literally untrue. Instead, they argue that the statements were misleading because Defendants failed to disclose underlying problems in ViSalus's business that would cause the performance to be short-lived. (*See, e.g.*, Compl. ¶ 88; *see also* Pls.' Opp'n [Doc. # 83] at 14 (stating that "such were misleading because, among other reasons, the purported sales growth at ViSalus was driven by the recruitment of promoters rather than genuine demand for ViSalus's actual products" and "when ViSalus could no longer increase or maintain the number of promoters . . . its sales began to decline").)

As Defendants correctly point out, however, "[d]isclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the

future." *In re Duane Reade Inc. Sec. Lit.*, No. 02-cv-6478, 2003 WL 22801416, at *6 (S.D.N.Y. Nov. 25, 2003) (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 401, n.3 (6th Cir. 1997)), *aff'd sub nom. Nadoff v. Duane Reade, Inc.*, 107 F. App'x 250 (2d Cir. 2004); *see also Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) ("It is well-established . . . that defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy." (internal quotation marks and brackets omitted)).    Indeed, the Second Circuit "easily rejected" the argument that a defendant's "statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-term unsustainability of its business model." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, at 38 (2d Cir. 2012) ("Whatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings.").  Plaintiffs' argument that disclosure of accurate historical data was misleading because it omitted ViSalus's alleged flaws fails for this reason. *Id.* at 38-39 ("As the Sixth Circuit succinctly observed, '[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data.'" (quoting *In re Sofamor Danek Group, Inc.*, 123 F.3d at 401 n.3)).  Moreover, insofar as Plaintiffs argue that Defendants' statements of past performance were misleading because they implied a positive future outcome, that argument was rejected in *Boca Raton* as well.  *Id.* at 38 ("To the extent that investors might impute a positive corporate outlook from omissions in earnings reports, we have explained that general expressions of corporate optimism are too indefinite to be actionable under the securities laws." (internal quotation marks omitted)).

　　Plaintiffs' effort to distinguish this line of authority is unpersuasive.  Plaintiffs argue that, unlike in *In re Duane Reade*, where the statements regarding past performance were simply

"self-laudatory," the statements regarding past performance in this case were "provided as a predicate for the Company's future performance."[15]  (Pls.' Opp'n [Doc. # 83] at 15 n.8 (citing allegations in the Complaint about Blyth's press releases that announced increases in Blyth's earnings guidance the September 26, 2012 conference call).)   Even accepting Plaintiffs' distinction as a legitimate one[16], Plaintiffs do not explain why this distinction is meaningful in the present context.   The fact remains that Plaintiffs do not contest the literal truth of the statements about past performance.  Instead, it appears that Plaintiffs argue that the statements about past performance, though literally true, rendered the statements about future performance misleading because the projected future performance was unlikely in light of the undisclosed flaws in ViSalus's business.  But if it is the statements about *future* performance that are alleged to be misleading, they must be analyzed as just that – statements about future performance.  As explained above, Defendants statements about future performance are not actionable because they are either puffery or protected under the PSLRA's safe harbor for forward-looking statements.

**b.    Blyth Had No Duty to Disclose the Allegedly Omitted Information in Light of Information It Had Already Disclosed**

Apart from the fact that most of the affirmative statements identified in the Complaint are not actionable, I find that Blyth had no duty to disclose the allegedly omitted information in light of the information that was disclosed during the class period.  The core of Plaintiffs' omissions claim is that various statements about ViSalus made throughout the class period—statements about past performance and earnings, the ViSalus business model, and future expected

---

[15] Plaintiffs also attempt to distinguish *In re Duane Reade* by arguing that "Defendants here knew at the time that they made these statements that they were engaged in a scheme to artificially and temporarily inflate the price of Blyth stock and the revenues and earnings at ViSalus."  (Pls.' Opp'n [Doc. # 83] at 15 n.8.)  This argument essentially repeats Plaintiffs' claim in Count III of the Complaint, which is addressed below.

[16] It is difficult for the Court to imagine a company's "self-laudatory" statement about past performance that could *not* be characterized as providing a "predicate" for future performance, particularly if "predicate" means, as Plaintiffs use it, simply being disclosed on the same day as the statements about future performance.

earnings—were misleading because Defendants knew but failed to disclose that: (1) the growth rate of ViSalus's sales was being driven by recruitment of "transient" promoters—who had been recruited by Sarnicola from other companies and who Sarnicola knew would stay at ViSalus only for a short term—rather than by sales to authentic customers who actually used or consumed the products themselves, and (2) the churn rate for promoters/customers was approximately 200%, and that, as a result, ViSalus's growth rate was "unsustainable." (*See, e.g.*, Compl. ¶ 88.)

Although Plaintiffs do not expressly frame their omissions theory in this fashion, the alleged omissions make plain that Plaintiffs' theory of liability is about risk, and more specifically, the failure to disclose the risk that ViSalus's growth would soon end. (*See, e.g.*, *id.* ¶ 69 ("The fact that ViSalus's sales were driven by the poaching of down-lines from other multi-level marketing companies is material to investors because it indicates . . . that *the Company's growth will be short-lived*.") (emphasis added); *id.* ¶ 88 (stating that certain statements were misleading because the "churn rate" of promoters rendered ViSalus's growth rate "unsustainable").) I find, however, that Defendants disclosed sufficient information about the source of ViSalus's growth, and the risks associated with its business model, to avoid incurring any duty to disclose the specific items Plaintiffs claim they concealed. Plaintiffs' omissions claim thus fails for failure to establish a duty to disclose.

To start, Blyth's statements about ViSalus's growth made clear that the growth was driven, at least in part, by an increase in promoters. For example, Blyth's 10-K filed on March 14, 2012, described increases in Blyth's sales and stated that "[t]his increase is attributed to ViSalus's net sales increase of $192.6 million, to $225.4 million from $32.8 million last year. *This growth is a result of an increase in promoters to over 59,000 this year from over 8,000 last year*, as well as increased demand for its products." (*Id.* ¶ 84 (emphasis added).) The 10-K also

stated that 2011 sales growth at ViSalus was "a result of a 371% increase in promoters on a year-over-year basis."  (*Id.*)  Blyth's 10-Q filings from the first and second quarters of 2012 make nearly identical statements.  (*See id.* ¶ 94 ("This growth is a *result of an increase in promoters* to over 92,000 this year from over 16,000 last year, as well as increased demand for its products.") (emphasis added); *id.* ¶ 104 ("This growth is a result of an increase in the number of promoters to over 114,000 as of June 30, 2012 from over 28,000 in the comparable prior year period.").  The 10-K also disclosed that Blyth's financial performance was dependent upon independent salespersons, *i.e.*, promoters:

> *We are dependent upon sales by independent consultants and distributors*.  A significant portion of our products are marketed and sold through the direct selling method of distribution, where products are primarily marketed and sold by independent consultants or distributors to consumers without the use of retail establishments. [17]

(Ex. B to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. # 61-2] at 12; *see also id.* at 13 ("[o]ur sales are directly tied to the levels of activity of our consultants and promoters, for many of whom this is a part–time working activity").)  Moreover, the 10-K stated that "[t]his distribution system depends upon the successful recruitment, retention and motivation of a large number of independent consultants and distributors *to offset frequent turnover*."  (*Id.* at 12 (emphasis added).)  According to the 10-K:

> The recruitment and retention of independent consultants and promoters depends on the competitive environment among direct selling companies and on the general labor market, unemployment levels, economic conditions, and demographic and cultural changes in the workforce. The motivation of our consultants and promoters depends, in large part, upon the effectiveness of our compensation and promotional programs, the competitiveness of our programs compared with other direct selling companies and the successful introduction of new products.

---

[17] Although the 10-K was filed by Blyth and not ViSalus, the words "we" and "our" as they appear in the 10-K refer to Blyth "together with its subsidiaries."  (Ex. B to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. # 61-2] at 4.) By the time of the 10-K filing, Blyth owned 73.5% of ViSalus.  (*Id.* at 5.)  Thus, "we" and "our" in the 10-K refer to both Blyth and ViSalus.

(*Id.*)  Blyth expressly stated in the 10-K that "we compete for independent sales consultants and promoters with other direct selling companies.  We may face increased competition from other companies, some of which may have substantially greater financial or other resources than those available to us."  (*Id.* at 15.)  The 10-K then stated that "[t]he loss of a leading consultant or promoter, together with the associated down line sales organization, or the loss of a significant number of consultants or promoters for any reason, could negatively impact sales of our products, impair our ability to attract new consultants or promoters and harm our financial condition and operating results."  (*Id.*)  Finally, the 10-K also disclosed that ViSalus might be considered a pyramid scheme in some markets, the very feature of its business the Complaint suggests was concealed from investors.  (*See id.* at 9 ("We remain subject to the risk that, in one or more markets, its network marketing program could be found not to be in compliance with applicable law or regulations," including regulations "directed at preventing fraudulent or deceptive schemes, often referred to as *'pyramid' or 'chain sales' schemes* . . . ." (emphasis added).)[18]  Thus, Blyth's 10-K disclosed to the market that promoters were important to ViSalus's and Blyth's success, that increases in sales were the result of increases in promoters, that the success of the business model depended on offsetting "frequent turnover" by recruiting, retaining, and motivating a "large number" of promoters, that Blyth and ViSalus competed with other companies for promoters, that the loss of a leading promoter or a significant number of promoters could negatively impact sales, and that ViSalus's "network marketing program," including recruitment of promoters to "offset frequent turnover," could be considered a "pyramid scheme" in some jurisdictions.

---

[18] *See also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F.Supp.2d 388, 396 (S.D.N.Y. 2005) (the court need not accept "the truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss.").

In addition, Blyth's press releases in March, May, and August announcing increased 2012 earnings guidance also disclosed risks related to promoter turnover. (Compl. ¶¶ 82, 95, 105.) While raising Blyth's expected earnings for 2012, the press releases disclosed that "[a]ctual results could differ materially due to various factors, including . . . risks associated with our ability to recruit new independent sales consultants, . . . and other factors described . . . in the Company's most recently filed Annual Report on Form 10-K." (*See* Exs. E, F, G to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. ## 61-5, 61-6, 61-7].) The press releases therefore disclosed that the realization of projected earnings was subject to the risk that ViSalus would not be as successful as expected in recruiting new promoters, among other things.

Finally, in its S-1 filed on August 16, 2012, ViSalus disclosed that increases in its sales "are driven primarily by our recruitment of new customers and retention of existing customers, rather than through increases in the average monthly expenditures of customers," and that it expected its "customer growth rate will decline over time as the size of our customer base increases, and as we achieve higher market penetration rates." (Ex. C to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. # 61-3] at 14.) The S-1 even stated that "[w]e anticipate that the growth rate of our independent promoter sales force will decline over time . . . . To the extent the growth rate of our independent promoter sales force slows, our business performance will become increasingly dependent on our ability to retain and motivate existing individual promoters." (*Id.* at 12.) Thus, the S-1 further disclosed the extent to which ViSalus's growth depended on recruiting new promoters and that it expected the growth rate of its promoters to decline over time.

These disclosures—in Blyth's 10-K and 10-Q filings, Blyth's press releases, and ViSalus's S-1 filing—fully informed the market that ViSalus was a multi-level marketing

company whose growth was driven, at least in part, by the addition of new promoters. Indeed, the 10-K expressly stated that Blyth was "dependent" upon sales by independent salespersons, and that the loss of a leading promoter or of a significant number of promoters could negatively impact sales. (*See* Ex. B to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. # 61-2] at 12-13.) The 10-K even disclosed the specific risk that promoters could be lost to competing direct-selling companies. (*Id.*) Further, the disclosures informed the market that a net decline in promoters was a real possibility, stating that Blyth was experiencing "frequent turnover," and that such turnover needed to be "offset" by the successful recruitment and retention of a "large" number of promoters. (*Id.* at 12.) The disclosure of "frequent turnover"—though it did not quantify the precise turnover rate or provide the raw data to calculate such a rate—was sufficient to inform investors that the turnover rate among promoters posed a risk to ViSalus's future performance, particularly when combined with the warning in the Blyth press releases that "[a]ctual results could differ materially due to various factors, including . . . risks associated with our ability to recruit new independent sales consultants." (*See, e.g.*, Ex. E to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. # 61-5].) These disclosures sufficiently informed the market about ViSalus's business model and the risks associated with that model.

In addition, to the extent Plaintiffs argue that Blyth was obligated to disclose the precise turnover rate among ViSalus's promoters—as opposed to stating that turnover was "frequent"—I find that argument to be without merit. First, Blyth was not obligated to disclose an item of information—such as the exact turnover rate—"simply because it may be relevant or of interest to a reasonable investor." *See Klienman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013). Rather, Blyth was only required to make disclosures "when necessary to make statements made, in light of the circumstances in which they are made, not misleading." *Id.* As just discussed, the

disclosure of "frequent turnover" was sufficient to put investors on notice during the class period that the degree to which promoters were leaving ViSalus posed a challenge for its continued growth. *Cf. Robbins v. Moore Med. Corp.*, 894 F. Supp. 661, 670 (S.D.N.Y. 1995) (no duty to disclose the amount of capital invested where it was disclosed that company was "under-capitalized"). Second, the Complaint fails to plead sufficient facts to allow the Court to draw the inference that a material difference exists between describing the turnover as "frequent" and stating that the turnover rate was 200%.[19] The 200% figure, by itself, says nothing of the number's significance, and the Complaint does not explain why a 200% turnover rate is "extraordinarily high" and why it would mean more to an investor than knowing that turnover was "frequent."[20] Indeed, it is worth emphasizing what the 200% figure does *not* mean. The 200% does not represent—as it might lead one to assume—that ViSalus was losing promoters at twice the rate it was gaining them. For example, despite having a churn rate calculated at

---

[19] The source for the 200% churn rate is an article about ViSalus from the Southern Investigative Reporting Foundation ("SIRF"). (Compl. ¶ 71; *see* Roddy Boyd, *The Infernal Machine: From Powder to Dust*, Southern Investigative Reporting Foundation (Nov. 26, 2012), *available at* http://sirf-online.org/2012/11/26/the-infernal-machine-from-powder-to-dust/ (last visited Mar. 27, 2014). The article states that SIRF "pieced together" the churn rates—197.1% for 2011 and 194.2% for 2012—from "annual filings" and ViSalus's S-1 filing. Although the article does not explain how the rate was calculated, it appears from an Excel spreadsheet linked to the article that the "churn rate" was calculated by dividing the number of promoters lost during a particular period by the average number of promoters during that period and multiplying by 100. The article provides no explanation, however, as to why the particular formula used is an appropriate one, and Plaintiffs' counsel was unable to offer any insight at oral argument. (*See* Compl. ¶ 71.)

[20] I note that, although the Complaint compares the ViSalus's turnover rate to the turnover rate at Herbalife, this comparison does not help. (Compl. ¶ 71 ("To put these figures in perspective, the churn rate for the multi-level marketing company Herbalife, which itself is considered high, is approximately 51%.").) The source for the allegation is, once again, the SIRF article, which states: "In contrast, Herbalife, whose churn rate has been a major headache for its company, has about a 51% turnover among its distributor ranks." Boyd, *The Infernal Machine*. The source for Plaintiffs' allegation does not say that the Herbalife turnover rate of 51% is "considered high"; it says only that it has been "a major headache for its company." A "headache" for one company may not be "considered high" as a general matter, i.e., as applied to other companies. It may very well be that, due to different business models, a 51% turnover rate may be a "headache" for one company but not another. Indeed, a frequent turnover rate among promoters would seem to be somewhat less of a problem for a company like ViSalus, which at least has the capacity to "establish a direct servicing relationship with the customer, fulfilling orders and delivering products directly to him or her." (*See* Ex. D to Aff. in Support of First Mot. to Dismiss (ViSalus S-1 filed Aug. 16, 2012) [Doc. # 61-3] at 41.) The statement about Herbalife's turnover rate is also unsourced. The Court is left to wonder how SIRF calculated the 51% turnover rate for Herbalife, whether it was calculated in the same way as ViSalus's "churn rate," how the author knows that the 51% turnover was a "major headache" for Herbalife, and what exactly the author meant by "headache." Thus, there are insufficient factual allegations to permit the Court to draw the inference that there is a material difference between a 200% churn rate and "frequent turnover."

197.1% in 2011, ViSalus began that year with 9,000 promoters and ended the year with 59,000 promoters.  (Compl. ¶ 71.)  And during the first six months of 2012, ViSalus increased its number of promoters by 55,000—from 59,000 to 114,000—despite a churn rate of 194.2%.  (*Id.*) In other words, a dramatic increase in promoters is possible, and actually happened, despite a 200% churn rate.  In the absence of further detail about how the 200% turnover rate would affect ViSalus's bottom line and when, the Complaint fails to plead a material difference between disclosing that turnover was "frequent" and disclosing that the turnover rate—according to one person's calculation—was almost 200%.  The Complaint simply contains insufficient information about the significance of the 200% figure to allow the Court to conclude that there is a "substantial likelihood that the disclosure of the [200% figure] would have been viewed by a reasonable investor as having significantly altered the 'total mix' of information available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).  Because I find that the 200% calculation was not material in light of the disclosure of "frequent turnover" and related information, Defendants were under no duty to disclose it at the time they made the relevant statements about ViSalus.[21]

Further, in light of the information that had been disclosed to the market, Goergen's and Barghaus's statements during the September 26, 2012 conference call about ViSalus's "churn rate" were not misleading.  During the call, in which Goergen and Barghaus discussed the

---

[21] Plaintiffs' claim that ViSalus's definition of "customer" in its S-1 was misleading fails for the same reason. Plaintiffs argue that that definition—which defined customer as "anyone who has purchased products from us at least once in the previous 12 months other than any purchaser who qualifies as an individual promoter on the measurement date"—was misleading because it included promoters who failed to achieve the status of "individual promoters," such as promoters who purchased one item during the designated period and dropped out of the program shortly thereafter, but did not disclose that the turnover rate was "extraordinarily high."  (Pls.' Opp'n [Doc. # 83] at 16-17.)  But Blyth had repeatedly disclosed that promoter turnover was "frequent" (*see, e.g.*, Ex. B to Aff. in Supp. Defs.' First Mot. to Dismiss [Doc. # 61-2] at 12), permitting the inference that the "customer" total included failed promoters.  ViSalus also disclosed the raw data used to calculate the 200% churn rate in the amended S-1 filed on August 29, 2012.  (*See* Compl. ¶ 71; *see also* Ex. D to Aff. in Supp. First Mot. to Dismiss [Doc. # 61-4] at 43, 45, 47.)

cancellation of the ViSalus IPO, Goergen was asked by an "analyst" whether the "very high promoter churn" at ViSalus, which the analyst calculated to be about 200%, was "one of the underwriters [sic] concerns" leading to the cancellation of the IPO.  (Compl. ¶ 116.)  Barghaus responded by saying, "[n]o. . . . I think in our experience in direct selling there's always a lot of promoter churn in direct selling companies."  (*Id.*)  Goergen then stated that "[t]hat's the nature of direct selling.  I don't know how you got your number because it can be calculated different ways . . . ."  (*Id.*)  The analyst then commented that "[i]t looks like 80% of sales to distributors are churning quite a lot," to which Barghaus responded, "[w]e're not going to get into ViSalus, I'm sorry, but you're inaccurate."  (*Id.*)

Plaintiffs do not argue that Barghaus's response of "no" to the analyst's first question was false; rather, they argue that the answers to the analyst's questions were "misleading and evasive" and that "the truth should have been revealed to the market" but that Defendants willfully chose to continue their fraud.  (Pls.' Opp'n [Doc. 83] at 16.)  This argument fails because the raw numbers used to calculate the 200% figure *had* been revealed to the market when ViSalus filed its amended S-1 on August 29, 2012.  (*See* Ex. D to Aff. in Supp. First Mot. to Dismiss [Doc. # 61-4] at 43, 45, 47.)  Once that information was disclosed, Defendants were under no duty to characterize that information in a particular way or disparage their own competitive position in the market.  *See In re Xerox Corp. Sec. Litig.*, 935 F. Supp. 2d 448, 488 n.8 (D. Conn. 2013) ("The plaintiffs argue that while the defendants disclosed that certain billing metrics were declining, they did not disclose the severity of those problems or how they would ultimately impact earnings. However, a company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its

stock."). Moreover, in response to the analyst's questions, Goergen simply questioned the method by which the analyst calculated the churn rate, and Goergen and Barghaus expressed the general opinion that high churn rate among promoters is common among direct selling companies; such an expression of opinion is not actionable, at least where, as here, the information underlying it is publicly available. *See, e.g.*, *In re Sanofi-Aventis Sec. Litig.*, 07-cv-10279, 2009 WL 3094957, at *5 (S.D.N.Y. Sept. 25, 2009) ("taken in context with the publicly available data, defendants' conclusions that the negative side effects were 'relatively mild and self-limiting,' and their other characterizations, amount to little more than expressions of opinion which are not actionable misstatements under Rule 10b–5").[22] Finally, it not clear what the analyst meant when he referred to "80% of sales to distributors are churning quite a lot." The Complaint does not attempt to provide an explanation, and thus fails to articulate why it was misleading for Barghaus to say that such a figure was "inaccurate."

### c.    The Complaint Fails to Plead Allegedly Undisclosed Information with Sufficient Particularity

Insofar as Plaintiffs' theory is that Defendants failed to disclose the particular *degree* of risk associated with ViSalus's business or, more specifically, that its demise was inevitable, the allegations in support of that theory fail to meet the particularity requirement for pleading securities fraud. Plaintiffs seem to allege that Sarnicola's recruitment strategy, combined with the lack of sales to genuine consumers and the 200% turnover rate among promoters, made it inevitable that ViSalus growth would be "short lived," and that Defendants knew this to be the case. (*See* Compl. ¶¶ 69, 71; Pls.' Opp'n [Doc. # 83] at 21 (arguing that statements about "the Company's growth rate – which was driven by increased numbers of customers/promoters" and

---

[22] Although a statement of opinion may still be actionable if the speaker "does not genuinely and reasonably believe it or if it is without a basis in fact," *In re Int'l Bus. Mach. Corporate Sec. Litig.*, 163 F.3d 102, 109 (2d Cir. 1998), Plaintiffs do not argue that the expression of opinion during the call was not genuine, nor are there sufficient facts pled in the Complaint to support such an argument.

statements about turnover "were misleading because they knew, but failed to disclose . . . that a substantial number of promoters would only be staying at ViSalus for a limited time . . . and would then be leaving and moving on to the next 'hot' company.").)  Because these allegations are too vague and conclusory to satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, I find that the Complaint fails to adequately plead an omission.

Plaintiffs' theory that ViSalus's sales growth would be "short-lived" is premised in part on the conclusory allegation that Sarnicola recruited "transient" promoters, *i.e.*, promoters who would stay at ViSalus only for a short time.  (*See* Compl. ¶¶ 69, 88.)  But the label "transient," which is based on the allegation that Sarnicola recruited organized down-lines from other companies using payments to attract them to ViSalus, (*see id.* ¶¶ 67-69), raises more questions than answers.  Conspicuously absent are any allegations about any particular promoters who were recruited, how many promoters were recruited, how large their down-lines were, how long they were with their former employer (and any previous employers), when they were recruited, how long they were expected to remain at ViSalus and what any such expectation was based on, whether they had entered into any contractual arrangement with ViSalus—such as contracts limiting their commitment to a particular length of time—and when (or even if) they actually left ViSalus.  Adding the allegation that the turnover rate among promoters was "extraordinarily high" does not help.  There are no allegations to suggest whether there was turnover among the "transient" promoters recruited by Sarnicola with payments, or whether the turnover was experienced by other groups of promoters.  At most, the facts alleged support the inference that the recruited promoters viewed ViSalus as a better opportunity than their existing companies and were attracted by Sarnicola's payments.  For example, it may be that the promoters who were recruited from MonaVie had been at MonaVie for several years and had no intention of leaving

ViSalus within a short period of time.  The same could be true of promoters recruited from Excell, Prospex, and Send Out Cards.  Thus, the allegation that promoters recruited by Sarnicola were "transient" is merely conclusory and is not supported by particular factual allegations.

Nor are there sufficient facts alleged to support the vague claim that Sarnicola—let alone Goergen and Barghaus, the two individual defendants against whom Count I is asserted—knew or should have known that the promoters who were driving ViSalus's growth were "transient" and would stay only for a short time, let alone that they knew when the promoters would leave. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them.").  Without more, the conclusory allegation that ViSalus's sales were "driven by the recruitment of *transient* promoters," and that Goergen and Barghaus knew this to be this case, is speculative at best and fails to satisfy the particularity requirement.  *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("A plaintiff cannot base securities fraud claims on speculation and conclusory allegations.").

Once the "transient" label is set aside, the Complaint simply alleges that Sarnicola recruited a substantial number of promoters—along with their down-lines—from other companies and made payments to promoters to accomplish this aggressive recruitment.  As the Complaint acknowledges, this only raised the *possibility* that some promoters would leave ViSalus at some unknown point in the future and result in a decline in sales.  (*Id.* ¶ 69 ("If these free-agent down-lines simply move to the highest-bidding multi-level marketing company, there is nothing stopping them from picking up and moving to the next 'hot' company at any time.")); *Iqbal*, 556 U.S. at 678 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully.").  Moreover, this risk was fully disclosed in Blyth's 10-K, 10-Q

forms, and press releases announcing increases in its 2012 earnings guidance, as discussed above.

Also key to Plaintiffs' theory is the allegation that ViSalus's sales growth was being driven by recruitment of promoters "*rather than* by sales to authentic customers who actually used or consumed the products themselves." (*See, e.g.*, Compl. ¶ 88 (emphasis added).) This allegation is based on the slightly more specific allegation that "the majority of sales are to persons who intend to profit by promoting the product, recruiting promoters, and/or referring customers," as opposed to "persons whose principal intentions are to use or consume the product themselves." (Compl. ¶ 65.) But the Complaint is devoid of any particular facts to support the vague allegation that "the majority" of sales were to promoters rather than consumers. For example, the Complaint does not specify what percentage of sales were to promoters as opposed to "bona fide" consumers and during what period(s) of time. *NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, 2013 WL 1188050, at *26-28 (D. Conn. 2013) (finding vague allegations about customer dissatisfaction without reference to a particular time period were too "vague" and "amorphous" to meet the particularity requirement). Indeed, the only facts marshaled to support allegation that ViSalus's growth was "driven by promoters – rather than by sales to bona fide customers" appears to be "the close correlation between the decline in promoters and the corresponding decline in sales during the most recent three quarters." (*See* Pls.' Opp'n [Doc. # 83] at 19; *see also* Compl. ¶ 70.) But that correlation supports, at most, the inference that fewer promoters results in fewer sales and more promoters results in more sales, an inference that (a) is not surprising given that the role of promoters is to market the products, and (2) was disclosed repeatedly during the class period. (*See, e.g.*, Compl. ¶ 94 (stating that reported growth during second quarter 2012 was "a result of an increase in promoters to over

92,000 this year from over 16,000 last year, as well as increased demand for its products"); *see also* Ex. B to Aff. in Supp. Defs.' First Mot. to Dismiss (Mar. 14, 2012 10-K) [Doc. # 61-1] at 12 ("We are dependent upon sales by our independent consultants and distributors.").)   In other words, the correlation reveals nothing about whether most of the sales were to promoters or to consumers.   Thus, the allegation that the "majority" of ViSalus sales were to promoters rather than "authentic" consumers is only conclusorily pleaded and is too vague to meet the particularity requirement of Rule 9(b) and the PSLRA.[23]

In the absence of the allegation that the "majority" of sales were to promoters, the allegation that sales were driven by recruitment of promoters *rather than* sales to consumers is purely conclusory and speculative.   Once that allegation is read out of the Complaint—as all conclusory allegations must be—what remains is the allegation that sales were "driven by" recruitment of promoters, which, as noted above, was sufficiently disclosed to the market and thus cannot be considered an omission.   (*See* Compl. ¶ 94 (stating that reported growth during second quarter 2012 was "a result of an increase in promoters to over 92,000 this year from over 16,000 last year, as well as increased demand for its products"); *id* ¶ 86 (quoting Blyth's 2011 Form 10-K, which stated "[t]his growth is a result of a 371% increase in promoters on a year-over-year basis"); *see also* Ex. B to Aff. in Supp. Defs.' First Mot. to Dismiss (Mar. 14, 2012 10-K) [Doc. # 61-2] at 12 ("We are dependent upon sales by our independent consultants and

---

[23] I also note that the allegation appears to be contradicted by data that was disclosed in an amendment to ViSalus's S-1, which stated:

> For the six months ended June 30, 2012, our direct sales to customers accounted for approximately 66% of our net sales as compared to approximately 60% for the six months ended June 30, 2011. The remaining 34% and 40% of sales, respectively, reflect sales to our promoters, which include products they resell to their retail customers.

(Ex. D to Aff. in Supp. First Mot. to Dismiss (Aug. 29, 2012 Amendment to S-1) [Doc. # 61-4] at 45.)   Accordingly, the Court need not accept the allegation as true.   *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F.Supp.2d 388, 396 (S.D.N.Y. 2005) (the court need not accept "the truth of factual allegations that are contradicted by documents properly considered on a motion to dismiss").

distributors."); *id.* at 13 ("Our sales are directly tied to the levels of activity of our consultants and promoters").)

Similarly, the allegation that ViSalus's sales growth rate was "unsustainable" because of the 200% promoter churn rate is also conclusory and unsupported by particularized factual allegations. As noted above, the 200% figure *does not* mean that ViSalus was losing promoters at twice the rate it was gaining them, and the Complaint does not make that allegation. Further, the notion that ViSalus's churn rate was incompatible with sustaining the existing level of sales is contradicted by Plaintiffs' own allegations. Despite a 2011 churn rate of 197.1%, sales in 2011 were substantially higher than the year before (Compl. ¶ 119.) Similarly, the churn rate in 2012 is alleged to be 194.2%, (*id.* ¶ 71); nevertheless, sales continued to rise in the first half of the year, reaching their peak in the second quarter of 2012. (*Id.* ¶ 119.) Although sales fell during the following three quarters, the sales totals in each of those quarters were higher than in any quarter in 2011. (*Id.*) Thus, the Complaint shows a long period of impressive growth and strong sales alongside churn rates of approximately 200%. This significantly undermines the allegation that the churn rate rendered ViSalus's growth unsustainable.

In any event, the Complaint fails to explain why it would have been impossible for ViSalus to sustain its sales levels, at least through 2012, despite the high turnover rate among promoters. For example, it may have been that the organized teams of promoters recruited by Sarnicola were driving ViSalus's sales growth and that they had no intention of leaving, and turnover instead was being experienced among other promoters. If that were the case, the organized down-lines recruited by Sarnicola could have continued to drive the growth that ViSalus experienced in 2011 and the first half of 2012. Rather than attempting to connect the turnover rate with the allegation that ViSalus's model was unsustainable, Plaintiffs merely argue

that "the unsustainability of ViSalus's business model is shown by the continued decreases in ViSalus's sales following their peak in the second quarter of 2012." (Pls.' Opp'n [Doc. # 83] at 18.) That argument is unpersuasive. The allegation that the model is inherently "unsustainable" simply does not follow from a decline in sales over three quarters – any number of factors could have contributed to the decline. Nor is the Court persuaded by Plaintiffs' argument that the "inability to maintain the exponential growth rate was a mathematical certainty." (*Id.* at 18.) That argument is based on a series of assumptions about "pyramid schemes" in general that have not been alleged with particularity to apply to ViSalus's business, such as the assumption that "a promoter's success depend[s] on recruiting three persons" and that the *only* purchasers of ViSalus products were promoters. (*Id.*)

Moreover, even assuming that the growth was unsustainable—or that ViSalus's demise was a mathematical certainty—the Complaint does not plead sufficient facts to support the inference that Defendants knew or should have known, at the time they made statements about ViSalus, that the growth was unsustainable, let alone that they knew or should have known *when* sales would start to fall. *Novak*, 216 F.3d at 309 ("Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures . . . do not suffice to make out a claim of securities fraud." (internal citation omitted)). The Complaint provides no detail about why, given the particulars of ViSalus's business, sales should have been expected to decline in the third quarter of 2012 as opposed to 2013, 2014, or 2015. Instead, the Complaint simply states that Defendants "knew" that future results would be different at some unspecified time in the future, and points to declining sales in the latter half of 2012 to support this point. (*See, e.g.*, Pls.' Opp'n [Doc. # 83] at 18 n.10 ("Defendants knew that

41

ViSalus would **contract** in the near term (as it has).") (emphasis in original).)  This allegation falls well short of the particularity requirement for pleading securities fraud and amounts to nothing more than an allegation of "fraud by hindsight."  *See Stevelman v. Alias Research Inc.*, 174 F.3d 79, 85 (2d Cir. 1999) ("Management's optimism that is shown only after the fact to have been unwarranted does not, by itself, give rise to an inference of fraud."); *Vining v. Oppenheimer Holdings Inc.*, No. 08-cv-4435, 2010 WL 3825722, at *6 (S.D.N.Y. Sept. 29, 2010) (stating that the Second Circuit has "consistently rejected" claims based on "fraud by hindsight").

The Complaint also claims that Defendants omitted: (1) that ViSalus was experiencing a decline in sales beginning in June 2012, and (2) that it was experiencing product and supply chain problems during the same period.  (*See, e.g.*, Compl. ¶ 106.)  At oral argument, Plaintiffs acknowledged that those allegations merely "add color" to the Complaint and that their central theory of fraud relates to ViSalus's alleged "illusory" growth and its high promoter turnover.  It appears, therefore, that Plaintiffs have abandoned any claims based on declining sales and supply chain issues.  To the extent they have not been abandoned, I find that they nonetheless fail to state a claim of materially misleading omission.

With respect to declining sales, there is no interim duty to report sales results between quarterly disclosures.  *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *5 ("there is no obligation to release interim sales data prior to a quarter's end").  Even if there were, the Complaint fails to allege slowing sales with particularity – there are no allegations as to how much sales had slowed or why, and thus no way for the Court even to begin to assess whether the information was material.  *Cf. NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, 09-cv-1740, 2013 WL 1188050, at *26 (D. Conn. Mar. 23, 2013) (finding allegations of customer

dissatisfaction too vague where complaint only referred to "some" customers" and stated that "many" attempted to cancel contracts); *In re Trex Co., Inc. Sec. Litig.*, 212 F. Supp. 2d 596, 611 (W.D. Va. 2002) (dismissing allegations of improper revenue recognition where plaintiffs failed to identify "the amount or percentage of revenues" at issue). With respect to product and supply chain problems, the Complaint provides no quantitative information about how many (or what percentage) of customers were experiencing product issues, how many customers complained about the taste of a meal-replacement shake, what percentage of ViSalus's sales were affected by the supply chain issues, or to what extent, if any, the product or supply chain problems affected ViSalus's revenue. Thus, the allegations are too vague and lacking in particularity to support the inference that the information regarding product and supply chain problems was material. *Cf. Rombach v. Chang*, 355 F.3d 164, 173-74 (2d Cir. 2004) (although plaintiffs had identified "a handful of incidents in which Family Golf did not pay creditors, did not execute construction or operational projects, and had problems integrating newly acquired properties into their national system, [] these allegations do not support an inference that the company was in trouble. . . . the allegations in the complaint are consistent with unremarkable circumstances short of financial peril or instability").[24]

### d. The Complaint Fails to Plead a Duty to Disclose Under Item 303

Finally, Plaintiffs argue that Defendants had a duty to disclose the allegedly omitted information under Item 303 of Regulation S-K, which requires an issuer to "[d]escribe [in the

_____

[24] Further, Defendants made disclosures informing the market of the risks associated with ViSalus's products and supply chain. Blyth's March 14, 2012 10-K, for example, disclosed that "profitability may be affected by shortages" and that results could be significantly affected by opinions concerning "the quality of our products and ingredients." (Ex. B to Aff. in Support of Defs.' First Mot. to Dismiss [Doc. # 61-2] at 13, 14; *see also* Ex. C (ViSalus August 16, 2012 S-1) [Doc. # 61-3] at 21 ("[s]ince we rely on independent third parties for the manufacture and supply of our products, if these third parties fail to reliably supply products to us at the required levels of quality, then our business, financial condition, and results of operations would be harmed"); *id.* at 19 (stating that "[o]ur profitability may be affected by shortages" and that revenues could be adversely impacted by opinions concerning, among other things, the "taste of our products and ingredients").)

non-financial portions of their Forms 10-K and 10-Q] any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."   17 CFR § 229.303. Item 303 "imposes a disclosure duty where a trend, demand, commitment, event or uncertainty is both [1] presently known to management, and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations."   *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114 (2d Cir. 2012) (internal quotation marks and citation omitted). Plaintiffs allege that Blyth failed to disclose: (i) the Company's trend of slowing sales growth beginning in June 2012; (ii) the Company's trend of decreasing sales beginning in June 2012; (iii) the uncertainties concerning the Company's supply problems; (iv) the uncertainties surrounding the exceedingly high promoter churn rate; (v) the uncertainties surrounding the Company's practice of recruiting transient teams of promoters; and (vi) the trend of decreasing numbers of new promoters.[25]   (*See, e.g*, Compl. ¶ 134.)  With respect to the first two items, a two-month decline in sales (or less – the Complaint does not say when in June sales began to slow) is not a "trend" that must be disclosed.  *Blackmoss Invs. Inc. v. ACA Capital Holdings, Inc.*, No. 07-cv-10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303."); *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08-cv-9203, 2010 WL 1372709, at

---

[25] I note that, "[a]lthough the SEC has concluded that when companies violate Item 303 of SEC Regulation S–K, they often violate § 10(b) as well . . . violations of Item 303 do not necessarily create a private cause of action."  *In re Quintel Entertainment Inc. Securities Litigation*, 72 F. Supp. 2d 283, 293 (S.D.N.Y. 1999).  As the court stated in *In re Canandaigua Sec. Lit.*, 944 F. Supp. 1202, 1209 n.4 (S.D.N.Y. 1996), "[i]t is far from certain that the requirement that there be a duty to disclose under Rule 10b–5 may be satisfied by importing the disclosure duties from S–K 303," and some authority is to the contrary.  *See Oran v. Stafford*, 226 F.3d 275, 288 (3d Cir. 2000) (holding that "violation of SK–303's reporting requirements does not automatically give rise to a material omission under Rule 10b–5"); *Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 607-08 (N.D.Cal. 1991) ("Thus, demonstration of a violation of the disclosure requirements of Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b–5. Such a duty to disclose must be separately shown.").  I need not reach this issue, however, because I find that the Complaint does not plead a violation of Item 303.

*6 (S.D.N.Y. Mar. 31, 2010) ("Item 303 does not require companies to disclose isolated occurrences that affect their financial performance"); *see also In re Turkcell Iletisim Hizmetler, A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (a 9% drop in operating income for one-quarter did not constitute a "trend" under Item 303). Second, the allegations in the Complaint are too vague to allow the Court to draw the inference that the alleged slowing of sales beginning in June 2012 was material.[26] (*See* Compl. ¶¶ 63, 64 (citing confidential witness and alleging that sales "began to slow beginning in June 2012," that certain "speakers" at a July 2012 conference discussed "how the growth of ViSalus's sales was slowing" and "how sales by certain subsets of lower-level promoters were flat or declining").) Third, the Complaint fails to plead factual allegations sufficient to support the inference that Defendants knew of any trend[27]; the general reference to "reports" and "speakers" at a conference, without more, are insufficient. *See also Novak*, 216 F.3d at 309 ("Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *NECA-IBEW Health & Welfare Fund*, 2013 WL 1188050, at *34 (stating that "vague and generalized allegations of the mere existence of reports, particularly absent any assertion that any Defendant actually saw or was aware of them" fails to establish knowledge of contrary facts).

The third item—uncertainties concerning ViSalus's supply problems—suffers from similar shortcomings. The Complaint provides no information about what share of ViSalus's product was affected, how long the supply issues could be expected to last and whether they could be resolved in the short term, or what impact the issues would have on ViSalus's revenues.

---

[26] *Compare Panther Parnters*, 681 F.3d at 121 (holding that Item 303 omission claim became sufficiently pleaded only when plaintiff alleged that chip failures affected clients that accounted for 72% of the defendant's revenues and pleaded sufficient facts to support the inference that *all* defective chips shipped to that client would have to be replaced).

[27] *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 118 (S.D.N.Y. 2010) ("Defendants' actual knowledge of the trend is an essential allegation for purposes of a claim based on Item 303." (internal quotation marks omitted)).

The Complaint therefore fails to provide sufficient information to allow the Court to infer that the issues could reasonably be expected to have a material impact on future revenue. (Compl. ¶¶ 76-78.) Moreover, the Complaint is devoid of any particularized allegations demonstrating that Defendants were aware of the alleged supply issues.

With respect to the uncertainties surrounding the "exceedingly high" promoter churn rate, any uncertainty was, as discussed, sufficiently disclosed. To reiterate, Blyth's Form 10-K and Forms 10-Q disclosed that sales were dependent upon sales by promoters, that promoter turnover was "frequent," and that the frequent turnover needed to be "offset" by the successful recruitment and retention of a "large number" of promoters. This was sufficient to meet Blyth's disclosure duty under Item 303. With respect to the alleged uncertainties surrounding the Sarnicola's practice of recruiting "transient" teams of promoters, the Complaint fails, as explained above, to allege with particularity that teams of promoters were "transient," and thus that there were any special uncertainties—aside from the disclosed risk of frequent turnover— associated with Sarnicola's recruitment practices. Finally, with respect to the alleged "trend" of declining numbers of promoters, that allegation suffers from the same problems as the alleged "trend" of declining sales. Accordingly, the Complaint fails to establish a duty to disclose under Item 303.

### 2.    Loss Causation

Plaintiffs' omission claim fails for the additional reason that the Complaint does not adequately plead loss causation. Loss causation "is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). To establish this causal link, a plaintiff must allege that the loss was "foreseeable" and "caused by the

materialization of the concealed risk." *See id.* at 173. Thus, to plead loss causation, "a plaintiff must allege that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered, *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* (emphasis in original) (internal citation, quotation marks, and ellipses omitted). Loss causation is not subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. Nonetheless, consistent with *Iqbal*, a complaint "must allege facts that support an inference that [the defendant's] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Id.* at 175.

As an initial matter, "[i]t is not enough to allege that a defendant's misrepresentations and omissions induced a 'purchase-time value disparity' between the price paid for a security and its 'true investment quality.'" *Id.* at 174 (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 198 (2d Cir. 2003)). "Such an allegation—which is nothing more than a paraphrased allegation of transaction causation—explains why a particular investment was made, but does not speak to the relationship between the fraud and the loss of the investment." *Id.* (internal quotation marks omitted). As a result, the allegation that Defendants' acts caused Plaintiffs "to purchase Blyth shares at artificially inflated prices" is insufficient to plead loss causation. (*See* Compl. ¶¶ 27, 28, 136, 137, 144, 147, 151, 155.)

The Complaint otherwise fails to plead sufficient facts to support the inference that a causal link exists between the economic harm suffered—the drop in Blyth's share price—and the alleged omissions. "Loss causation may be adequately pleaded by alleging either a corrective disclosure of a previously undisclosed truth that causes a decline in the stock price or the

materialization of a concealed risk that causes a stock price decline." *In re Am. Intern. Grp., Inc., 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 534 (S.D.N.Y. 2010).  The Complaint appears to allege loss causation under both theories – in each case inadequately.

First, with respect to a "corrective disclosure" theory, Plaintiffs allege that, "at the end of the Class Period, when Defendants' prior misrepresentations *became known to the public*, the price of Blyth shares fell precipitously, as the prior artificial inflation came out of the price of the shares." (Compl. ¶ 136 (emphasis added); *see also id.* ¶ 137 ("These actions caused Blyth shares to trade at artificially inflated prices throughout the Class Period and *until the truth was revealed to the market*.") (emphasis added).)  The Complaint then mentions three disclosures: (1) the September 26, 2012 announcement that Blyth was cancelling the ViSalus IPO and the subsequent conference call (*id.* ¶ 138), (2) the November 2, 2012 announcement at Blyth's National Success Training event that third quarter 2012 sales were "only" $169.9 million (*id.* ¶ 139), and (3) the November 6, 2012 press release showing that the number of ViSalus promoters had fallen from the previous quarter (*id.* ¶ 140).  None of the three disclosures constituted "corrective disclosures," however, because none disclosed the allegedly omitted facts upon which Plaintiffs base their fraud claim – that Sarnicola recruited teams of "transient" promoters knowing they would only be at ViSalus for a "short term," (*id.* ¶ 145), that sales to such promoters rather than customers drove ViSalus's growth, that ViSalus experienced an "extraordinarily high" promoter churn rate, and that, as a result, ViSalus's growth was "illusory." *Janbay v. Canadian Solar, Inc.*, No. 10-cv-4430, 2012 WL 1080306, at *15 (S.D.N.Y. Mar. 30, 2012) ("The announcement of a delay in the reporting of CSI's 1Q 2010 financials does not establish loss causation because it fails to reveal the truth that CSI had engaged in sham sales, secret consignments, or any wrongdoing asserted in the Complaint.").  To the contrary, the

disclosures simply revealed the ViSalus IPO would not go forward and that ViSalus experienced a slight decline in sales and promoters during the third of quarter 2012.[28] *Cf. In re Initial Public Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) (where "an event–in this case, a failure to meet earnings forecasts or a statement foreshadowing such a failure–disabused the market of that belief does not mean that the event disclosed the alleged scheme to the market.   In other words, a failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect.").   Plaintiffs' conclusory allegations that the disclosures made it "apparent to investors that many of Defendants' Class Period statements had been false or misleading" are insufficient.  (Compl. ¶¶ 139, 140.)  The Complaint does not even attempt to explain how a slight decline in sales and promoter numbers over one quarter make it "apparent" that "many" of Defendants' prior statements had been false or misleading.  Because the disclosures upon which Plaintiffs rely do not actually disclose the alleged fraud, the Complaint fails to plead loss causation under a "corrective disclosure" theory.

Second, with respect to a "materialization of a concealed risk" theory, the Complaint simply states that "the subjects of the fraudulent and misleading statements and the fraudulent or deceptive scheme were the cause of the actual loss suffered."  (*Id.* ¶ 141.)  This allegation is nothing more than a "threadbare recital" of the loss causation standard articulated in *Lentell*.  *See* 396 F.3d at 173 (to plead loss causation, "a plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered").  Such "threadbare recitals" of an element of a cause of action are insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  At best, the factual allegations in the Complaint support the inference that some drop in Blyth's share price was causally connected with the three above-mentioned disclosures upon

---

[28] With respect to the September 26, 2012 conference call, Plaintiffs do not argue that the statements made by Goergen and Barghaus were "corrective."  To the contrary, they allege that statements during the call continued to conceal the truth.  (Pls.' Opp'n [Doc. 83] at 16.)

which Plaintiffs rely – none of which, as noted, disclosed the information related to the recruitment of transient promoters.  There are no factual allegations, however, to support the inference that the results reported in those disclosures—that is, the decline in sales and promoters—were caused by the materialization of an alleged concealed risk.  In particular, there is nothing in the Complaint to suggest that the decline in sales and promoters—and the subsequent drop in Blyth's stock price—was caused by the materialization of a *concealed* risk as opposed to a *disclosed* risk.  The concealed risk, according to Plaintiffs, was that, because of ViSalus's reliance on recruitment of and sales to "transient" promoters (*i.e.*, promoters that Defendants knew would leave) and the "extraordinarily high" churn rate among promoters, ViSalus's growth rate was "illusory" and "unsustainable."   The disclosed risk, as discussed above, was that: (1) sales depended on the number of promoters, (2) Blyth and ViSalus competed with other companies for promoters, (3) the loss of a major promoter or a substantial number of promoters could cause a decline in sales, (4) promoter turnover was "frequent," and (5) as a result, ViSalus's success was dependent upon offsetting "frequent turnover" with the successful recruitment of promoters.  Further, the raw numbers forming the basis of the "churn rate" had, by this time, been disclosed.  (*See* Compl. ¶ 71; *see also* Ex. D to Aff. in Supp. First Mot. to Dismiss (August 29, 2012 Amendment to ViSalus's S-1) [Doc. # 61-4] at 43, 45, 47).)  The Complaint does not even attempt to explain why the materialization of the concealed risk, not the disclosed risk, caused the decline in sales and promoters, and in turn, the decline in Blyth's share price.  Accordingly, Plaintiffs' conclusory allegation in support of its "materialization of a concealed risk" theory appears to be nothing more than speculation, which is insufficient under *Iqbal*.

Thus, in addition to failing to plead a "corrective disclosure," the Complaint fails to adequately allege that a "materialization of the concealed risk" caused the decline in Blyth's stock price. *See In re American Intern. Group, Inc.*, 741 F. Supp. 2d at 534. Because the Complaint fails to sufficiently plead two necessary elements of a § 10(b) and Rule 10b–5(b) claim—a materially misleading omission and loss causation—Count I is DISMISSED.

### B.    Count III – Deceptive Scheme Under § 10(b) and Rules 10b–5(a) and (c)

Count III alleges that Goergen, Sarnicola, and ViSalus engaged in a deceptive scheme in violation of § 10(b) of the Exchange Act and Rules 10b–5(a) and (c). Subsections (a) and (c) of Rule 10b-5 make it unlawful for any person, directly or indirectly, and in connection with the purchase or sale of any security, "[t]o employ any device, scheme, or artifice to defraud," or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b–5(a) and (c). Rules 10b-5(a) and (c) impose what is commonly referred to as "fraudulent or deceptive scheme" liability.

To plead a violation of Rule 10b–5(a) and (c), a plaintiff must allege facts showing that the defendant: (1) committed a deceptive or manipulative act; (2) with scienter, *i.e.*, a wrongful state of mind; (3) in connection with the purchase or sale of a security; and (4) that defendant's actions caused the plaintiff's injuries. *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 1-cv-4209, 2013 WL 1223844, at *11 (S.D.N.Y. Mar. 27, 2013). Claims premised on a fraudulent or deceptive scheme, unlike actionable misstatements or omissions, do not require compliance with the PSLRA's pleading requirements. *Id.* Such claims do sound in fraud, however, and Plaintiffs must meet the strict pleading requirements of Rule 9(b). *Id.* "To meet the Rule 9(b) requirements for a claim of market manipulation, a plaintiff must allege specific

facts regarding what manipulative acts were performed, which defendant(s) performed them, when they were performed, and what the effect of the alleged scheme was on the securities." *Id.*

For the reasons discussed below, I find that the Complaint fails to adequately plead: (a) any deceptive or manipulative act, or (b) loss causation.

### 1. Deceptive or Manipulative Act

Plaintiffs' theory of deceptive scheme liability is summarized in paragraph 145 of the Complaint:

> Motivated to maximize either (a) the price Blyth would have to pay for ViSalus or (b) the amount that could be raised in ViSalus's planned IPO, defendants Sarnicola, Goergen, and ViSalus committed deceptive or manipulative acts that affected the market price of Blyth's common shares. Defendant Sarnicola recruited teams of promoters from other multi-level marketing companies – knowing that these teams of promoters would only be at ViSalus for a short term – for the purpose of driving up ViSalus's EBITDA over the short term, which would maximize the pecuniary gain he and the other ViSalus owners would receive in a fourth closing to Blyth or, alternatively, an IPO to the investing public.

(Compl. ¶ 145.) Plaintiffs' theory fails to meet the pleading requirements of Rule 9(b), and even assuming it did, the Complaint fails to state a claim upon which relief may be granted because the alleged scheme is not inherently deceptive.

First, the Complaint offers only conclusory allegations regarding any deceptive and manipulative act rather than the "specific facts" necessary to satisfy Rule 9(b). The key to Plaintiffs' deceptive scheme theory is that Sarnicola recruited teams of promoters "*knowing* that these teams of promoters would only be at ViSalus for a short term." (*Id.*) But the facts pleaded in the Complaint do not support this conclusory allegation. There are no specific factual allegations elucidating how Sarnicola knew that promoters would stay at ViSalus for only a short term, how long that term was, or what number (or percentage) of promoters would leave. Nor are there specific factual allegations about when Sarnicola recruited these large teams of

promoters; there is only the vague allegation that he did so at some point between the third and fourth phase of the ViSalus acquisition. *Taylor v. Westor Capital Group*, 943 F. Supp. 2d 397, 404 (S.D.N.Y. 2013) (dismissing deceptive scheme claim in part because the complaint contained "virtually no details about [the] alleged scheme: it is impossible to tell what manipulative acts were performed, . . . [and] when they were performed"). To the extent Plaintiffs' theory of a scheme incorporates the allegations in paragraphs 67-69 of the Complaint, the key allegations in those paragraphs are deficient for the reasons explained above.

Stripped of its conclusory characacterizations, the Complaint simply alleges that: (1) Sarnicola recruited large teams of promoters from other companies, (2) in some cases, he was able to induce the promoters to join ViSalus with payments, and (3) this practice carried with it the possibility that the newly-recruited promoters would leave for another company at some unknown time in the future. (*See* Compl. ¶ 68-69.) At most, these factual allegations suggest that Sarnicola knew there was a *risk* that the newly-recruited teams of promoters would be drawn away by other companies willing to pay them more. But recruiting a large sales force with the knowledge that some or all of its members might leave at some undefined point in the future— although it may carry some level of risk and may even be a poor strategy for long-term growth— is not a deceptive or manipulative act. *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977) ("We thus adhere to the position that Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.") (internal quotation marks and citations omitted).

Even assuming that Sarnicola *did* know for certain that large teams of promoters would leave ViSalus in the near future, recruiting large teams of promoters to boost sales in the short term is not itself inherently deceptive. *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011)

("Scheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement."); *see also SEC v. Lee*, 720 F. Supp. 2d 305, 334 (S.D.N.Y. 2010) (finding that SEC stated a claim for scheme liability where defendants colluded to "u-turn" commodity prices between brokerage houses, which consistent of one broker sending his price to a second broker, who would then report the price back as a purportedly "independent" quote; this practice deceived bank's market risk division into believing that the quotes originating with one broker, and "u-turned" by the other, were independent quotes). Rather, at most, it is merely conduct that could *become* deceptive only through misleading statements in Blyth's public filings. Such conduct does not create liability under subsections (a) and (c) of Rule 10–b5. *See Kelly*, 817 F. Supp. 2d at 344 (finding no liability under Rule 10b–5(a) and (c) because the alleged practice, inflating advertising revenue reported in public filings, was "not about conduct that is itself deceptive—it [was] about conduct that *became* deceptive only through [the defendant's] misstatements in its public filings"). To the extent Plaintiffs are claiming that Sarnicola's recruiting activity should have been disclosed to investors to make statements made by Blyth not materially misleading, that simply repeats the omissions claim in Count I—which I have dismissed for the reasons stated above—and does not independently state a cause of action for deceptive or manipulative acts under Rules 10b-5(a) or (c). *Cf. id.*

### 2.    Loss Causation

As with an omissions claim, loss causation is also a necessary element of a deceptive scheme claim. *See* 15 U.S.S. § 78u–4(b)(4) ("In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."); *see also*

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 338 (2005) ("A private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss."). As shown above, Plaintiff has failed to plead sufficient facts to permit the Court to draw the inference that the decline in ViSalus's promoter and sales figures—and by extension, the decline in Blyth's stock price—was caused by the alleged deceptive scheme.

Because I find that the Complaint fails to adequately plead any deceptive act and loss causation—three necessary elements of a deceptive scheme claim—Count III is DISMISSED.

### C.      Counts II and IV – Control Person Liability under § 20(A)

Counts II and IV of the Complaint assert "controlling persons" claims against Goergen, Barghaus, and Sarnicola under § 20(A). The claims in Counts II and IV are predicated upon Plaintiffs' claims in Counts I and III. Because I have found that Plaintiff failed to adequately plead a violation under Rule 10b-5, Counts II and IV are DISMISSED as well. *Bui v. Indus. Enters. of Am., Inc.*, 594 F. Supp. 2d 364, 372 (S.D.N.Y. 2009) ("To the extent that Plaintiffs have failed to sufficiently allege predicate violations of § 10(b), the control person claims under § 20(a) of the Exchange Act also fail.").

### D.      Leave to Amend

In their opposition brief, Plaintiffs request leave to amend the Complaint if the motion to dismiss is granted. "It is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) [of the Federal Rules of Civil Procedure] is within the discretion of the trial court . . . and a district court may therefore properly deny leave to amend where a plaintiff has already been given one opportunity to plead fraud with greater specificity." *Endovasc, Ltd. v. J.P. Turner & Co., LLC*, 169 F. App'x 655, 657-58 (2d Cir. 2006).

Here, Plaintiffs do not inform the Court what additional factual material they will allege in support of their claims.  The Court presumes that if Plaintiffs were in possession of additional information, they would have informed the Court.  Moreover, after Defendants filed their first motion to dismiss, the Court entered the following order:

> Defendants have filed a [Doc. # 58] Motion to Dismiss. On or before June 24, 2013, Lead Plaintiff may file a second amended complaint in which it pleads as many facts as possible, consistent with Rule 11, to address the alleged defects discussed in Defendants' memorandum of law. *The Court will not allow further amendments after June 24, 2013*.  If Lead Plaintiff chooses to amend and if Defendants renew their motion to dismiss, Defendants may incorporate by reference any prior briefing.

[Doc. # 62] (emphasis added).  Thus, Plaintiffs were given an opportunity to amend their Complaint in light of Defendants' arguments in the first motion to dismiss, and specifically informed they would not be given a further opportunity.  Plaintiffs filed an amended complaint in response to the Order.  That amended complaint is the complaint that is subject to this decision.  Because it does not appear that Plaintiff possesses further factual material in support of its claims, and because the Court already gave Plaintiffs a chance to amend—and stated that it would not allow further amendments—the request to file an amended complaint is DENIED.

## IV.    CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED and the request for leave to file an amended complaint is DENIED.   The Clerk is directed to enter judgment for Defendants and to close this case.

IT IS SO ORDERED.

                  /s/  _____
                  Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              March 31, 2014